**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 05-359-01, -2, -3 (RMU)** |
| | : | |
| **DOUGLAS JEMAL, et al** | : | |

**GOVERNMENT'S CONSOLIDATED OPPOSITION TO
1) DEFENDANTS' [DOUGLAS JEMAL AND NORMAN D. JEMAL]
MOTION TO QUASH, AND
2) DEFENDANT BLAKE ESHERICK'S MOTION TO SUPPRESS
EVIDENCE OBTAINED BY ILLEGAL SEARCH**

The United States, through its attorney, the United States Attorney for the District of

Columbia, respectfully opposes  1) Defendants' [Douglas Jemal and Norman D. Jemal] Motion

to Quash (related to the February 23, 2005 Search Warrant for the offices of Douglas

Development Corporation) and 2) Defendant Blake Esherick's Motion to Suppress Evidence

Obtained by Illegal Search (related to the February 23, 2005 Search Warrant for the residence at

6001 Nevada Avenue, N.W., Washington, D.C.).

In support of this opposition, the Government respectfully submits:

I.  THE WARRANTS AND THEIR EXECUTION WERE PROPER
IN ALL PERTINENT RESPECTS

A. Introduction

On February 23, 2005, search warrants were executed at two locations:  the business

offices of Douglas Development Corporation (DDC) at 702 H Street, N.W., Washington, D.C.

(the DDC warrant) and the home of defendant Blake Esherick, a DDC employee, at 6001 Nevada

Avenue, N.W., Washington, DC (the Nevada Avenue warrant).  The warrants had been issued

the prior day by Magistrate Judge Alan Kay of this Court.

Defendants argue, variously, that:  1) there was no probable cause to believe crimes were

committed;[1] 2) no nexus existed between the evidence sought and places to be searched; 3) the information was stale; 4) the "command section" was overbroad; 5) the items to be seized were not defined with requisite particularity; and 6) the "good faith exception" does not apply.

Defendants' contentions to the contrary, the affidavits and warrants are free from defect in all material respects. They reflect precision, care and detail, and present a powerful case that crimes described were committed. The affidavits amply support the determination of Magistrate Judge Kay that a warrant should be issued to search specific locations for certain evidence. Moreover and in any event, the seizing agents appropriately relied in good faith on the decision by Magistrate Judge Kay that the warrants were legally appropriate. In short, no grounds exist to suppress evidence seized in the searches and the defendants' motions must be denied.

The Government addresses the defendants' legal arguments in largely the order they were advanced to make it abundantly clear that the warrants satisfy all legal criteria. Nonetheless, for reasons set forth in Section II of this pleading, these are arguments the Court ultimately will not need to decide. Rather, this Court may readily conclude there was a "substantial basis" for Magistrate Judge Kay's decision to sign the warrants, especially when Magistrate Judge Kay's decision is reviewed under the deferential standard required by law, and, upon such finding affirm the warrants in this case.

B. Magistrate Judge Kay's Determination That the Warrants Satisfied Legal Standards Is Entitled to Great Deference

The warrants at issue were signed by Magistrate Judge Kay on February 22, 2005.[2] His

---

[1]    This argument is advanced only by defendants Douglas Jemal and Norman Jemal.

[2]    The affidavits for the two locations are identical, so only one of them is attached to this pleading. The Affidavit for the DDC offices is attached as "Attachment I." The warrant

determinations as to the legal sufficiency of the affidavit to support the warrants, and his

(implicit) determination that the warrants comported with the pertinent legal requirements being

raised in this case, is entitled to great deference by this Court.  In review a magistrate's finding of

probable cause, "[a] deferential standard of review is appropriate to further the Fourth

Amendment's strong preference for searches conducted pursuant to a warrant." United States v.

Vaughn,  830 F.2d 1185, 1187 (D.C.Cir. 1987) (quoting Massachusetts v. Upton, 466 U.S. 727,

733 (1984)).  "A magistrate's 'determination of probable cause should be paid great deference by

reviewing courts.'" Illinois v. Gates, 462 U.S. 213, 236 (1983) (quoting Spinelli v. United States,

393 U.S. 410, 419 (1969)).  In effect, this Court sits as a reviewing court in applying a deferential

standard of review of the decision by Magistrate Judge Kay to issue the warrants.[3]  Thus, the

issue for this Court is not whether it would have made the same probable cause decisions as

Magistrate Judge Kay.  Rather, as we discuss in Section II, infra, the issue for this Court in

deciding the defendants' motions is whether there was a "substantial basis" to support Magistrate

Judge Kay's decision.

C.  The Affidavits Set Forth Probable Cause
to Believe Offenses Were Committed

The affidavits set forth ample grounds to support a finding that probable cause existed to

conclude that three separate sets of offenses had been committed.

The Supreme Court has repeatedly stressed that affidavits are to be read in very common

---

for the DDC offices is attached as "Attachment II."  The warrant for Nevada Avenue is attached
as "Attachment III."

