# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

UNSEALED
UNDER SEAL

702 H Street, N.W.
The Offices of Douglas Development Corp.
Suite 400 and other storage areas
Washington, D.C.

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

FILED
FEB 2 2 2005

[as further described in "Attachment A"]

CASE NUMBER: 05-0089M-01

(Further described below)

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

I __Andrew Sekela__ being duly sworn depose and say:

I am a(n) __Special Agent with the Federal Bureau of Investigation__ and have reason to believe
(Official Title)
that ☐ on the person of or ☒ on the property or premises known as (name, description and or location)
The offices of Douglas Development Corp., 702 H Street, N.W., Suite 400 and other storage areas, Washington, D.C.
(as further described in "Attachment A")

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be searched)

documents and other evidence, as further described in "Attachment B"

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
evidence and instrumentalities.

concerning violations of Title 18 United States Code, Section(s) 371 and 201, and Title 26, United States Code, Section 7201. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN

Continued on the attached sheet and made a part hereof.  ☒ YES ☐ NO

Mark H. Dubester
Public Corruption/Government Fraud Section
(202) 514-7986

Signature of Affiant
Andrew Sekela, Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence
FEB 2 2 2005
Date    Alan Kay
U.S. Magistrate Judge

at Washington, D.C.

Name and Title of Judicial Officer    Signature of Judicial Officer

3

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

1. Your affiant is a Special Agent of the Federal Bureau of Investigation (FBI) and has been so employed for eleven months. I am currently assigned to the Public Corruption Squad of the Washington, DC field office. I have training and experience in the enforcement of laws of the United States, including the preparation, presentation, and service of search warrants. My duties include investigation of various criminal allegations, including those involving government fraud and bribery of public officials.

2. This affidavit is written in support of search warrants for the following locations:

    The District of Columbia residence of Blake C. Esherick;

    The District of Columbia offices of Douglas Development Corporation (Douglas Development).

    (Each of these locations is further specifically described in the accompanying "Attachment A" to the specific warrant.)

3. I believe that there is probable cause to believe that in each of these locations will be found evidence of the violations of Title 18, United States Code, Sections 201 (Bribery of a Public Official) and 371 (Conspiracy to Commit Bribery of a Public Official), and of Title 26, United States Code 7201 (Tax Evasion).

4. This affidavit is based in part upon documents obtained in connection with an investigation, interviews, and other information gathered during the investigation. The information contained herein is based on my personal knowledge and experience, and information provided to me by other law enforcement personnel who have participated in the investigation described in this affidavit. In particular, I have consulted with a Special Agent of the Internal Revenue Service related to certain of the tax-related information contained in this affidavit. This affidavit does not contain all of the information known to me regarding this investigation. Your affiant has included in this affidavit facts which he believes are sufficient to support a probable cause finding for the issuance of the requested warrant.

5. Douglas Jemal owns Douglas Development Corporation, as well as over 100 properties. Each property is set up as its own "limited liability corporation," or "LLC." For some of these LLCs, Douglas Jemal shares ownership with other individuals. Douglas Development is the entity which manages the various individual properties. The financial records for Douglas Development and for the various "LLCs" are maintained at 702 H Street, NW, Washington, DC.

6. Norman Jemal is Douglas Jemal's son and an employee of Douglas Development. His responsibilities include leasing various Jemal-owned properties that are managed by Douglas Development.

7. Blake C. Esherick is an employee of Douglas Development. His responsibilities include leasing various Jemal-owned properties that are managed by Douglas Development.

8. John E. Brownell ("Brownell") is variously referred to as the Treasurer or Chief Financial Officer of Douglas Development.

9. For purposes of this affidavit, unless otherwise specifically noted, the term "Douglas Development" refers to the firm and its owner, Douglas Jemal, and its employees and agents, including but not limited to Norman Jemal and Blake Esherick.

## Overview

10. As set forth in the following paragraphs, the evidence supports the conclusion that:
1) Douglas Development personnel have conspired to bribe a DC Government official,
2) Douglas Development personnel have used the wires to defraud a partner of Douglas Jemal, and 3) high-level Douglas Development employees have been compensated in a way so that their income has been concealed from the Internal Revenue Service.

## Bribery Scheme

11. Since June 2003, law enforcement agencies have been conducting an investigation of Michael Lorusso (hereinafter "Lorusso") and his relationship with DC Government contractors. Lorusso served as the Deputy Director of the District of Columbia Office of Property Management (OPM) from November 2000 until his resignation in January 2003.

