UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 05-359-01,-02,-03 (RMU) |
| | : | |
| DOUGLAS JEMAL, et al | : | |

**GOVERNMENT'S REPLY TO
DEFENDANTS' OPPOSITION TO GOVERNMENT'S THIRD REQUEST FOR
APPROVAL TO ISSUE RULE 17(c) SUBPOENAS**

The United States, through its attorney, the United States Attorney for the District of Columbia, respectfully replies to Defendants' Opposition to Government's Third Request for Approval to Issue Rule 17(c) Subpoenas. The government will address its replies to the categorization of documents set forth by the defendants in their opposition.

**INTRODUCTION**

At issue are four very discrete sets of documents. They consist of:

1. supporting documents for defendant Blake Esherick's amended W-2s for calendar years 2001 through 2004;

2. supporting documents for <u>four</u> specific Douglas Development checks to Esherick;

3. supporting documents for exactly <u>one</u> check from Douglas Development to the District of Columbia; and

4. specified draft returns and accounting documents related to the accounting for the transaction set forth in Count Five of the Indictment.

The factual and legal detail associated with the parties' arguments should not obscure the

inherent narrowness of the Rule 17(c) subpoenas at issue and the reasonableness of the government's requests in light of the other litigation in this case.

### A. Supporting Documents Underlying Defendant Esherick's Amended W-2s and Amended Tax Returns

In 2005, Douglas Development prepared amended W-2s for defendant Blake Esherick. These were used to support the amended returns Esherick filed for 2001 and 2002, and to support the "non-amended" income tax returns he filed for 2003 (overdue) and 2004. The government has subpoenaed the underlying records that account for the additional income contained in the W-2s from both Douglas Development and its outside accountant, Jeffrey Hotek.

Defendants advance a series of arguments in opposition. First, they claim that the amended returns are irrelevant to establishing the "intent" at the time the initial returns were filed. They persist in framing the issue in this way even though the government has repeatedly made clear that these returns are quite relevant to a _different_ issue: the existence of the underlying tax deficiency.[1] The relevance and admissibility of the amended returns and W-2s is plain. Defendants also claim that the amended returns should be excluded as a "remedial measure." However, they cite no case to support the application of this principle in the context of excluding amended returns and amended W-2s in a tax evasion prosecution.

Finally, they claim that the records at issue are protected by the attorney-client privilege. The D.C. Circuit has warned that "testimonial privileges 'are not lightly created nor expansively construed, for they are in derogation of the search for truth.'" In re Grand Jury Subpoena (Judith Miller), 397 F.3d 964, 984 (D.C. Cir. 2005) (Henderson, J., concurring) (citing United States v.

---

[1] These issues are the subject of the Defendants' Motion in Limine to Exclude Evidence of Amended Tax Returns or W-2 Forms, and the Government's Opposition thereto.

Nixon, 410 U.S. 683, 710 (1974)). Moreover, defendants bear the burden to establish the existence of a valid, unwaived attorney-client privilege to the documents supporting the amended W-2s. See, e.g., In re Subpoena Issued to Commodity Futures Trading Comm'n, 370 F. Supp. 2d. 201, 209 (D.C. D.C. 2005) ("The party claiming privilege has the burden to establish its existence." (citation omitted)).

Financial work papers or data which underlie filed tax returns are not entitled to the protection of the attorney-client privilege, for it is well-understood that this information, even if passing through the hands of an attorney, was intended to be disclosed on the returns. As stated by Judge Posner:

> [I]f a taxpayer involved in or contemplating litigation sat down with his lawyer (who was also his tax preparer) to discuss both legal strategy and the preparation of his tax returns, and in the course of the discussion bandied about numbers related to both consultations: the taxpayer could not shield these numbers from the Internal Revenue Service. This would be not because they were numbers, but because, being intended (though that was not the only intention) for use in connection with the preparation of tax returns, they were an unprivileged category of numbers.

