UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES** ) | |
| ) | |
| v. ) | Crim. No. 05-359-1, -2, -3 (RMU) |
| ) | |
| **DOUGLAS JEMAL**, *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE PROPOSED EXPERT TESTIMONY OF RICHARD WATKINS**

Defendants' accounting expert, Richard Watkins, will not offer any opinions about intent. He will not offer opinions as to whether any transactions charged in the Indictment were intentional crimes or innocent mistakes; indeed, it is not necessary that he mention any charged transactions in his testimony. However, Watkins' testimony will be of crucial assistance to the jury in evaluating the Government's proof. His 40-plus years of experience as an accountant and successful entrepreneur in his own right establish his qualifications beyond doubt. His testimony is relevant and reliable. He should be allowed to testify.

I.   FACTUAL BACKGROUND

   A.   The Tax Charges

      1.   The Government's evidence

Counts Six, Seven, and Eight of the Indictment charge Defendants Douglas Jemal and Blake Esherick with tax evasion related to Esherick's personal tax liability for the years 2001, 2002 and 2003, respectively. During those years, Douglas Development Corporation ("DDC") made a substantial number of payments to Esherick that were booked as loans on DDC's general ledger. After he separated from his first wife, Esherick lived rent free in a house owned by

Norman Jemal in 2001, 2002, and through mid-2003.  DDC cut monthly checks for child support to Esherick's ex-wife that were initially booked as miscellaneous business expenses on DDC's general ledger, and subsequently reclassified as loans to Esherick.  DDC paid for cars titled to Esherick and his second wife; DDC did not have an accounting system that accounted for car expenses or personal use of company cars as potential income to DDC employees.

The Government claims that the failure to record any of these items on Esherick's W-2s was intentional tax evasion.  The defense contends that the majority of these payments were loans to Esherick, that certain items were gifts arising out of Esherick's close relationship with Douglas Jemal, and that with respect to a few items, DDC simply did not have accounting infrastructure and systems in place to monitor and accurately capture all items of employee compensation.  The Government will doubtless say that such accounting failures were intentional; the defense contends that DDC's tax accounting failures were not intentional, but instead were part of a larger company problem.

### 2. The relevance of Watkins' opinions

The Government's evidence will take advantage of jurors' assumptions that a successful business like DDC could not have failed to do proper tax accounting by accident.  That is why Watkins' first opinion is so relevant and crucial to the defense.  Watkins' "Opinion 1" is that "DDC's accounting department was woefully understaffed and overworked throughout the period from 1999 through 2004.  As a result, routine accounting work was not being done or was being done late.  In such an environment, mistakes are common.  The mistakes that occurred as a result of DDC's understaffed accounting department often hurt DDC financially."

Watkins will testify about how DDC's interdependent accounting functions were understaffed and delayed.  He will testify that the same lack of infrastructure that failed to

capture all employee compensation also failed to capture Common Area Maintenance ("CAM") charges and rent increases that should have been billed to DDC's tenants.  DDC's accounting failures cost the company millions of dollars.  Only an expert can explain what an accounting department for a business like DDC should be, and put the actual performance of DDC's accounting department in perspective for the jury.  With that perspective, the jury will be able to evaluate whether DDC's failures to capture all items of potential employee compensation were intentional, or part of a systemic problem at the company.  Only with the assistance of Watkins' expertise will the jury see the truth.  This was not criminal conspiracy.  It was overworked people failing to keep up with an exploding, entrepreneurial business.

As part of its tax case, the Government contends that Esherick and other key DDC employees were underpaid in comparison to their fellow employees, and that loans to these underpaid employees were intended as income to make up for inadequate salaries.  Again, Watkins' 40-plus years of providing accounting and business advice to clients, and his experience in running his own successful businesses, can put the Government's evidence in perspective for the jury.  Watkins offers two opinions obviously relevant to the defense:

Opinion 2: In many companies and businesses, salaries are not set purely as a function of job title, but often depend on the specific circumstances and personalities of the individual employees.

Opinion 3: It is common for small businesses to make loans to their employees.  The DDC loans to employees alleged in the indictment very likely enhanced loyalty and employee retention.  Because of the understaffing in the DDC accounting department, it is not surprising that mistakes would happen in accounting for the employee loans and other compensation.

