UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Crim. No. 05-359-01, -2, -3 (RMU) |
| | : | |
| DOUGLAS JEMAL, ET AL. | : | |

**DEFENDANTS' MOTION TO COMPEL THE
GOVERNMENT TO COMPLY WITH ITS OBLIGATIONS
UNDER *BRADY*, *GIGLIO*, AND D.C. RULE OF PROFESSIONAL CONDUCT 3.8**

Two words, one man, Michael Lorusso. Before joining the D.C. government, he held in trust a widow's civil settlement for the untimely death of her husband, the life savings of a Florida hairdresser, and tens of thousands from other acquaintances in Ponzi schemes that he claims neither to have managed nor understood. As Deputy Director of OPM, he won the trust of high-level District officials and impressed the private real estate community by cutting through red tape, getting deals done, and finding a desperately-needed impound lot, all while charging thousands of dollars for computers, furniture, and other personal items on his D.C. government credit card, and running a dummy invoice scheme with government contractor Fred Villegas. When the U.S. Attorney's Office for the District of Columbia found a wire transfer of $25,000 from Villegas to Lorusso's attorney in Boston, Lorusso turned his powers of persuasion on Government investigators. Despite acknowledging that the Defendants never asked him for a quid pro quo, Lorusso won the trust of the U.S. Attorney's Office for the District of Columbia with implausible and inconsistent stories of having received cash from Defendant Blake Esherick on two occasions.

In return for his stories about cash, Lorusso received full absolution for his Ponzi schemes. In return for testifying against his prominent former friends, Lorusso capped his

guidelines exposure at an Offense Level of 25, and may even get a 5K motion if he can hold up as a trial witness. Government counsel have refused to explain how they arrived at that guidelines calculation. Only a few days before Lorusso is due to testify, Government counsel still have not disclosed crucial information about Lorusso's finances and criminal conduct.

In response to persistent efforts by Defense Counsel, the Government has produced some *Brady* and *Giglio* material relating to Michael Lorusso. It is clear from a review of these materials and of the Government's discovery letters and motions responses, however, that the Government has not turned over substantial information that is exculpatory to Defendants and bears directly on Lorusso's credibility. Accordingly, the Government is obligated to produce additional information under *Brady v. Maryland,* 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and District of Columbia Rule of Professional Conduct 3.8. The Government has notified Defendants that it expects Lorusso to testify next week. Defendants urgently request the Court to order Government Counsel to produce all *Brady, Giglio,* and Rule 3.8 material to Defendants by 5 p.m. Monday, October 2.

**I.    THE LAW.**

There is no dispute that the Government must disclose to Defendants any favorable evidence in its possession that is material to guilt or punishment. *Brady,* 373 U.S. at 87. "Favorable" evidence includes not only evidence tending to exculpate the accused, but also any evidence that casts doubt on the credibility of the Government's witnesses. *United States v. Bagley,* 473 U.S. 667, 676 (1985); *Giglio,* 405 U.S. at 155.

Pursuant to *Giglio,* "a prosecutor is obligated to disclose any benefit conferred on any witness." *United States v. Ramsey,* 165 F.3d 980, 989 (D.C. Cir. 1999). Such benefits include,

but are not limited to, "plea agreements, promises of leniency by the Government, inducements to testify, and financial assistance offered by the government." *United States v. Beckford,* 962 F. Supp. 780, 786 (E.D. Va. 1997); *United States v. Johnson,* 840 F. Supp. 634, 640 (E.D. Wis. 1993)("the lengths to which the government was willing to go to help [a government witness] would have been material evidence.")

In addition to the textbook obligations imposed by *Brady* and *Giglio,* the District of Columbia has adopted Rule of Professional Conduct 3.8, entitled "Special responsibilities of a prosecutor." Rule 3.8(e) provides that a prosecutor shall not:

> intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or mitigates the offense . . .

Local Criminal Rule 57.26 provides that the D.C. Rules of Professional conduct apply to attorneys practicing in the United States District Court for the District of Columbia.[1]

The Supreme Court has recognized that Rule 3.8 imposes a higher standard on prosecutors than the standards mandating disclosure of exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83 (1963):

> [*Brady*] requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate. See ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)("A prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate

---

[1]The local rule is consistent with 28 U.S.C. 530B(a) which provides that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each state where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorney in that State."