[3]        The nature of the review process is discussed in greater detail in Section II of this
pleading.

sense, non-technical manner.  In <u>Gates</u>, the Court discussed "probable cause" as follows:

> As early as <u>Locke v. United States</u>, 7 Cranch. 339, 348 (1813),
> Chief Justice Marshall observed ... that "the term 'probable cause'
> ... means less than evidence which would justify condemnation ....
> It imports a seizure made under circumstances which warrant
> suspicion." ... Finely-tuned standards such as proof beyond a
> reasonable doubt or by a preponderance of the evidence, useful in
> formal trials, have no place in the magistrate's decision.... [I]t is
> clear that "only the probability, and not a prima facie showing, of
> criminal activity is the standard of probable cause." [<u>Spinelli v.
> United States</u>, 393 U.S. 410, 419  (1969)].

<u>Gates</u>, 462 U.S. at 235.  Thus:

> The task of the issuing magistrate is simply to make a practical,
> common-sense decision whether, given all the circumstances set
> forth in the affidavit before him ... there is a fair probability that
> contraband or evidence of a crime will be found in a particular
> place.

<u>Id</u>. at 238. "Consequently, the affidavit cannot be attacked paragraph by paragraph; it must be

evaluated as a whole."  <u>United States v. Anderson</u>, 933 F.2d 612, 614 (8th Cir. 1991).  Despite the

efforts by which the defendants seek to argue the evidence, we submit that it was reasonable for

Magistrate Judge Kay to conclude that the affidavits set forth the "probability ... of criminal

activity " and the "fair probability that ... evidence will be found in a particular place."

First, the affidavit provides evidence that the defendants, personally and through DDC,

provided Michael Lorusso, a former DC Government official, numerous items of value at about

the same time that Lorusso was taking official acts to benefit the defendants.  The affidavit

provided substantial corroborating detail to support the contentions related to the items of value

provided by DDC to Lorusso, and discussed the numerous acts that Lorusso undertook of value

to DDC.  This sets forth probable cause to believe the offense of bribery has been committed.[4]

Second, the affidavit provided the essential details to support the conclusion that the defendants provided a false invoice, in the name of "MTD Real Estate" (MTD) to obtain from Morgan Stanley approximately $430,000 funds that at that time were being held in escrow.  The affidavit provided grounds to conclude:

- that MTD was not in fact the DC Government's real estate agent and was not entitled to the real estate commission specified in the invoice; in fact, the DC Government had two legitimate agents;

- that MTD was in substance the alter ego of Douglas Jemal, Blake Esherick and Paul Millstein (not charged in this case);

- that the funds from Morgan Stanley passed through an account on which Douglas Jemal was the sole signor;

- that the defendants created documents ostensibly in the name of one "MR" to facilitate this transaction;

- that in fact, MR was a friend of Douglas Jemal and had nothing to do with MTD and had no actual knowledge of the contents of the documents, and that such documents were created to further the deception on Morgana Stanley by creating the false appearance that the monies were going elsewhere other than to Douglas Jemal.

_____

[4]    The legal underpinnings for a "course of conduct" bribery scheme are set forth in the Government's Opposition to  Defendants' Motion to Dismiss Counts One and Two for Failure to State an Offense.  The evidence in the Affidavit would also provide probable cause to believe that specific items constituted specific bribes.

This portion of the affidavit provides probable cause to believe offenses, including wire fraud were committed related to the defendants' use of "MTD" to obtain funds from Morgan Stanley.

Finally, the affidavit set forth an abundance of evidence to support the conclusion that Esherick and two other DDC employees received substantial compensation in forms that were not reported to the Internal Revenue Service. With Esherick this compensation consisted of cash disguised as loans from DDC, payments from DDC to third parties for Esherick's benefit, and the provision of free housing. For Chief Financial Officer John Brownell, this compensation consisted of payments directly from DDC to Brownell's line of credit. For Vice President Paul Millstein, this compensation consisted of DDC payments for the construction of his house and his credit card. This portion of the affidavit provided bases to conclude a tax evasion scheme was perpetrated involving the compensation by Douglas Jemal of DDC's high-ranking employees.

These allegations in the affidavit provided ample grounds to conclude that federal offenses of bribery, wire fraud and tax evasion were committed. Although defendants Douglas Jemal and Norman Jemal argue that nearly every piece of evidence is capable of innocent inferences, those arguments have little to do with the issue before Judge Magistrate Kay. The issue for the Magistrate Judge was not whether the facts proved the defendants guilty, but rather whether the facts demonstrated a "fair probability that ... evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238.[5]

_____

[5]    As one court noted in response to a defendant's claim that there were innocent explanations to the evidence set forth in an affidavit (detailing failure to file tax returns):

It is obvious that were defendant to go to trial solely on the evidence presented in the search warrant affidavit he might have

D.  Probable Cause Existed to Believe Evidence Would Be Found
at DDC Offices and Esherick's Residence

The defendants challenge the "nexus" between the nature of the crimes and the places to be searched.  However, the nexus is obvious.

The DDC warrant.  The crimes were committed in the name of and through the facilities of DDC.  It was reasonable to conclude that evidence related to those crimes, consisting in large part of typical business records, would be found in DDC's offices.[6]

Just from the four corners of the affidavit, it was known that Douglas Jemal owned and that  DDC managed over 100 properties.  It was known that Douglas Jemal (personally and through DDC) was involved in large-scale real estate development, and entered into multi-million dollar financial agreements, and had employees, including several high-level executives

_____

> defenses to the charge.  That is not the test, however.  Here, the "practical considerations of everyday life," on which a reasonably prudent magistrate would act, would dictate that there was probable cause to believe that a well-established businessman with proven significant sources of income who files no business or personal income taxes for three years is in violation of applicable state income tax laws.