12. In November 2004, Lorusso pleaded guilty to the offense of conspiracy to pay and receive bribes. The Information specified the entity which paid the bribes as "Company X." This is a reference to Douglas Development

13. In Lorusso's sworn statement of facts, which was submitted to Judge Ricardo M. Urbina, he admitted the following:

- Michael A. Lorusso was from approximately November, 2000, through January, 2003, an employee of the District of Columbia Government (DC Government), holding the position of Deputy Director, Office of Property Management (OPM). Among his duties was arranging for the leasing of space for use by agencies of the DC Government.

- Douglas Development was a company which leased and sought to lease real estate to the DC Government. In doing so, Douglas Development's agents and employees dealt with Michael A. Lorusso, among others. Douglas Development also managed real estate titled in the name of related entities.

- "S&C" was a firm which provided real estate services to the DC Government. S&C also had a contractual relationship with the DC Government generally referred to as the "tenant representation contract."

- On numerous occasions from approximately November of 2001 through January of 2003, Michael A. Lorusso used his official position to and attempt to benefit Douglas Development, including:

    a.  Causing the DC Government to lease property from Douglas Development for a vehicle impoundment lot at a cost of approximately $998,000 per year;

    b.  Attempting to cause the DC Government purchase property from Douglas Development and companies related to Douglas Development for approximately $12.5 million;

    c.  Signing numerous leases and lease-related documents on behalf of the DC Government as a tenant in a building owned by Douglas Development, resulting in commitments by the DC Government to pay rent to Douglas Development in excess of $100 million over the ten year term of the leases;

    d.  Taking steps to cause payments to be made by the DC Government to Douglas Development in response to a variety of invoices for matters such as repairs, improvements, rent adjustments, and other matters, stemming from the DC Government's status as a tenant in Douglas Development's property;

    e.  Causing "S&C" to pay certain obligations of Douglas Development, thereby saving Douglas Development hundreds of thousands of dollars.

- Defendant Michael A. Lorusso's actions resulted in enormous profits to and generated significant wealth to Douglas Development.

- On numerous dates from May 2001 through late 2002, Douglas Development took a variety of actions to benefit defendant Michael A. Lorusso, including:

    a.  In or about May, 2001, at or about the time when defendant Michael A. Lorusso was dealing with Douglas Development in regard to the impoundment lot lease, paying for a hotel room for Michael A. Lorusso at the Bellagio Hotel in Las Vegas, Nevada, on

        a trip with agents and employees of Douglas Development;

    b.    In or about August, 2001, giving Michael A. Lorusso cash;

    c.    In or about August, 2001, giving Michael A. Lorusso a Rolex brand wrist watch;

    d.    In or about October, 2001, paying for repairs for Michael A. Lorusso's Audi at a Virginia auto repair shop;

    e.    In or about February, 2002, offering to take Michael A. Lorusso on a trip to Florida and purchasing airline tickets for Michael A. Lorusso for this trip.

    f.    In or about May, 2002, providing airfare and hotel accommodations for Michael A. Lorusso for a trip to Las Vegas with agents and employees of Douglas Development.

    g.    In or about May, 2002, purchasing 2 pair cowboy boots for Michael A. Lorusso in Las Vegas.

    h.    On numerous dates in 2001 and 2002, providing limousine service for Michael A. Lorusso for local transportation in the District of Columbia area.

    i.    On numerous dates in 2001 and 2002, providing tickets and making tickets available for Washington Wizards and Washington Capitals games to Michael A. Lorusso at Douglas Development's box at the MCI Center.

    j.    In late 2002, agreeing to purchase approximately over $600,000 furniture from Global Furniture Resources, Inc., a company owned by Fernando J. Villegas.

13.    I am aware of corroborating evidence for various of Lorusso's statements. For example, Lorusso claimed Douglas Development paid for his hotel accommodations at the Bellagio Hotel in Las Vegas at the time when Lorusso was negotiating the Addison Road lease. This is confirmed by witnesses and a Bellagio invoice indicating that a room was occupied by "Peter Lorusso" (who had traveled with his brother, Michael Lorusso). The Bellagio invoice was charged to the credit card of Norman Jemal and paid for by Douglas Development.