United States v. Frederick, 182 F.3d 496, 501-02 (7th Cir. 1999) (Posner, J.) (citations omitted) (denying privilege asserted by an attorney to the production of tax return related documents), cert. denied, 528 U.S. 1154 (2000). See also United States v. Lawless, 709 F.2d 485, 488 (7th Cir. 1983) (preparation of tax returns was not privileged legal advice and that, even if it were, "disclosure of tax information effectively waives the privilege 'not only to the transmitted data but also as to the details underlying that information'"); United States v. Crane, 1988 WL 12138 at ** 3 (6th Cir. February 18, 1988) ("If the client transmitted the information so that it might be used on a tax return, such a transmission destroys any expectation of confidentiality which might

have otherwise existed." (referencing unfiled returns));[2] United States v. Cote, 456 F.2d 142, 145 (8th Cir. 1972) (where otherwise privileged documents were used to prepare an amended tax return, the filing of the return "effectively waived the privilege not only to the transmitted data but also as to the details underlying that information.").[3] Esherick filed amended 2001 and 2002 returns, and "non-amended" 2003 and 2004 returns, in each instance relying on amended W-2s. For reasons set forth above, the attorney-client privilege may not be interposed to insulate the underlying financial data from disclosure.

The government stresses that the subpoenas have been carefully drafted precisely to avoid production of documents reflecting legal analyses. In this regard, the June 8, 2006 Douglas Development subpoena seeks "all records which itemize and/or otherwise provide the calculations for all components of the additional income reflected in the amended W-2s for Blake Esherick issued for calendar years 2001, 2002, 2003 and 2004." Similarly, the July 21, 2006 subpoena to Mr. Hotek seeks "all records which itemize and/or otherwise provide the calculations for all components of the additional income reflected in the amended W-2s for Blake Esherick issued for calendar years 2001, 2002, 2003 and 2004." If these documents were prepared by an accountant or tax preparer directly for Douglas Development or Esherick, and not

---

[2] In re Grand Jury Proceedings (Osman), 220 F.3d 568, 571 (7th Cir. 2000) ("[M]aterial transmitted to an attorney or the attorney's agent for the purpose of using that information on a tax return is not privileged. The preparation of tax returns is an accounting service, not the provision of legal advice." (citing Lawless and Frederick)); United States v. White, 970 F.2d 328, 334 (7th Cir. 1992) (same, on facts involving documents underlying disclosures in bankruptcy filings) (citing Lawless)).

[3] These principles have been relied on by Chief Judge Hogan of this Court, who, in addressing claims of attorney client privilege interposed by an accounting firm, noted that "the privilege does not protect communications between a tax practitioner and a client simply for the preparation of a tax return." United States v. KPMG LLP, 237 F. Supp. 2d 35, 39 (D.D.C. 2002) (citing Lawless).

for defense counsel, no privilege would pertain, "and a taxpayer must not be allowed, by hiring a lawyer to do the work that an accountant, or other tax preparer, or the taxpayer himself or herself, normally would do, to obtain greater protection from government investigators than a taxpayer who did not use a lawyer as his tax preparer would be entitled to." United States v. Frederick, 182 F.3d at 500.

In addition, it appears that any attempt to cloak these papers with "privilege" was waived by other disclosures as well. In particular, the defendants have indicated that they hired a forensic accountant, Paul Dopp of the CPA firm Tauber & Baler, P.C., to work with them, and directed Mr. Dopp "to work with Jeff Hotek and others at DDC's independent accounting firm, Grossberg Company, LLP, to develop the tax schedules that were ultimately used to prepare Esherick's amended W-2 forms." Defendants' Opposition at 6. Even assuming certain aspects of Mr. Dopp's work product are subject to protection under the attorney-client privilege, defendants provide few details to support their claim that the information disclosed to or prepared by a third party, Mr. Hotek, from "DDC's independent accounting firm" (emphasis supplied), is cloaked with the privilege. In this regard, Mr. Hotek has enjoyed a professional relationship with Douglas Development since the mid-1990s, long before he had some undefined role in preparing the amended W-2s. Simply labeling him part of the defense team for a limited purpose does not make him so, and the subjective intent of Akin Gump attorneys (to seek advice from Mr. Hotek) does not render their disclosures to him (or from him) protected any more than if they made disclosures to seek advice from the Internal Revenue Service. The defendants have provided no proffer of any contemporaneous evidence that would memorialize a new and fundamentally different relationship between Mr. Hotek and the defendants (and their counsel)