These general observations, based on Watkins' personal experience, are not intended as specific opinions about DDC's salaries or the effect of DDC's loans on any specific employee. The Government objects to the language in the expert disclosure that DDC loans to employees "very likely enhanced loyalty and employee retention." That language merely illustrated the relevance of Watkins' opinions, and is actually unnecessary to his general opinion that loans to employees enhance loyalty and employee retention.

### B.     "False" Invoices

#### 1.     The Government's evidence

Count Three of the Indictment charges that the Defendants intended to defraud the D.C. government through a series of fraudulent invoices. As part of its case, the Government apparently will contend that DDC's failure to credit the District for a $100,000 advance payment on construction expenses at the Addison Road property was intentional, rather than an accounting oversight. The Government apparently will contend that DDC's fully disclosed charge of a 20% profit margin on construction at Addison Road, instead of the 15% margin allowed in the lease, was an intentional criminal act, rather than an administrative error. The Government will apparently contend that DDC's delay of months in crediting the District for $377,000 in payments it made to vendors at 77 P Street out of the District's commission pool reflected criminal intent.

#### 2.     The relevance of Watkins' opinions

Watkins' opinion that DDC's accounting department was understaffed and behind in reconciling accounts will obviously assist the jury in determining whether DDC's billing errors were intentional criminal acts or innocent mistakes. Again, Watkins will not offer opinions about whether any billing errors were intentional or not; he will simply explain how the lack of

accounting resources at DDC led to an environment where mistakes did occur, many of which hurt DDC financially.

### C.    The MTD Charge

#### 1.    The Government's evidence

In November, 2002, DDC submitted to Morgan Stanley, the construction lender for 77 P Street, a bill for a real estate commission payable to MTD Real Estate Services ("MTD").  Count Five of the Indictment charges the Defendants with wire fraud, alleging that the MTD invoice was part of a scheme to defraud Morgan Stanley of money or property, because the MTD invoice did not reveal that MTD was a DDC affiliate.

#### 2.    The relevance of Watkins' opinion

Watkins' Opinion 5 is directly relevant to the charge in Count Five: "Morgan Stanley did not lose any money as a result of the $430,039.08 commission paid to MTD out of the "Rollover Account" for tenant improvements, nor would it have from the borrower's point of view."  Watkins has analyzed the loan agreement between Morgan Stanley and the Jemal partnership that owned 77 P Street.  He will explain that Morgan Stanley fully funded the loan upon execution of the agreement, and that Morgan Stanley began receiving interest on the entire loan amount, even those amounts that it held in the "Rollover Account" created to pay for remaining leasing commissions and tenant improvements at 77 P Street.  Morgan Stanley also retained a $19 million Completion Holdback from the loan proceeds, payable when 77 P Street met certain leasing benchmarks.  Morgan Stanley received interest on that $19 million, even before it had to distribute the $19 million.  Watkins will also explain that Jemal's partner also guaranteed the loan, and that Jemal's partner submitted a statement showing a net worth of $350 million.

Watkins will explain that Morgan Stanley was earning interest on the $430,000 commission it paid as a result of the MTD invoice, regardless of whether the bank distributed the $430,000 in November, 2002, or whether it distributed that money several months later when it distributed the Completion Holdback. The bank was fully guaranteed on the loan. It did not lose any money, and was not in danger of losing money regardless of whether it paid the MTD invoice. Watkins' testimony will assist the jury in determining that Defendants could not possibly have intended to defraud Morgan Stanley.[1]

## II.  ARGUMENT

Based on the erroneous assumption that Watkins will offer testimony about the intent of DDC employees when they booked checks benefiting Esherick, the Government argues that such issues are not "beyond the common knowledge of the average layman."[2] Because Watkins will not opine about the intent behind any specific transaction, the Government's argument misses the mark.

However, Watkins' expert testimony about the accounting functions and personnel necessary to support a business managing over 120 properties, and DDC's understaffing and interdependent accounting delays and failures, is crucial to the defense precisely because it is specialized knowledge beyond the ordinary juror's experience. In an analogous context, D.C. law requires expert testimony in any civil action for accountant malpractice, because the

---

[1] The Government does not challenge Watkins' Opinion 4: "The property at 77 P St., N.E. was not a cash drain on DDC in 2001 and 2002 because of the structure of the loan in place with Fremont Investment and Loan ("Fremont"). Similarly, it was not a cash drain after November 19, 2002, because of the structure of the Morgan Stanley loan."