> the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused"); ABA Model Rule of Professional Conduct 3.8(d) (1984)("The prosecutor in a criminal case shall . . . make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense.")

*Kyles v. Whitley,* 514 U.S. 4199, 437 (1995).

## II.     INFORMATION REQUESTED BY THE DEFENSE.

Defendants have requested the following categories of exculpatory evidence from the Government:

### A.     Missing Notes From Interviews With Lorusso.

This Court previously directed Government counsel to produce notes of witness interviews. Although the Government has produced some of this information regarding Lorusso, the Government's own discovery letters and motion responses demonstrate that Government counsel have interviewed Lorusso many more times than is reflected in those documents. For example, in its Discovery Letter #11, dated July 10, 2006, the Government identified two different investment schemes in which Lorusso was involved, the first with an entity called "Resource F," and the second with an individual named "Dexter Wadsworth."[2] The letter disclosed that Lorusso obtained $100,000 from Deborah Koepper, a Florida hairdresser, to invest in Resource F. He also obtained $170,000 and $35,000 from individuals to invest with Dexter Wadsworth. The Government stated, "Lorusso has stated that he thought and intended at the time that he was putting Koepper in a good investment, sought to impress her by doing so, and had no intent to defraud her." Similarly, with respect to Wadsworth, the Discovery Letter stated:

> Lorusso has stated he believed at the time that the Wadsworth investments were

---

[2] Discovery Letter #11, attached as Exhibit 1.

-4-

good investments and this is why he invested his own money and as well as money from personal friends and persons he would not wish to alienate (such as his girlfriend and her mother). The $170,000 and $35,000 was in fact returned to Lorusso and, with the exceptions noted above, the investors were repaid.

<u>There are no such "statements" by Lorusso in any of the FBI 302 reports and rough notes of interviews with Lorusso that the Government has provided to the Defendants</u>. In fact, the materials that Defendants have received do not indicate that this Government investigative team ever asked Lorusso about the Resource F or Wadsworth schemes. Defendants once again request that the Government comply with its obligation to produce to the Defendants <u>all</u> 302s and <u>all</u> notes of interviews or discussions with Michael Lorusso in connection with this case, Resource F, Dexter Wadsworth, or any other matter. These are required *Jencks* materials. Even more important, Defendants believe that Lorusso's statements regarding his involvement in transactions that the Government itself labels "Ponzi schemes" will provide a wealth of exculpatory information under *Brady, Giglio*, and Rule 3.8.

    **B.**    <u>**Testimony Or Witness Statements Regarding Lorusso's Conduct**</u>.

The Government has given the Defendants transcripts of Lorusso's deposition testimony in the SEC enforcement action involving Resource F, and of Deborah Koepper's grand jury testimony regarding her investments with Lorusso. Defendants are entitled to more than these transcripts. Specifically, by email dated September 22, 2006, Defendants requested "any other statements or testimony from witnesses that you do not intend to call, but who have provided information bearing on the credibility or conduct of Mr. Lorusso."[3] Defendants believe that the Government interviewed many other witnesses regarding Resource F or Wadsworth, and that

---

[3]Email from Christopher Mead to Mark Dubester and Timothy Lynch, September 22, 2006, attached as Exhibit 2.

one or more of those witnesses testified in the grand jury.  To the extent that their testimony related to Lorusso's involvement in these schemes or his credibility, Defendants are entitled to it under *Brady, Giglio* and Rule 3.8.  Similarly, to the extent that witnesses in the SEC enforcement proceeding gave any statement or testimony regarding Lorusso's involvement, conduct, or credibility, Defendant are entitled to that information pursuant to *Brady, Giglio,* and Rule 3.8.