United States v. McManus, 719 F.2d 1395, 1400 (6th Cir. 1983) (footnotes omitted) (quoting Brinegar v. United States, 338 U.S. 169, 174 (1949)).

In light of the flexible understanding of "probable cause" it is not necessary to argue the facts other than to note some of the defendants' arguments are pure make-weight.  The fact that a grand jury investigation had commenced has nothing to do with whether a search was appropriate.  Indeed, the Government would have been unable to obtain by Grand Jury subpoena personal (and not corporate) financial records.  The fact that the Government seized and returned within 24 hours a few attorney-client documents is testament to the care of the Government in executing the search and handling the documents.

[6]     This argument, to some extent, overlaps with the "staleness" argument.  However, we address these arguments separately in that they have been raised as separate arguments by the defendants.

receiving substantial compensation.  It was reasonable for Magistrate Judge Kay to have

concluded that such activities generate a host of records, including records which would certainly

be maintained (contracts, leases, billing records) by an on-going business.  Likewise, it was

reasonable to conclude that DDC's records of its financial relationships with its employees would

be found in the DDC offices.  Moreover, the affidavit in support of the search warrants, at

paragraph 5, clearly stated:  "The financial records for Douglas Development and for the various

"LLCs" are maintained at 702 H Street, NW, Washington, DC."  Putting aside for a moment

defendants' staleness claim, it was eminently reasonable for Magistrate Judge Kay to conclude

that evidence of the crimes described in the affidavit would be found at the business offices of

DDC.

     The Nevada Avenue warrant.   In addition, it was reasonable to conclude that individuals,

to include Esherick, maintain personal financial records – including records in the nature of

evidence supporting his compensation as well as records associated with any investments or

ownership interests in entities such as MTD, at both DDC and at his personal residence.  Certain

compensation and "loan" agreements could reasonably be found at either location.  See, e.g.,

United States v. Paul, 692 F. Supp. 186, 192-93 (S.D.N.Y. 1988) (reasonable to infer that an

individual would keep records in his house over an extended period of time); United States v.

Freeman, 685 F.2d 942, 949 (5th Cir. 1982) (passports, personal identification papers, bank and

safety deposit box records properly subject of search or residence).  Similarly, the items involved

in Nevada Avenue search, consisting of personal and business records, and records in the nature

of social and business connections related to Esherick's work, are the sort which may reasonably

found not only at his place of employment but at home.  In this regard, it is not required that a

specific individual have specifically seen such items at that location, so long as it is reasonable to search for such items at that location.  United States v. Anderson, 851 F.2d 727, 729 (4th Cir. 1988) (upholding search of house for pistol, even though no witness had provided evidence that the pistol was at that location; Fourth Circuit followed the Fifth, Sixth, Eighth and Ninth Circuits in holding "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." (citations omitted)).   Indeed, the affidavit described how the 6001 Nevada Avenue property was purchased by Douglas Jemal as Esherick's residence, and indeed, that very property was evidence of the unreported compensation.

### E.  The Information was not Stale

"[T]he amount of delay which will make information stale depends upon the particular facts of each case, including the nature of the criminal activity and the type of evidence sought." United States v. Freeman, 685 F.2d at 951.  An obvious distinction exists between a "mere isolated violation," for which probable cause to search "dwindle[s] with the passage of time," as opposed to "protracted or continuous [criminal] conduct" for which "time is of less significance." Bastida v. Henderson, 487 F.2d 860, 864 (5th Cir. 1973).   In connection with the affairs of an on-going business, it is reasonable to conclude that certain records would be kept for extended periods of time. As the Supreme Court noted in Andresen v. Maryland, 427 U.S. 463, 478 (1976):  "The business records sought were prepared in the ordinary course of petitioner's business in his law office of that of his real estate corporation.  It is eminently reasonable to expect that such records would be maintained in those offices for a period of time and surely as

long as three months required for the investigation of a complex real estate scheme."[7]    See, also,

United States v. Singh, 390 F.3d 168, 182 (2nd Cir. 2004) (search and seizure of records from

medical practice:  "The records made and retained in the business office were of the type that

would necessarily be kept over a period of years and would reasonably be found in the business

office of any medical practice."); United States v. Cherna, 184 F.3d 403, 410 (5th Cir. 1999)

("Especially in light of the facts that [the two businesses at issue] were ongoing businesses and

that financial records typically are retained for long periods of time, we cannot say that [the

agent's] affidavit was based on stale information." (citations omitted)), cert. denied, 529 U.S.

1065 (2000)); United States v. Shomo, 786 F.2d 981, 984 (10th Cir. 1986) ("[W]here the property

sought is likely to remain in one place for a long time, probable cause may be found even though

there was a substantial delay between the occurrence of the event relied on and the issuance of

the warrant." (citations omitted));  United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996)

(years-old information not stale where items to be seized in marijuana cultivation conspiracy

were likely to be in service for years); United States v. (Patricia) Williams, 897 F.2d 1034, 1039

(10th Cir. 1990) (information, some of which dated back four years, not stale where drug

conspiracy ongoing and business records likely to be kept for long time), cert. denied, 500 U.S.