14.    Similarly, Lorusso stated he received cash in the summer/fall of 2001. Lorusso's

        personal checking account reveals a deposit of $6000 cash in August of 2001. Lorusso has identified this deposit as being from the cash provided by Blake Esherick

15. Similarly, Lorusso claimed he received a Rolex brand wristwatch. According to Lorusso, in or about August 2001, Esherick gave him a Rolex brand wrist watch, serial # P289380. The value of the watch was approximately $3,000. Credit card records obtained in this investigation show that the watch was purchased using Norman Jemal's credit card. The watch was turned over to the affiant. The serial number on the watch was matched against the serial number provided by the jeweler who sold the watch.

16. Similarly, Lorusso claimed that Douglas Development paid for over $1,000 in repairs for Lorusso's personal automobile at a Virginia auto repair shop. I have interviewed the Douglas Development employee who brought Lorusso's automobile to the auto repair establishment. He stated that he recalled either Blake Esherick or Norman Jemal or both to have given him the instructions. The repairs were charged to the credit card of Douglas Development employee. Those credit charges were paid for by Douglas Development and were approved for payment by Esherick.

17. Similarly, Lorusso claimed that in or about May 2002, while in Las Vegas, Nevada, Lorusso reported that Douglas Jemal purchased for him two pairs of cowboy boots for Lorusso at a cost of over $1,000. This is corroborated by the receipt form the "Boot Barn" in Las Vegas, and Douglas Jemal's credit card. In addition, Lorusso provided law enforcement the boots.

18. Lorusso has informed the undersigned that Douglas Jemal informed him that he (Jemal) had paid for some of medical bills of the father of the former District of Columbia Deputy Mayor, Eric Price's, father. The investigation to this date has not confirmed this. However, Douglas Development records have revealed that an automobile cellphone power adapter in the amount of $105.74 was purchased by Douglas Develoment for Eric Price.

19. Lorusso's direct supervisor was Tim Dimond.

### The $430,039.38 MTD Real Estate Invoice

20. After the DC Government, through Lorusso, signed a series of leases placing DC Government agencies in 77 P Street, Douglas Jemal, through Douglas Develoment, sought to refinance the property.

21. As part of his duties at Douglas Development, Brownell handled much of the financing relationships of Douglas Jemal. For example, Brownell dealt with lenders on large construction and financing loans and has dealt with the tax preparers. He has taken steps in connection with loans, financing and handling the financial affairs of Douglas

Develoment which have provided significant value to Douglas Jemal.

22. In late 2002, a company owned 50-50 by Jemal and another (the "partner"), through a "limited liability company" ("LLC"), obtained a $67 million loan secured by the LLC's property at 77 P Street, Northwest. (Though the property was held in the legal form of an LLC, the men were functionally partners, and will on occasion be referred to as such.) A portion of this $67 million loan was held in escrow by the lender to be disbursed for purposes of completing construction at that property. Settlement on this loan occurred November 19, 2002.

23. On November 21, 2002, two days after settlement, Douglas Development submitted a "draw" request to the lender, requesting the lender provide funds from the loan for payment to several entities, including, for example, construction companies. As part of this draw request, the lender was informed that $430,039.38 was due to "MTD Real Estate Services" ("MTD"), purportedly for a commission owed by the DC Government to MTD for representing the DC Government in obtaining a lease at 77 P Street. An MTD invoice in that amount, approved by Blake Esherick, was attached.

24. An official with the DC Government familiar with the real estate operations of the city has stated that the DC Government only used two agents for leasing space: Cushman & Wakefield and Staubach & Co. The various DC Government agencies were "divided" among those two companies. He had not heard of "MTD Real Estate Services" and stated that MTD Real Estate Services did not represent any city government agency in connection with the leases at 77 P Street.

25. The lender requested a lien release and wiring instructions. Douglas Development submitted a lien release signed by "MR," an acquaintance of Douglas Jemal. MR has been interviewed. He is an old friend of Douglas Jemal, and a personal trainer at a local health club. (He was once a linebacker for the Baltimore Colts but got injured.) He has on occasion lent money to Jemal. However, MR denied knowing what he was signing or why. He also denied knowledge of the operations of MTD. He claimed that it was either Douglas Jemal or Blake Esherick who asked him to sign the document, and that he did so as a favor.

26. In addition, the wiring instructions submitted to the lender were set forth on a memorandum from "MR" to Douglas Development personnel. MR claimed to have no knowledge of the bank account, nor did he give anyone permission to use his name on the memorandum related to wiring instructions.