sufficient to bring Hotek communications and documents within the ambit of the attorney-client privilege. See, e.g., Cavallaro v. United States, 284 F.3d 236, 249 (1st Cir. 2002) (accounting firm Ernst & Young's work not held privileged in the absence of contemporaneous evidence that the firm acted as an agent of attorneys at Hale and Dorr in providing legal advice: "[W]hen a party hires an accountant to provide accounting advice, and only later hires an attorney to provide legal advice, it is particularly important for the party to show that the accountant later acted as an agent necessary to the lawyer in providing legal advice." (citation omitted)).

Thus, in considering: 1) the narrow scope of the subpoenas (calling for limited collection of "non-legal" type financial documents), 2) the well-established body of law that stands for the proposition that financial documents underlying tax returns cannot be cloaked with the attorney-client privilege once the returns have been filed, and, 3) the failure of the defendants to provide anything more than assertion to establish the existence of a privilege as to Mr. Hotek, we urge the Court order production of the documents sought by the subpoenas relating to the amended Esherick W-2s. To the extent that the defendants maintain that portions of those documents contain legal analyses, those portions may be redacted and presented to the Court for in camera inspection.

**B.  Certain Esherick Financial Records from 2000 and 2005.**

The subpoenas seek supporting data for four checks to Esherick: one in 2000 and three in 2005.

The Indictment charges that part of the tax evasion scheme consists of the routine payments by Douglas Development to Esherick, recorded on the books and records of Douglas Development as "loans." Once they became aware of the tax investigation, the defendants

attempted to clean up these so-called Esherick "loans." Rather than actually making Esherick repay the approximately $250,000 in recorded "loans" from his own savings (a task which would have been impossible since (1) Esherick had no savings, (2) he had been paid only $66,000 per year from Douglas Development from 1998 through 2004, and (3) he had no equity in a home (he was instead living in house provided by Douglas Jemal)), Douglas Development paid Esherick approximately $245,000 in June 2005, and, on that same date, Esherick's wife wrote a check back to Douglas Development in the exact same amount.

Accordingly, the government seeks the supporting details for this 2005 transaction, as well as two other large dollar transactions in the early 2005 time-frame (that appear to provide Esherick the cash to pay his taxes on his now "amended" income disclosures). The contention that these documents are irrelevant to the charges in the case because they relate to transactions occurring outside the charged years of evasion is simply frivolous. If there were a temporal limitation on the evidence the government may admit along the lines suggested by the defendants, the government in a homicide case could not put into evidence the events preceding the homicide reflecting motive (such as years of prior non-fatal fights between the defendant and the decedent) or preparation (such as buying weapons and stalking), or subsequent to the homicide reflecting concealment and cover-up activity (such as burying the body and attempting to create a false alibi). A white collar fraud case is no different: the post-offense scurrying around to make the books look right, even if it happened a year after the crime, is powerful admissible evidence of intent. Defendants' assertions notwithstanding, no basis in law or fact supports the notion that 2005 "post-offense" conduct or 2000 "pre-offense" conduct is irrelevant to the proof of 2001 through 2003 tax charges in this case. Indeed, Esherick filed his (false)

-7-

2003 return in 2005. For reasons set forth above, the 2000 and 2005 conduct squarely relate to the charges in this case.

Thus, the government seeks supporting detail for only four specific payments to Esherick: one that occurred in 2000 (a purported "loan" check issued prior to the charged conduct) and three in 2005 (at least one of which accounted for the prior loans). The motion for the production of said documents by way of Rule 17(c) subpoena should be granted.