[2] Government's Motion *In Limine* to Exclude Proposed Expert Testimony of Richard Watkins ("Gov't Motion") at 4, quoting *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001) and citing additional cases.

standards for ordinary accounting practice are not something juries know from common knowledge. *Hodge v. D.C. Housing Finance Housing Agency*, Civil Action No. 92-2347, 1993 U.S. Dist. LEXIS 14584, at*2 (D.D.C. Oct. 15, 1993) (Oberdorfer, J.). <u>See also</u> *Griggs v. WMATA*, Civil Action No. 99-1552, 2002 U.S. Dist. LEXIS 18413, at *11-12 (D.D.C. Sept. 30, 2002) (Urbina, J.) (noting requirements for expert testimony in negligence cases under D.C. law). The Government does not contend that the jury will know from its common experience which of DDC's accounting functions were understaffed and delayed, and the effect that would have on the accuracy of DDC's general ledgers, tax compliance, and billing functions.

Next, the Government complains that Watkins will testify to a non-scientific inference that mistakes in accounts payable and receivable mean that mistakes were likely to happen in accounting for tax compliance. Gov't Motion at 5. Again, Watkins will not offer an opinion about whether failures to account for all items of employee compensation were intentional or innocent. He will testify about how DDC's accounting department was so understaffed and delayed that it was routinely reconciling accounts and filing tax returns late. He will testify that DDC's accountants did not review the accuracy of expense accounts. He will testify about the effect that such problems would have on the accuracy of DDC's general ledgers and tax information. He will testify that DDC's accounting failures cost the company money.

This opinion testimony about the inadequacies of DDC's accounting systems certainly leads to an inference that accounting failures on employee compensation were not intentional, but Watkins will not testify to such an inference. The Government's arguments that businesses have stronger incentives to account accurately for employee compensation than for accounts

payable and accounts receivable[3] seem illogical, but that is what jury trials are for. Such arguments go the weight, not the admissibility, of Watkins' testimony.

In any event, testimony supporting an inference that Defendants' conduct was not willful and intentional is clearly admissible. *United States v. Garber*, 607 F.2d 92, 99 (5th Cir. 1979) (*en banc*)("where the element of willfulness is critical to the defense, the defendant is entitled to wide latitude in the introduction of evidence tending to show lack of intent.") In a closely analogous case, *United States v. Vitillo*, No. CR 03-555, 2004 WL 2496877 (E.D. Pa. Nov. 2, 2004), the prosecution sought to exclude expert accounting testimony that Defendants' billing function had made numerous mistakes. The district court denied the Government's motion, holding: "[t]he accountants' testimony is relevant to establish the fact that there were numerous mistakes made in the formulation of the bills submitted, and that Defendants lacked the specific intent to commit the violation of [18 U.S.C. section] 666." *Id.* at *9.

Next, the Government argues that no reliable methodology would allow Watkins to testify that because DDC's accounting department made mistakes in some areas, it made innocent mistakes in accounting for employee compensation. Gov't Motion at 6. Again, the Government's argument misses the mark, because Watkins will not offer an opinion that DDC's failures to account for some items of employee compensation were innocent or intentional.

The Government's appeal to the Court's "gatekeeper" function fails to acknowledge the limits of that role. As the D.C. Circuit has noted, "In analyzing the admissibility of expert testimony, it is important for trial courts to keep in mind the separate functions of judge and jury, and the intent of *Daubert* to loosen the strictures of *Frye* and make it easier to present legitimate conflicting views of experts for the jury's consideration." *Ambrosini v. Labarraque,* 322 U.S.

---

[3] Gov't Motion at 5.

App. D.C. 19, 101 F.3d 129, 134 & n.7 (D.C. Cir. 1996), quoting *Joiner v. General Electric Co.*, 78 F.3d 524, 539 (11th Cir. 1996). This Court has recognized that "the standard under Federal Rule of Evidence 702 is a liberal and 'flexible' one, and that personal experience can be a reliable and valid basis for expert testimony." *Groobert v. President and Directors of Georgetown College*, 219 F.Supp.2d 1, 7 (D.D.C. 2002) (Urbina, J.), citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999).