Defense counsel find it hard to believe that the SEC, the U.S. Attorney's Office for the District of Columbia, or other federal law enforcement agencies, including the FBI and IRS, have not investigated Dexter Wadsworth, Lorusso, and others involved with them, in the Ponzi schemes described in the Government's discovery letter 11.  The U.S. Attorney's Office for the District of Massachusetts indicted Eric Edward Resteiner for wire fraud, mail fraud, and money laundering for his role in the Resource F scheme.  Defendants ask that Government counsel in this case to confirm that they have made inquiry of the SEC, the U.S. Attorney's Office for the District of Massachusetts, the FBI, the IRS, and any other relevant federal law enforcement agencies concerning Lorusso's participation in the Resource F and Wadsworth Ponzi schemes, and have produced any exculpatory information in the possession of the United States..

### C.     The "Full And Complete Accounting Of All Assets" Required By Lorusso's Plea Agreement.

Paragraph 4 of Lorusso's October 6, 2004 plea agreement provides that "Mr. Lorusso also agrees to provide a full and complete accounting of all assets, real or tangible, held by him or in any other name for his benefit, and, to that end, to submit a standard form 500 (Financial Statement of Debtor)."  The Government has not provided that "full and complete accounting." As part of his participation in two Ponzi schemes, Lorusso personally directed victims to wire funds to overseas accounts, and received wire deposits into his bank accounts from overseas.

Lorusso's accounting of his assets is relevant to his credibility and to his participation in Ponzi schemes.

      D.      **Plea Agreement Information.**

Lorusso's plea agreement with the Government contains an agreement to a sentence within the range for a final offense level of 25, before consideration of any cooperation departures. Lorusso pled guilty to conspiring to receive bribes. The guidelines for bribery, U.S.S.G. 2C1.1, provide enhancements based on "the benefit received or to be received for the payment, or the loss to the government from the payment, whichever is greater . . . ." 2C1.1.(b)(2)(A). It appears that the Government could not have agreed to a final offense level of 25 without conceding that the Defendants in this case did not receive any benefits from the payments allegedly made to Lorusso. Such a concession is directly exculpatory.

Government counsel have refused to disclose how they arrived at their guidelines agreement with Lorusso, and have even suggested that they are unable to do so. However, at Lorusso's guilty plea proceeding, Government counsel told the Court "that level 25 represents a principled compromise of many guideline issues."[4] If the compromises were principled, they should be easy to disclose. Government concessions on guidelines factors, just like a Government requests for downward departures, "fall[] squarely within the ambit of *Giglio.*" *Beckford,* 962 F. Supp. at 802; *Johnson,* 840 F.Supp. at 640.

      E.      **Financial Information Regarding Lorusso.**

Defendants are concerned that the Government has provided them with incomplete information regarding Lorusso's finances. For example, the Government has not provided

---

[4]Transcript of Plea Hearing, November 9, 2004, at 20.

expense account statements submitted by Mr. Lorusso to the D.C. government. The defense believes that Lorusso's claims of business expenses will demonstrate his lack of credibility, his access to other sources of cash, and his participation in criminal conduct utterly independent of the Defendants.

As another example, the Government provided Defendants with bank statements regarding two bank accounts that Lorusso set up in connection with the Wadsworth scheme – Global ROI and Global ROI Offshore. These accounts show transfers in from numerous other accounts that have not been identified by the Government. They include ROI International, Global ROI International, and ROI 4032063. Defendants believe that there is a strong likelihood that Lorusso had some ownership interest in these accounts and that they may have been an additional source of cash for him. Defendants also believe that the United States Government has obtained information about the ownership of these accounts in connection with its investigation of the Wadsworth scheme.

Much of the Government's case depends on Lorusso's outlandish assertions that random cash was given to him by Blake Esherick. Information regarding these accounts and any other sources of cash to Lorusso of which the Government is aware would tend to contradict Lorusso's unsupported assertions that he received cash from Defendant Esherick. In addition, this information may reveal additional bad acts that bear on Lorusso's credibility. Defendants are entitled to this information under *Brady, Giglio* and Rule 3.8.

For the same reasons, Defendants have also requested that the Government confirm that it has provided them with "all financial information in [its] possession related to Mr. Lorusso,

including bank statements, credit card statements etc."[5] All of this information is likely to shed light on the sources of Lorusso's cash and the many shady transactions in which he was involved.