937 (1991).[8]

---

[7]        The search in Andresen was only three months after the offense at issue.  The
Court's understanding of the inherent record-keeping requirements of a real estate business is
nonetheless applicable to the facts of this case.

[8]        One formulation of the "staleness" criteria is:

Staleness is not measured merely on the basis of the maturity of the
information but in relation to (1) the nature of the suspected
criminal activity (discrete crime or "regenerating conspiracy"), (2)

-10-

<u>The DDC warrant</u>.  The warrant for the DDC offices specified the seizure of the sorts of records which would be retained or found in the offices of an on-going business, months or even years after the conduct at issue.  In this case, for example, it would be reasonable to conclude that lease files, loan agreement files, historical payroll records or loan records, cancelled checks, check stubs and supporting documents, would be found at DDC.  Though some of the events associated with the Addison Road and 77 P Street leases happened in 2001 and 2002, these leases by their nature contemplated on-going financial relationships covering many years between Douglas Jemal (and his entities) and the DC Government, and would likely be maintained in lease files, property files (or similar files whatever their title) at the offices of DDC, the entity which managed those properties.  Similarly, it is difficult to imagine that documents associated with a $67 million loan would have been destroyed, and it was reasonable to conclude that records associated with such a transaction would be maintained at the business offices.  Finally, there is every reason to conclude that financial information related to the compensation of employees would be found at the business offices at which the employees worked.  In this regard, even though the affidavit covered the tax year through calendar year

---

the habits of the suspected criminal ("nomadic" or "entrenched"),
(3) the character of the items to be seized ("perishable" or " of
enduring utility"), and (4) the nature and function of the premises
to be searched ("mere criminal forum" or "secure operational
base").

<u>United States v. Bucuvalas</u>, 970 F.2d 937, 940 (1st Cir 1992) (citations omitted). Bucuvalas
involved a RICO prosecution related to the adult bookstore business in Boston, so the terms it
uses are somewhat inapt to the facts of this case.  Nonetheless, the principles set forth by the First
Circuit have at least general application here.  DDC was an on-going concern, the records were
not "perishable," and the occupants were "entrenched" in the "operational base" of the DDC
offices insofar as they conducted their business at this location.

2003, evidence of subsequent financial dealings between DDC and its employees, including financial arrangements in 2004 and 2005 would likewise be inherently relevant as well. Indeed, the sheer length of time that spanned the events covered in the affidavit (2001 through 2003), and numerous events at issue, many necessarily leaving a financial and record trial, made it nearly inevitable that some substantial volume of evidence covered by the warrant would exist and be present at the business offices of DDC. Though this is not such a case where it was alleged there was on-going criminal activity as of February 2005, this is a case where there were on-going business and financial activities as of February 2005, including the maintenance of records, had evidentiary relevance to the investigation. These considerations fully support Magistrate Judge Kay's determination that warrant was not stale in relation to the evidence to be seized.

The Nevada Avenue search. Similarly, there is every reason to believe that Esherick would maintain personal financial records, to include such records as banking records, at his personal residence. Although every person is unique, and has different practices regarding their own financial records, it is at least reasonable to conclude that Esherick would have historical personal financial records at his residence. See, e.g., United States v. Freeman, 685 F.2d at 952 (recognizing that bank records are the sort of item which would normally be kept at one's personal residence and "are the sort which could be reasonably expected to be kept there for long periods of time."); United States v. McManus, 719 F.2d at 1401 ("The locations to be searched were defendant's home and business, which locations were not only verified by official records by personal observation.... It certainly would be reasonable for a magistrate to conclude that on January 7, 1980, defendant's business records for the years 1977, 1978 and 1979 would be found at either his place of business or his residence.).

<u>F.  The Command Section was not Overbroad</u>

The defendants claim that the affidavit suffered from overbreadth and lack of particularity.  These reflect two closely related concepts:  "Particularity is the requirement that the warrant must clearly state what is sought.  Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based."  <u>In re Grand Jury Subpoenas Dated December 10, 1987,</u> 926 F.2d 847, 856-57 (9th Cir. 1991) (citations omitted).

Dealing first with the "overbreadth" challenge, a plain reading of the affidavit and warrant reveal that the scope of the warrant is limited by the probable cause set forth in the affidavit.  The seizing language of the DDC search commands the seizure of records related to the relationship between DDC and Lorusso and the DC Government (Item 1); the financial affairs of three DDC employees referenced in the tax evasion allegations (Items 2 through 4), "MTD" (Item 4)[9], 77 P Street and 4800 Addison Road (Items 5 and 6),[10] other items of value provided to other individuals (Item 7), specified transactions involving Lorusso (Item 8), appointment books and similar planners (Item 9), photographs (Item 10), and such documents which may be found on the computer or stored electronically.  The language of the Nevada Avenue is far narrower, and involves only the items linked to Esherick.  This is not a case where the agents were authorized to seize "all or virtually all of appellant's business records and equipment."  <u>See</u>, <u>e.g.</u>, <u>United States v. Maxwell</u>, 920 F.2d 1028, 1033 (D.C.Cir. 1990).  The

---

[9]    There was a numbering error in the list of Items to be Seized, with two items labeled number 4.