27. As a result of this request, over $430,000 was wired from the lender to an account in the name of MTD at Adams National Bank ("Adams") in the District of Columbia.

28. Douglas Jemal was the signor on the Adams MTD account. The account was opened

December 10, 2002; the funds were wired from the lender into the account December 12, 2002. On December 13, 2002, $400,000 was wired out of the MTD bank account to the account of a settlement company, where those funds were used by Jemal as part of the monies paid at settlement to purchase another property through another LLC. (The approximately $30,000 balance in the MTD account was returned to Douglas Development.)

29. Douglas Development's controller was interviewed in February 2005. He stated that he was told by Paul Millstein that the purpose of the MTD invoice was to allow Douglas Jemal to have access to funds from the refinance loan without his partner being aware.

30. In effect the MTD invoice accomplished the diversion of $430,039.38 from an entity owned 50-50 by Jemal and his partner to the personal benefit of Douglas Jemal and his son Norman, who also had an ownership interest in the property which was purchased with the monies.

31. Brownell, as Chief Financial Officer and the individual intimately connected with the various financing activities of Jemal, was in a position to know about the activities described above. Records reflect he had substantial involvement lining up the $67 million loan and he had substantial contacts with Jemal's partner on the financial relationship between the two men.

32. In particular, Brownell took two steps which furthered the scheme:

First, on November 18, 2002, Brownell for Douglas Development wrote a letter to Jemal's partner, explaining details of the loan, in which Brownell stated:

> Note that $7 million is being held back to fund the remaining tenant improvement and leasing commissions (<u>all of these are to outside brokers</u>). (emphasis supplied).

I believe that Brownell's use of the phrase "outside brokers" was intended to suggest brokers other than Douglas Development (or related Douglas Jemal entities). The evidence supports the conclusion that this statement was a deliberate lulling comment and that even prior to settlement Brownell was a participant in a scheme to submit the false invoice to the lender in order to divert loan proceeds to Jemal.

Second, the wire transfer documents from Adams to the settlement attorney reflect that Brownell instructed Adams to wire the $400,000 from the MTD account to the account of the settlement attorney. These funds were then used by Douglas Jemal and Norman Jemal to purchase a property. As part of Brownell's job, he would have been familiar with the financing issues and need for cash to complete the purchase of the property that was being acquired.

33. It was the practice of Jemal's partner in the ownership of 77 P Street to closely scrutinize the expenses of the LLC. Although employees of Douglas Develoment would write checks on the LLC account to pay for expenses of the LLC, one of the partner's employees would co-sign all the checks. The partner was interviewed by law enforcement authorities in January 2005 and stated he does not now know whether or not he would have objected at the time to Douglas Development receiving a leasing commission, but Douglas Jemal would have had reason to be concerned that the partner would have objected. Thus, the MTD invoice accomplished the following: it caused a wire payment to be made directly from the lender to an account under the control of Jemal, bypassing both Douglas Development and the partnership account.

34. For reasons set forth above, the evidence demonstrates that MTD was simply entity used by Jemal to receive funds from the lender and avoid Jemal's partner, and that Esherick, Brownell and Millstein were all involved in this.

### Tax Violations - Overview

35. In addition, evidence has been obtained that Douglas Jemal, through Douglas Development, rewarded key employees by paying them compensation that was not reported to the Internal Revenue Service.

### Compensation of Esherick

36. Blake C. Esherick was the individual at Douglas Development with whom Lorusso had the most dealings, and, according to Lorusso, gave him the cash and the Rolex. Numerous documents reflect that Lorusso dealt with Esherick in numerous lease matters.

37. For years 2000 through 2003, Esherick received a "payroll" salary from Douglas Develoment of $70,200 per year; this was the amount reported to the IRS.

38. According to documents obtained from the IRS, Esherick has filed federal tax returns for calendar years 2000-2002; he has not filed a return for 2003.