### C. Support for the $42,159.67 Check from Douglas Development to the D.C. Government.

On November 12, 2003, Douglas Development wrote a check to the D.C. Government in the amount of $42,159.67. This payment constituted a refund for overcharges in connection with construction performed by Douglas Development for the city at 4800 Addison Road.[4]

On December 18, 2003, many weeks subsequent to the November 12, 2003 check, Douglas Development and the D.C. Government reached a settlement on a broad range of issues. Paragraph 11 of the settlement agreement referenced the above check, and stated in full: "[Douglas Development] paid to the District on November 13, 2003, and the District has accepted, Forty Two Thousand One Hundred Fifty Nine and 67/100 Dollars ($42,159.67) to reimburse the District for excess payment for improvements at 4800 Addison Road."

The government seeks the underlying documents in support of this payment; the defendants object on the grounds that this entire payment and the settlement agreement must be considered off-limits pursuant to Rule 408 of the Federal Rules of Evidence.

---

[4] In particular, Douglas Development had separately billed the city for fencing that it had agreed to provide under the lease, and overcharged the city for certain profit and overhead in excess of the lease terms.

First, the defendants state that this payment was "part of" the settlement agreement. This appears not to be the case. This payment was made November 12, 2003, the check was negotiated December 12, 2003, and the agreement was not executed until December 18, 2003. No indication exists that the November 12, 2003 payment was conditioned on the subsequent settlement agreement.[5] No basis exists for any conclusion other than that this payment was absolute and irrevocable, and that once the money left the account of Douglas Development it could not be retrieved even if no settlement agreement were reached. Accordingly, the evidence tends to support the conclusion that the payment was not made as part of the settlement, notwithstanding the fact it was subsequently referenced in the settlement agreement.[6] Thus, Douglas Development should possess other documents, such as a check request form, a check stub, and accounting documents that provide contemporaneous accounting for this November 2003 payment.

Second, it is arguable whether Rule 408 even bars the admission of the single paragraph in the settlement agreement (along with the signature lines and certain introductory phrases) which recite the purpose of this payment. As noted in related litigation, it appears Rule 408 has no application to criminal cases, and, in any event, it does not appear that the terms of the Douglas Development--D.C. Government settlement agreement that acknowledge this payment actually resolved a truly contested debt.

---

[5] For example, the settlement agreement is conditioned on the approval by the D.C. City Council. However, there is no suggestion that if the City Council were to reject the agreement, the $42,159.67 would have to be returned by the city government to Douglas Development.

[6] Douglas Development would have incentives to insert reference to this payment in the settlement agreement so that the D.C. Government would be constrained from pursuing other remedies against Douglas Development for Addison Road overcharging.

Third, assuming the admissibility of the paragraph of the settlement agreement referencing the payment, the government acknowledges that it could not argue from such evidence that Douglas Jemal has admitted <u>wrong-doing</u>. However, the government would remain free to argue that Douglas Jemal has admitted the precise contents of paragraph 11: namely that the payment "reimburse[d] the District for excess payment for improvements at 4800 Addison Road." Unless Mr. Jemal asserts that his signed word is not to be believed, there is no reason he should not be bound by it.

Accordingly, the government's motion, insofar as it seeks the underlying records related to this single check, should be granted.

### D.   The "MTD" Documents

In 2005, the government alerted Douglas Development's outside CPA, Jeffery Hotek, as to the existence of a company – MTD Real Estate Services (MTD) – controlled by defendant Douglas Jemal, that received $430,000 from the settlement of the refinance loan for 77 P Street. The proceeds of the $430,000 were then used by Jemal to purchase a property at 111 Massachusetts Avenue, N.W., Washington, D.C.

In 2006, Mr. Hotek was interviewed in preparation for trial. He stated that subsequent to January of 2005 he prepared tax returns for MTD, that he possesses them, and that the returns have not been filed. (He did not state when he prepared the returns.) He also indicated that the transaction is presently characterized as income to Douglas Development (hence income to Douglas Jemal) and a loan from Douglas Development/Douglas Jemal to the corporate entity (consisting of Douglas Jemal and Norman Jemal) that used the funds to purchase the 111 Massachusetts Avenue property. These accounting actions, in certain broad strokes, are

-10-

consistent with the Indictment, which charged in substance that the defendants used MTD as a way for Douglas Jemal to obtain income from the Morgan Stanley refinance loan, so as to conceal his receipt of these funds from his partner, from Morgan Stanley, and from the Internal Revenue Service.