      The Government objects to Watkins' opinion 2 ("in many companies and businesses, salaries are not set purely [as] a function of job title, but often depend on the specific circumstances and personalities of the individuals"). The Government claims that what happens at other companies is irrelevant. Gov't Motion at 7. However, the Government seems to believe that what happens at other companies is relevant, because it apparently intends to argue that the salaries paid to certain key DDC employees were below market. A big part of the Government's tax case is that Esherick was underpaid, and that loans to him were intended as compensation to make up for a low salary. The jurors may not have Richard Watkins' 40-plus years experience in running two businesses of his own and giving business advice to clients. They may not be able to evaluate the Government's inference that employees will not accept below market salaries, which is decidedly contrary to Watkins' long personal experience. Watkins' testimony about various factors that lead employees to accept below market salaries is directly relevant to rebut an inference that the Government would have the jury uncritically accept.

      The Government makes similar objections to Watkins' opinion 3 ("It is common for small businesses to make loans to their employees. The DDC loans to employees alleged in the indictment very likely enhanced loyalty and employee retention"). Again, the Government argues that what happens at other companies is irrelevant. Gov't Motion at 7-8. Jurors without

Watkins' business experience and expertise may draw adverse inferences from the fact that DDC recorded large loans to employees on its general ledger, without understanding that loans to employees are, in Watkins' experience, not unusual at all. Watkins' testimony here is relevant to rebut any inferences that loans to employees are somehow improper or unusual on their face.

The Government argues that Watkins should not testify that the transactions at issue "very likely" enhanced loyalty and employee retention at DDC. Defendants intended that disclosure as illustrative only; Watkins can testify generally that loans enhance loyalty and employee retention, without referencing the specifics of any loans to DDC key employees. The Government contends that expert testimony to that effect is unnecessary, because jurors understand that loans to employees will enhance loyalty and employee retention. Gov't Motion at 8. Put the Government to the test—if it will stipulate that loans to employees enhance loyalty and make it difficult for employees to leave because the loans may become immediately callable, there is no need for Watkins to testify on this subject.

Finally, in a single paragraph without case citation, the Government argues that expert testimony demonstrating that Morgan Stanley did not, and could not, have lost money as a result of paying the MTD invoice is irrelevant to a wire fraud charge that Defendants intended to defraud Morgan Stanley. Gov't Motion at 9. That argument is both absurd and frightening. The Government must prove that the Defendants intended to defraud Morgan Stanley. If they understood the loan documents (a reasonable inference), Watkins' testimony demonstrates that they would not have had such an intent in submitting the MTD invoice.

The Government also argues that Watkins' analysis of hundreds of pages of the Morgan Stanley loan documents is not properly the subject of expert testimony. Based on the Indictment's allegations, it is highly likely that Government counsel misunderstood the loan

agreement. Defense counsel struggled to understand the loan documents. The jury will certainly have difficulty understanding the provisions for a "Rollover Account" and a "Completion Holdback" in the loan documents. Watkins' testimony will undoubtedly assist that jury in understanding that Morgan Stanley was not defrauded.

## III.     CONCLUSION

For all of the foregoing reasons, the Court should deny the Government's Motion *In Limine* to Exclude Proposed Expert Testimony of Richard Watkins.

Respectfully submitted,

_____
Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C.  20036
(202) 331-3334

Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036-1795
 (202) 429-3000

Michele A. Roberts
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 887-4306

Counsel for Douglas Jemal

- 11 -                                                                      Doc. #3307 v.3

Stanley M. Brand
Ross Nabatoff
The Brand Law Group
923 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 662-9700

Counsel for Norman Jemal


Paul Kemp
Carol Elder Bruce
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4400

Counsel for Blake Esherick

Dated: August 8, 2006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that the foregoing Defendants' Opposition to the Government's Motion *In Limine* to Exclude Proposed Expert Testimony of Richard Watkins was served via the Court's Notice of Electronic Filing to those authorized to receive filings in this case on the 8th day of August, 2006.

_____
Christopher B. Mead