**F.    There Is No Quid Pro Quo.**

The *Jencks* materials that the Government has produced regarding Lorusso confirm what Defendants have long suspected: Mr. Lorusso – the man who Defendants allegedly bribed – never agreed to perform any official acts in exchange for any payments or gifts from the Defendants. More importantly, the Defendants never even asked him to perform any such acts. In fact, in 110 pages of testimony before the Grand Jury:

– Lorusso never said that he performed or failed to perform any official acts to benefit the Defendants in exchange for any gifts or things of value provided by Defendants;

– Lorusso never said that the Defendants had asked him to perform or fail to perform any official act in exchange for any thing of value;

– Lorusso never said that he and the Defendants had discussed any official acts that he would perform or fail to perform in exchange for any thing of value;

– Lorusso never said that he understood or believed that the Defendants wanted him to perform or fail to perform any official acts in exchange for any thing of value;

– Lorusso never said that he intended to perform or fail to perform any official acts to benefit Defendants in exchange for any thing of value;

– Lorusso never said that he knew of any official acts that Defendants expected him to perform in exchange for any thing of value.

Tellingly, Government counsel never even asked Lorusso about any *quid pro quo*. Defendants strongly believe that the Government does not have any evidence of a *quid pro quo* necessary to support its bribery allegations. At the very least, the "bribee" does not believe that there was any

---

[5] Email from Christopher Mead to Mark Dubester and Timothy Lynch, September 22, 2006, attached as Exhibit 2.

*quid pro quo.*

This information unquestionably "tends to negate the guilt of the accused or mitigates the offense. . . " Defendants are charged in Counts 1 and 2 of the Indictment with violating and conspiring to violate the federal bribery statute, 18 U.S.C. 201(b)(1)A & C. The law is clear that this bribery statute requires "a *quid pro quo* – a specific intent to give or receive something of value *in exchange* for an official act." *Sun-Diamond,* 526 U.S. at 404. The D.C Circuit has long held that the bribery statute requires "an explicit *quid pro quo* . . . the briber is the mover or producer of the official act." *Brewster,* 506 F.2d at 72. (emphasis added)

D.C. Rule of Professional Conduct 3.8 requires the Government to disclose this information to the Defendants. Although the Defendants first requested this disclosure over six months ago, the Government has not yet responded.[6] Defendants cannot wait any longer for the Government to disclose its lack of evidence regarding the critical *quid pro quo* element of its bribery charges. That concession is crucial to allow the Court to make relevancy determinations about Mr. Lorusso's testimony, and to make evidentiary rulings with respect to the testimony of remaining witnesses in the trial. Defendants also believe that this concession would allow them to renew their Motion to Dismiss Counts 1 and 2 of the Indictment. Accordingly, Defendants respectfully request that this Court exercise its supervisory powers and order the Government to comply with its obligations under Rule 3.8. *Chambers v. NASCO,* 501 U.S. 32, 44 (1991)(Courts have inherent authority to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases."); *In re Fisherman's Wharf Fillet, Inc.,* 83 F. Supp. 2d 651,

---

[6]Letter from Christopher Mead to Mark Dubester, March 16, 2006, attached as Exhibit 3.

663 (E.D. Va. 1999)(District Court has inherent authority to enforce local rules.)

## CONCLUSION

For all of the foregoing reasons, Defendants request that the Court grant their motion and direct the Government to comply forthwith with its obligations under *Brady, Giglio,* and Rule 3.8.

Respectfully submitted,

_____/s/_____

Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson, LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036-1795
(202) 429-3000

Michele A. Roberts
Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 887-4306

Christopher B. Mead
London and Mead
1225 19th Street
Suite 320
Washington, D.C. 20036
(202) 331-3334

Counsel for Douglas Jemal

Stanley M. Brand
Brand Law Group
923 Fifteenth St., N.W.
Washington, D.C. 20005
(202) 662-9700

Counsel for Norman Jemal

                                                  Paul Kemp
                                                  Venable, LLP
                                                  One Church Street, Fifth Floor
                                                  Rockville, MD 20850
                                                  (202) 344-4400

                                                  Counsel for Blake Esherick

Dated: September 29, 2006