[10]    The Government acknowledges that the text of the affidavit refers to "Addison Road" while the seizing language refers to "4800 Addison Road."  This defect is truly "hypertechnical" on the facts of this case, and would not be such a problem as to vitiate the "good faith exception," discussed at pp. 17-19, <u>infra</u>.

specific categories of documents are directly linked to the probable cause established in the warrant, nor, for reasons described in the next section as to "particularity," can the defendants make a claim that the warrant was "overbroad" because some of the categories of items to be seized encompass documents that turn out to have little or no evidentiary relevance.

Indeed, this is not even a case where the Government sought to seize <u>all</u> business records on the theory that there was pervasive fraud through the entire company.  The seizing language is far narrower than seizing language which has been approved in other contexts.  <u>See</u>, <u>e.g</u>, <u>United States v. Travers</u>, 233 F.3d 1327, 1330 (11th Cir. 2000) (in connection with a complex scheme to commit financial fraud, search warrant allowed for the seizure of "all documents involving real estate, litigation, property, mailings, photographs and any other material reflecting identity, and anything reflecting potential fraud"), <u>cert. denied</u>, 534 U.S. 830 (2001).

### G.  The Items to Be Seized Were Defined with Particularity

For largely the same reasons that the warrant was not overbroad, we submit the seizing language was sufficiently "particular."  The seizing language set forth specific categories of evidence (10 for the DDC search, 5 for the Nevada Avenue search) in simple straight-forward language, which effectively constrained the agents' discretion in executing the warrant. "In assessing particularity, courts are concerned with realities of administration of criminal justice. It is sufficient if the warrant signed by the judicial officer is particular enough if read with reasonable effort by the officer executing the warrant." <u>United States v. Dale</u>, 991 F.2d 819, 846 (D.C. Cir.) (citations and internal quotations omitted), <u>cert. denied</u>, 510 U.S. 906 (1993). The particularity standard is one of "'practical accuracy' rather than a hypertechnical one." <u>United States v. Peters</u>, 92 F.3d 768, 69-70 (8th Cir. 1996) (citation omitted).  As one court noted:

> The degree of specificity required when describing the goods to be
> seized may necessarily vary according to the circumstances and
> type of items involved ... [T]here is a practical margin of flexibility
> permitted by the constitutional requirement for particularity in the
> description of items to be seized.

United States v. Truglio, 731 F.2d 1123, 11128 (4th Cir. 1984) (citing United States v. Davis, 542

F.2d 743, 745 (8th Cir.1976)).  The seizing language in this warrant is far narrower than the

language approved in Dale.  It is well within the "practical margin of flexibility" contemplated of

such seizing language, and is sufficient to "permit an executing officer to reasonably know what

items are to be seized." United States v. Beaumont, 972 F.2d 553, 560 (5th Cir. 1992), cert.

denied, 508 U.S. 926 (1993).

     The Supreme Court has recognized the need to review broad collections of documents in

the investigation of a fraud case:

> Under investigation was a complex real estate scheme whose
> existence could be proved only by piecing together many bits of
> evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's
> false pretenses scheme with respect to Lot 13 T would be shown
> only by placing in the proper place the many pieces of evidence
> that, taken singly, would show comparatively little. The complexity
> of an illegal scheme may not be used as a shield to avoid detection
> when the State has demonstrated probable cause to believe that a
> crime has been committed and probable cause to believe that
> evidence of this crime is in the suspect's possession.

Andresen v. Maryland, 427 U.S. at 480 n.10.  Similarly, in this case it may well be that some of

the seized items seized do not end up yielding evidentiary value, and, as in Andresen, it is

likewise the case that documents in the nature of routine business records seized pursuant to the

warrants acquire evidentiary significance only when understood in conjunction with other

documents.  However, "no tenet of the Fourth Amendment prohibits a search merely because it

cannot be performed with surgical precision. ... This flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records." United States v. Christine, 687 F.2d 749, 760 (3rd Cir. 1982).[11]

As but one example, in order to fully investigate the potential tax crimes of Esherick, it was reasonable to seize all his financial records, for such records were reasonably likely to detail his income, sources of income, his spending and spending patterns (cash, check, credit card), and even changes in spending patterns over time.  To investigate the tax case(s) for 2001 through 2003,  it was necessary not only to obtain and review financial records for those specific years, but to investigate his financial circumstances both prior to and subsequent to those years, to account for or negate such factual issues as the existence of loans, debts, a "cash horde," other sources of income, or similar such matters which bear on income during the charged years of evasion.  This sort of detailed financial review is not possible on the scene of a search, nor is it feasible to draft seizing language which would provide effective constraint so that only records and documents which would ultimately prove helpful would be seized.

This reasoning applies to nearly every category of items to be seized.  The warrant in this case provides straight-forward commands as to the objects to be seized by relation to the matters under investigation.  The seizing language is not so general as in effect to permit a wholesale seizure of the defendants' records.  In light of the allegations in the affidavit, it was "reasonable"

---

[11]     See also, United States v. Loveto, 343 F.Supp.2d 434, 447 (W.D. Pa.  2004) ("We must consider the practicalities of the situation and conclude that in a tax conspiracy case, still in the nascent stage of its investigation, a more detailed description might not be feasible." (citing United States v. Christine, supra in text)).

that Magistrate Judge Kay authorize the agents to seize the documents associated with Lorusso, the two properties at issue, the specific employees, "MTD," and the other categories which were itemized.  Nearly any agent, let alone the agents involved in this investigation, would be able to execute the warrants and have a good sense of the documents to be seized.