39. Rather than causing Douglas Development to pay Esherick a bonus or commission, reporting such a payment to the IRS, and withholding tax on such a payment and remitting the taxes to federal and state taxing authorities, Douglas Jemal, Norman Jemal and Esherick provided Esherick the following to Esherick in addition to his salary, for calendar years 2001 through 2003

  Douglas Development paid child support payments directly to ex-wife;

  Douglas Development paid numerous checks directly to Esherick,

>   not drawn from the payroll account. Typically, these checks would
>   be recorded as "advances" or "loans" to Esherick.
>
>   Douglas Development provided Esherick rent-free house; prior to
>   summer of 2003, Esherick lived in a house owned jointly by
>   Douglas and Norman on Radnor Road in Bethesda. That house
>   sold for $550,000 in June 2003.
>
>   In spring of 2003, Esherick went hunting for a new house, and
>   identified a house on the market at 6001 Nevada Avenue, NW,
>   Washington D.C. Douglas Jemal executed a contract to purchase
>   the property for $825,000. At settlement in June 2003, Douglas
>   Jemal purchased the property (in his own name) for $825,000. He
>   paid approximately 25% (over $200,000) and financed the balance
>   (over $600,000). Esherick thereafter moved in. According to
>   Douglas Develoment records and personnel, Jemal paid for various
>   renovations and improvements. Esherick has also lived at this
>   location rent-free.
>
>   At both Radnor Road and Nevada Avenue, Douglas Development paid for
>   utilities from Douglas Development accounts.
>
>   Douglas Development made payments for Esherick's personal
>   automobile. These vehicles included a Chevy Tahoe and a Jeep.

40. Even though Esherick lived rent-free in properties owned by the Jemal's, he claimed mortgage interest deductions and real estate tax deductions in calendar years 2000 through 2002.

41. As an example of the tax consequences of these acts, on Esherick's 2001 federal return he claimed: $66,000 income ($70,200 less his 401K contribution) and a $4,135 state tax refund, for an adjusted gross income of $70,135. He claimed $47,721 in itemized deductions and $5800 in exemptions, leaving a taxable income of $16,614, on which he owed tax of $2494. From that he had a child care tax credit of $600 and another credit of $500, leaving a total tax due of $1,394.

    Among the itemized deductions for 2001, Esherick claimed a mortgage interest deduction ($26,996) and real estate taxes ($3,956) amounting to almost $31,000. He did not claim as "income" Douglas Develoment's payments for the car in his name, though he claimed over $13,048 in deductions based on his claimed use of his vehicle for over 25,5000 miles for business purposes.

42. I have reviewed materials prepared by an IRS Special Agent who has reviewed the books

-9-

and records of Douglas and Develoment and of Blake Esherick. According to the agent, Esherick's return did not include the following verifiable income of Esherick in 2001:

> Payments directly to Esherick from Douglas Development - $15,000
> Car payments made by Douglas Development - close to $12,000
> Payments to ex-wife - $27,100
> Fair rental value of 7804 Radnor Road with utilities

43. According to the IRS Special Agent, crediting Esherick the unreported income mentioned above, making a reasonable assessment of the fair market value of the fair rental value, and disallowing the mentioned deductions, Esherick's true taxable income was over $100,000 greater than reported, and the income tax due and owing far greater than the $1,394 he claimed.

44. IRS analysis of records for calendar year 2002 reveals that Esherick continued to receive income that was not reported to the IRS, and that he claimed deductions to he was not entitled. As noted, Esherick did not file a federal return in 2003.

45. Although some of the Douglas Development payments for the benefit of Esherick are recorded in Douglas Development's books as a "loan receivable," that is, a loan to Esherick, the IRS's review of the records reveals that there have been no repayments on said "loans" and no interest charged on these loans in the books of Douglas Development. Witnesses familiar with the books and records of Douglas Develoment has stated they were unaware of any loan agreements or loan repayments on any so-called loans or advances to Esherick.

### Compensation of John Brownell

46. Records obtained from Douglas Development's payroll service, "ADP," reveal that Brownell has received the following gross annual salary from Douglas Development:

> 2002 - $128,715.96
>
> 2003 - $128,715.96

47. I have reviewed bank records from Brownell's bank account at the Adams National Bank. These records reflect, in calendar years 2001, 2002, and 2003, weekly direct deposits from Douglas Development consistent with the annual income reported above.

48. Pursuant to an ex parte Order signed by the Chief Judge of the United States District Court, District of Columbia, the IRS has disclosed that Brownell has not filed federal tax returns for calendar years 2000 through 2003.

49. In addition to the "payroll income," it appears that Brownell has received substantial additional unreported income from Douglas Development, as described in the following paragraphs.