The government promptly issued Rule 17(c) subpoenas for Mr. Hotek and Douglas Development for these documents, generally consisting of the "draft" returns prepared by Hotek and the underlying work papers, and the accounting records of Douglas Development that now account for this transaction – whether in the possession of Douglas Development or Mr. Hotek.

The defendants offer little in opposition, other than a broad claim as to 1) relevance of the documents and 2) the breath of the subpoena.

Taking the second argument first, we submit that, contrary to the contentions of the defendants, the underlying subpoenas describe the requested MTD documents with great specificity, using such easy to understand terms such as "draft returns," "work papers," and "general ledgers." (The defendants can hardly be heard to complain at to breadth in that they issued subpoenas to the District of Columbia Government calling for "all email, memoranda, reports, letters and transaction files relating to [three properties].")

As to the relevance: the defendants' post-transaction accounting for the transaction appears to support the charges in the Indictment and constitutes a broad admission that the monies were in fact a form of unreported income to Douglas Jemal. (Furthermore, the defendants intend on calling their own expert as to certain accounting aspects of this transaction; accordingly, Douglas Development's actual accounting for this transaction, and the tax returns prepared by Douglas Development's actual accountant, are likely to constitute significant

evidence, either on cross-examination of the expert, as admissions in the government's direct case, or as evidence of a type of cover-up conduct in the nature of cleaning up the books to account for previously concealed income.)

* * *

In light of what may appear to be a vast array of factual and legal issues contested by the parties, we stress that the particular issues presented by the government's motion involve an exceptionally narrow set of documents, and reflect the restraint and care by the government, in a complicated white collar case, to impose as few document production burdens as possible. One of the subpoenas was issued in early June – over three months prior to trial – the others in July upon an interview with a witness alerting the government to the existence of specific documents. For reasons set forth in this pleading, the documents sought are highly relevant and admissible.

WHEREFORE, we request the Court sign the proposed <u>Order</u> approving the issuance of the proposed subpoenas.[7]

                                                          KENNETH L. WAINSTEIN
                                                          DC Bar No. 451058.
                                                          UNITED STATES ATTORNEY

By: _____
                                                          MARK H. DUBESTER
                                                          ASSISTANT UNITED STATES ATTORNEY
                                                          DC Bar No. 339655
                                                          Timothy G. Lynch
                                                          555 Fourth Street, N.W., Room 5917
                                                          Washington, D.C. 20530
                                                          Ph. (202) 514-7986

---

[7]    The Government has attached an amended Order permitting the defendants to provide claimed attorney-client materials to the Court for <u>in camera</u> review.

## CERTIFICATE OF SERVICE

I hereby certify that, on this 7th day of August, 2006, I caused to be served by electronic filing a copy of the foregoing Reply, to:

Michele A. Roberts, Esquire
Counsel for Douglas Jemal
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036

Paul F. Kemp, Esquire
Counsel for Blake C. Esherick
Venable LLP
One Church Street, Fifth Floor
Rockville, MD 20850

Reid H. Weingarten, Esquire
Erik L. Kitchen, Esquire
Brian M. Heberlig, Esquire
Counsel for Douglas Jemal
Steptoe & Johnson
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Carol Elder Bruce, Esquire
Lawrence B. Bernard, Esquire
Counsel for Blake C. Esherick
Venable LLP
575 Seventh Street, NW
Washington, D.C. 20004

Christopher B. Mead, Esquire
Counsel for Douglas Jemal
London & Mead
1225 19th Street, NW, Suite 320
Washington, D.C. 20036

Stanley McK. Brand, Esquire
Ross A. Nabatoff, Esquire
Counsel for Norman D. Jemal
Brand Law Group
923 15th Street, NW
Washington, D.C. 20005

_/s/ Mark H. Dubester_
Mark H. Dubester
Assistant United States Attorney