### H.  The Warrants Were Otherwise Executed in Good Faith

Even if this Court were to reach a different determination as to the sufficiency of the affidavit to support any aspect of the warrants, no basis whatsoever exists to find that th warrants, approved by Magistrate Judge Kay, were not thereafter executed in good faith by the agents and that evidence should be suppressed.  See United States v. Leon, 468 U.S. 897 (1984).

The suppression of evidence obstructs the truth-seeking process and is a harsh sanction with profound costs to society.  Because the exclusionary rule is designed  "to deter unlawful searches by the police, not to punish the errors of magistrates and judges," Gates, 462 U.S. at 263 (White, J., concurring), the benefits of suppression are "marginal or non-existent" when law enforcement officers rely in good faith upon the determination of a sworn federal Magistrate Judge.[12]  Thus, there is no justification to suppress evidence when law enforcement conduct is beyond reproach, when agents have brought a detailed and carefully drafted affidavit to a Magistrate Judge, when the Magistrate Judge has signed it, and when the agents have executed the warrant pursuant to the permission so granted.  No grounds exist to support any finding other than that the "officers conducting the search acted in 'objectively reasonable reliance' on the warrant and the warrant was issued by a detached and neutral magistrate."  United States v.

---

[12]    "[T]he marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Leon, 468 U.S. at 922.

Maxwell, 920 F.2d at 1034 (D.C. Cir. 1990) (quoting United States v. Leon, 468 U.S. at 922

(1984)) (evidence seized pursuant to an overbroad warrant not suppressed where agents acted in

good faith). Even if an "error of constitutional dimensions may have been committed with

respect to the issuance of the warrant, ... it was the judge, not the police officers, who made the

critical mistake." Massachusetts v. Sheppard. 468 U.S. 981, 990 (1984)

    In their suppression motions, the defendants argue that the exceptions to the good-faith

doctrine are applicable. Defendants Douglas Jemal and Norman Jemal argue the warrant was

"'so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable,'" and that the warrant was "so facially deficient – i.e., in failing to particularize the

place to be searched or the things to be seized – that the executing officers cannot reasonably

presume it to be valid." Defendants' Motion to Quash at 27 (quoting Leon, 468 U.S. at 923)).[13]

---

[13]    In the body of its opinion, the Court listed three instances where the good faith
exception would not apply: 1) where the warrant was issued on a knowing or recklessly false
affidavit; 2) where the magistrate was not neutral and detached, and 3) where the affidavit "does
not 'provide the magistrate with a substantial basis for determining the existence of probable
cause'" [Gates, 462 U.S. at 239]. Leon, 468 U.S. at 914-95. In further explaining what it
intended by this third category: "Sufficient information must be presented to the magistrate to
allow that official to determine probable cause; his action cannot be a mere ratification of the
bare conclusions of others." Id. at 915 (citing Gates, 462 U.S. at 239).

    At the conclusion of the opinion, in summarizing its holding, the Court in Leon repeated
the first two grounds – falsity of the affidavit and abdication of judicial role – as circumstances
where the good faith exception would not apply. The Court continued: "Nor would an officer
manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia
of probable cause as to render official belief in its existence entirely unreasonable.' ... Finally,
depending on the circumstances of the particular case, a warrant may be so facially deficient -
i.e., in failing to particularize the place to be searched or the things to be seized-that the
executing officers cannot reasonably presume it to be valid." Id. at 923 (citation omitted).

    Whether the Court in Leon intended on setting forth three or four criteria is not important.
However, what is critical is that the one example the Court provided of an inadequate affidavit
was one which provided only "bare details" and insufficient information to permit the magistrate

Defendant Esherick advances nearly identical allegations. Esherick's Motion to Suppress at 18. For reasons already stated, however, we submit that a fair reading of the affidavit supports a finding of probable cause, and a fair reading of the seizing language suggests that it is fully supported by the affidavit.

The issue of good faith presents purely a legal issue.[14] In this case, this issue may be decided solely by an examination of the warrant and its relationship to the affidavit. First and foremost, the affidavit provided Magistrate Judge Kay an abundance of detail, thus allowing him

to perform his duties. See, e.g., United States v. Satterwhite, 980 F.2d 317, 321 (5th Cir. 1992) (citations omitted) ("When a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity. ... 'Bare bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.").

[14]     The issue of "good faith" is entirely a legal issue. The agents' subjective intent is irrelevant:

> As the Supreme Court in Leon emphasized, "the standard of reasonableness ... is an objective one." [Leon at 919 n.20.] Thus, the determination of whether the good faith exception applies in a particular case does not depend on the subjective beliefs of the officers involved. See United States v. Maggitt, 778 F.2d 1029, 1035 n. 3 (5th Cir.1985) ("Because the Leon standard is objective, the testimony of the agent who prepared the affidavit ⋯ is not particularly relevant."); United States v. Gant, 759 F.2d 484, 487-88 (5th Cir.1985) ("[T]he determination of good faith will ordinarily depend on an examination of the affidavit by the reviewing court.").