50. Brownell has had an equity line account at Potomac Valley Ban (PVB). Bank records reveal he opened the account in 1996. Originally, the credit line was $60,000. Over time, it has increased to about $126,700.

51. On numerous occasions since 1996, Brownell would cause Douglas Development to issue checks to pay down his credit line, and, at about the same time, make a draw on his credit line of the same amount as the Douglas Development check. For example, if he wanted, say, $6,200, he would direct that a Douglas Develoment check be prepared payable to PVB as a payment on his credit line for $6,200, and write a check on his credit line to himself for $6,200. The general ledger of Douglas Development would not reflect that Brownell would be personally enriched by $6,200 – rather, the general ledger would only show a check to a PVB.

52. As examples of the above pattern:

    a) On or about May 7, 1999, Douglas Development check 98391 was written to PVB in the amount of $10,391.04, consisting of $10,000 principal and $391.04 interest, payable to the Brownell line of credit account.

    The PVB account statement reflects the deposit of this check on May 10, 1999.[1]  Thereafter, on May 17, 1999, check no. 115 in the amount of $12,500 was drawn against the account.

    b) The very next month, on June 10, 1999, Douglas Development check 98946 was written to PVB in the amount of $3846.67, consisting of $3,500 principal and $346.67 interest, payable to the Brownell line of credit account.

    The PVB account statement reflects the deposit of this check on June 11, 1999. Thereafter, on June 14, 1999, check no. 116 in the amount of $3500, was drawn on the account.

    c) On or about September 13, 2000, Douglas Development check

---

[1] This affidavit is using the dates on the bank statements as the dates for the deposits of the Douglas Development checks into the line of credit and the date that the checks were drawn on the line of credit. The actual deposit or the negotiation of the check may have occurred a short time prior to the date indicated.

86299 was written to PVB in the amount of $1928.43, consisting of $1400 principal and $528.43 interest, payable to the Brownell line of credit account.

The PVB account statement reflects the deposit of this check on September 15, 2000. Thereafter, on September 19, 2000, $1400 was drawn on the account.

d) The next month, on or about October 16, 2000, Douglas Development check 87046 was written to PVB in the amount of $2434.13, consisting of $2000 principal and $434.13 interest, payable to the Brownell line of credit account.

The PVB account statement reflects the deposit of this check on or about October 16, 2000. Thereafter, on October 23, 2000, $2000 was drawn on this account.

e) On or about December 19, 2001, Douglas Development check 86299 was written to PVB in the amount of $6961.05, consisting of $6500 principal and $461.05 interest, payable to the Brownell line of credit account.

The PVB account statement reflects the deposit of this check on December 20, 2001. Thereafter, on December 19 and 24, 2001, two checks, in the amounts of $5000 and $1000 respectively, were drawn on the account. These checks were either deposited into Brownell's personal account or cashed.

f) On or about July 3, 2003, Douglas Development check 109634 was written to PVB in the amount of $6250, payable to the Brownell line of credit account.

The PVB account statement reflects the deposit of this check on July 7, 2003. Thereafter, on July 8, 2003, check #161 in the amount of $6200 was drawn on this account.

53. In 2001, Douglas Development checks amounting to over $50,000 were drawn on accounts of Douglas Development made payable to Brownell's account at PVB. In 2002, checks in excess of $40,000 were prepared. There are numerous checks in other years as well. Many of the PVB checks were simply deposited (in whole or in part with cash taken out) into Brownell's personal account. I have seen numerous "check request forms" of Douglas Development, including forms related to the specific checks described above. These forms reflect that Brownell personally directed the checks to be written to

      PVB to pay his account. Also, as part of the check request documents, Brownell's personal monthly PVB equity line statements would be attached.

54. It was the practice of Douglas Development that all Douglas Development checks were signed by Douglas Jemal personally.

55. The Douglas Development checks to PVB were recorded in the books of Douglas Development in an account for "loan repayments." The purpose of this account is to keep track of expenditures by Douglas Development which constitute repayments of loans <u>to Douglas Development</u> – such as loans from financial institutions and third parties.

56. I am aware of a copy of a 1996 check in the amount of $50,000 by Brownell to Douglas Development, drawn on the PVB account and a 1999 check from Brownell to Douglas Development drawn on BBT Bank in the amount of $20,000. Copies of these two checks have been provided by Douglas Develoment to the United States. They appear constitute loans from Brownell to Douglas Development.

57. There is ample evidence which negates the possibility that all the payments to PVB discussed above were "repayments" for these loans.