United States v. Allen, 211 F.3d 970, 978 (6th Cir. 2000)(Gilman, J., concurring). Moreover, no other allegations have been raised which would appear to require an evidentiary hearing. There is no allegation that the information in the affidavit was false or made in reckless disregard for the truth – to the contrary, the allegations in the warrant largely consist of a description of documents or sworn statements which leave a precise record trail. Furthermore, the defendants do not allege Magistrate Judge Kay abdicated his judicial in issuing the warrant. See, e.g., Lo-Ji Sales, Inc. v. New York, 442 U.S. 319, 327 (1979) (by participating in the search "[magistrate] was not acting as a judicial officer but as an adjunct law enforcement officer").

– indeed requiring him –  to exercise his independent judgement in determining the existence of probable cause.  Magistrate Judge Kay was not put in the position of simply "ratif[ying] the bare conclusions of others."  Leon, 468 U.S. at 915.  The facts do not present a "bare-bones" affidavit "rubber stamped" by the magistrate.  See, e.g., United States v. Wilhelm, 80 F.3d 116, 121-22 (4th Cir. 1996).  Indeed, it is difficult to conceive facts involving a detailed affidavit and detailed warrant where the "good faith exception" would not apply, absent a showing of falsity of the affidavit or inappropriate conduct by the Magistrate.  The defendants provide little in the way of authority other than general principles, and certainly cite no other case where the "good faith exception" was held not to apply on a warrant even remotely as rich in factual detail as the affidavit and warrant in this case.[15]   In light of the detail of the affidavits and the consequent decision by Magistrate Judge Kay to sign the warrants, the defendants' claims that the agents did not act in good faith must be denied.

## II.  THE DEFENDANTS' MOTIONS MUST BE REJECTED BECAUSE A "SUBSTANTIAL BASIS" EXISTED FOR MAGISTRATE JUDGE KAY TO SIGN THE WARRANTS

The United States urges this Court to decide the defendants' motions upon a review of the warrants, with due deference to the decision of Magistrate Judge Kay,  to determine whether there was a "substantial basis" for his decision to sign them.  If the Court finds there to be a

---

[15]    The one case cited in both suppression motions,  United States v. Johnson, 332 F. Supp.2d 35 (D.D.C. 2004), involved a D.C. Superior Court search warrant search for a gun at a residence where: 1) the search for the weapon occurred about a month after the reported altercation in which the gun was brandished; 2) there was little in the affidavit other than historical records to link the suspect in the gun offense to the place to be searched; and 3) there was little in the affidavit to suggest the gun would be found at that location in any event.  These are extreme facts, and the affidavit and warrant in Johnson are hardly comparable to the detailed affidavit and warrant in this case.

substantial basis, then the warrants stand, and the defendants' motions must be denied.  Only if

the Court determines  no "substantial basis" exists to support Magistrate Judge Kay's decision is

further scrutiny warranted.

      As stated at the outset of this pleading, deference to Magistrate Judge Kay is required.  In

Gates, supra, the Supreme Court characterized its prior decisions relating to the review of

warrants as "repeatedly [saying] that after-the-fact scrutiny by courts of the sufficiency of an

affidavit should not take the form of de novo review.  A magistrate's 'determination of probable

cause should be paid great deference by reviewing courts.'" Gates, 462 U.S. at 236 (quoting

Spinelli, 393 U.S. at  419).  These principles of deferential review have been adopted among the

federal courts in various formulations.  See United States v. Warren, 42 F.3d 647, 652 (D.C. Cir.

1994) ("On review, the appellate court inquires only whether the magistrate had a 'substantial

basis for concluding that probable cause existed.'" (citing Gates at 238-39) (internal quotations

and alteration omitted).[16]  See also, United States v. Singh, 390 F.3d at 181 (review on appeal

limited "to whether the issuing judicial officer had a substantial basis for the finding of probable

cause") (citation omitted); United States v. Nixon, 918 F.2d 895, 900 (11th Cir. 1990) ("The

standard for our review of the magistrate's determination is simply to ensure that the magistrate

had a substantial basis for concluding that probable cause exited." (internal quotations, ellipses

and brackets omitted; citations omitted)); United States v. Oloyede, 982 F.2d 133, 138  (4th Cir.

1992) ("The sufficiency of a search warrant and its supporting affidavit is reviewed de novo to

determine whether a "substantial basis" exists for the magistrate judge's decision. .... Yet, a

--------

[16]    There is no different standard for the district court in review of the Magistrate
Judge's exercise of his judgement.

determination of probable cause by a neutral and detached magistrate judge is entitled to substantial deference. ... The Fourth Circuit has held that courts should not suppress evidence seized pursuant to a warrant because of 'hypertechnical errors.'" (citations omitted)); United States v. Castillo, 866 F.2d 1071, 1076 (9th Cir. 1988) ("In applying the substantial basis test, we must give deference to the magistrate's finding of probable cause. We do not engage in de novo review. ... 'We may not reverse a magistrates's finding of probable cause unless it is clearly erroneous.'") (citations omitted); United States v. Conley, 4 F.3d 1200, 1205 (3rd Cir.1993) ("Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' [citing Gates], a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found."(footnote omitted)), cert. denied, 520 U.S. 1115 (1997).