58. First, there is evidence that Brownell used the "loan repayment" account, in which he reported the Douglas Develoment checks to PVB, for other personal means as well. As an example, a check to "Tex-Mex Construction" for $8,700 which is recorded in the same "loan repayment" account as the checks to PVB. The supporting invoice for this check reveals that Tex-Mex performed construction work at Brownell's house – and did not make a "loan" to Douglas Development for which the $8,700 was a repayment..

59. Second, Brownell's account balance on his PVB account in 1999 was at the limit of $60,000. Even if this entire balance reflected some sort of outstanding "loan" to Douglas Development, the payments from Douglas Development to PVB subsequent thereto were well in excess of $60,000, and there are no additional loans from Brownell to Douglas Development recorded in the loan payable account after that date.

60. Third, in 1999 and 2000, there are two other Douglas Development checks written directly to Brownell of $20,000 each. These were recorded in Douglas Development's general ledger as loans *to* Brownell (that is a loan receivable to Douglas Development), and not, at that time, as a loan payable to Brownell, suggesting that as of those dates, any loans from Brownell to Douglas Develoment had been repaid in full and these new distribution now represented loans from Douglas to Brownell.

61. Thus, although there may have at one time been a basis for Douglas Development to have made payments to Brownell or to Brownell's account at PVB as "loan repayments," I submit it is reasonable to conclude that Douglas Development and Brownell have used

-13-

the existence of loans as a pretext to conceal and obscure the payments of funds to Brownell well in excess of any loans he may have made.

### Compensation of Paul Millstein

62. Paul Millstein is Douglas Develoment's Vice President in charge of construction. The books and records of Douglas Develoment reveal that it has made substantial payments, amounting to several hundred thousand dollars, for the construction of a house for Millstein. In addition, Douglas Development has made payments of many thousands of dollars directly to Citibank as payment for Millstein's credit card. These have been recorded on Douglas Develoment's books, through 2003 as various loans and advances. Douglas Development's controller from 2001 through 2003 has been interviewed. He has stated that he advised Millstein that these payments should be memorialized in an agreement. The Controller was unaware of any loan repayments or loan agreement.

63. In late 2004, after the commencement of the investigation in this case, in a conversation with an outside accountant, Brownell used words to the effect that he had been instructed to "clean up" Esherick's and Millstein's tax situation.

64. It is reasonable to conclude that financial records related to the compensation or personal financial affairs of the three men – Esherick, Brownell and Millstein – may be found in their offices or in the offices of Douglas Development.

### Search Locations

65. A review of Washington, DC, land records shows that 6001 Nevada Avenue, NW, Washington, DC is owned by Douglas Jemal. The "settlement sheet" for the purchase reflects that the purchase occurred June 23, 2003. Persons associated with the transaction have stated that the home was purchased for Blake Esherick, and persons who know Esherick personally, including Douglas Development employees, have stated that he lives at that address. A witness familiar the address has stated that a truck with the words "Douglas Develoment" was seen in front of that location as recently as February 21, 2005.

66. A review of public records, along with correspondence from the company (including invoices, memos, and stationery with the company letterhead), shows that the principal business address of Douglas Development Corporation is 702 H Street NW, Suite 400, Washington, DC. Numerous items of Douglas Develoment stationery and financial records list 702 H Street, Suite 400, as the address of Douglas Develoment. On January 17, 2005 the undersigned observed 702 H Street NW, Washington, DC to be a multi-story unit in a row of storefronts. The number 702 is visible above the exterior door. Above the number is a large green sign stating "Douglas Development Corp" in gold letters. A two-tone green and silver pick-up truck, with "Douglas Development

Corp" printed on the side, was parked in front of this address. In light of the volume of records that would be created by a firm of the size of Douglas Development, and/or the need to maintain materials and supplies, or locate a computer server, it is reasonable to conclude that there may be areas within the building but not necessarily contiguous or within Suite 400 that serve as a storage room for files, archives or supplies or a location for computer equipment, or similar purposes. The agents shall search said space only if it is readily identifiable.

67. WHEREFORE, the undersigned requests a warrant to search for evidence and proceeds of the following offenses: Title 18, United States Code, Sections 201 (Bribery of a Public Official) and 371 (Conspiracy), and Title 26, United States Code 7201 (Tax Evasion) and 1343 (Wire Fraud).