        The defendants seek to draw the Court into a legally and factually intensive analysis of every aspect associated with search warrants – probable cause, nexus, staleness, breadth, and particularity -- as necessary steps to support their arguments that Magistrate Judge Kay's decision was wholly deficient (because he made legal errors) and that good faith reliance by the agents on the signed warrant was hence improper. The defendants have it all backwards. The "substantial deference" principles of Gates and the "good-faith exception" of Leon would have no vitality if this Court were to address the claims as structured by the defendants. Such an approach would entail precisely the sort of invasive judicial review and second-guessing that is absolutely antithetical to the approach mandated by Gates and would reflect insufficient recognition of the "good faith" principles enunciated in Leon.

-22-

Rather, this Court's analysis must instead start with a deferential review of Magistrate Judge Kay's findings solely to determine whether there was a "substantial basis" for his decision to sign the warrant. If so, this ends the inquiry. "Principles of judicial restraint and precedent dictate that, in most cases, we should not reach the probable cause issue if a decision on the admissibility of the evidence under Leon will resolve the matter." United States v. Craig, 861 F.2d 818, 820 (5th Cir. 1988) United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993) (same) (quoting Craig); United States v. Brown, 1994 WL 717580 (4th Cir.) at *1 (same) (quoting Craig). See also, United States v. Cherna, 184 F.3d at 407 ("If the good-faith exception applies, [the court] need not reach the question of probable cause." (citing Gates and Craig)).[17]

Thus, we urge this Court to undertake a deferential review of the warrant to determine the narrow issue of whether there is a substantial basis for the Magistrate Judge Kay's decision, and, to the extent necessary, to assure itself that defects are not found of such notorious and egregious nature so as to call into question the determination of probable cause by Magistrate Judge Kay and the good faith of the agents. It would be of little consequence if this Court were to find there were short-comings in the warrant (a conclusion with which we strenuously disagree for the reasons set forth in this pleading) or if this Court were to find it would have handled the warrant differently than Magistrate Judge Kay, for even if the Court were to make such findings, this Court can also easily conclude that any flaws were "hypertechnical" and not of such quality

---

[17]     Although the "substantial basis" deference is a somewhat different analytical issue than the existence of good faith, as a practical matter, these issues are frequently conflated; for if a substantial basis existed for the magistrate to sign the warrants, perforce the agents were entitled in good faith to execute them. As a purely analytical matter, however, it is possible for the agents to have executed the warrants in good faith, even if the Magistrate did not have a "substantial basis" to sign them.

or magnitude as to justify a determination that the affidavits were "so lacking in probable cause" and the warrant so "facially deficient" as to call into question the agents' good faith.  Indeed, we submit there is really no substantial question that Magistrate Judge Kay properly signed the warrant, and, hence really no claim whatsoever that the agents were not reasonably permitted to rely on the warrants he approved.

Accordingly, we request this Court review of the affidavit and warrant, with deference to Magistrate Kay, and further request this Court find:  1) there was a "substantial basis" to support the decision of Judge Magistrate Kay to issue the warrants, and, perforce, 2) no grounds exist to find that Magistrate Judge Kaye approved "facially deficient warrants" based on affidavits that were so "lacking in probable cause"as to call into question the "good faith" of the agents in relying on the warrant.  Upon making such finding(s), no reasons exist to address any of the numerous issues raised by the defendants.[18]

---

[18]     Indeed, such a review would be of academic interest only if the Court were to conclude that though it disagreed with Magistrate Judge Kay on one issue, it deferred to his finding and concluded that it was not of a nature as to call into question the agents' good-faith.

We note that the issues raised by the defendants – probable cause, nexus, breadth, particularity, staleness, involve the relationship between the affidavit and the warrant itself. These are purely legal issues.  There is nothing an agent could provide of a factual nature which would impact the analysis of these issues.

WHEREFORE, we request the defendants' Motions to Quash and Suppress be DENIED.

RESPECTFULLY SUBMITTED,


KENNETH L. WAINSTEIN
DC Bar No. 451058.
UNITED STATES ATTORNEY

By:    _____
MARK H. DUBESTER
ASSISTANT UNITED STATES ATTORNEY
DC Bar No. 339655
555 Fourth Street, N.W., Room 5917
Washington, D.C.  20530
Ph. (202) 514-7986

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused to be sent by fax or by electronic means a copy of the attached pleading, to:

Michele Roberts, Esq.                       Paul Kemp, Esq.
Counsel for Douglas Jemal                   Carol Elder Bruce
Akin Gump                                   Counsel for Blake C. Esherick
1333 New Hampshire Avenue, NW               Venable LLP
Washington, DC 20036                        One Church Street,
                                            Rockville, MD    20850

Reid Weingarten, Esq.
Brian M. Heberlig                           Stan Brand, Esq.
Counsel for Douglas Jemal                   Counsel for Norman D. Jemal
Steptoe and Johnson                         923 15th Street, NW
1330 Connecticut Avenue, N.W.               Washington, DC    20005
Washington, D.C.  20036-1795

Christopher Mead, Esq.
Counsel for Douglas Jemal
London & Meade
1225 19th Street, NW, Suite 320
Washington, DC  20036

this _____ day of January, 2006.

                              _____
                              Mark H. Dubester
                              Assistant United States Attorney
                              DC Bar No. 339655
                              555 Fourth Street, NW
                              Rm. 5917
                              Washington, DC 20001
                              (202) 514-7986