UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
**UNITED STATES,**              )
                                )
    v.                         )   Crim. No.  05-359-1, -2, -3 (RMU)
                                )
**DOUGLAS JEMAL, et al.,**      )
                                )
    **Defendants.**            )
_____)


**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL ON
THE PUBLIC CORRUPTION COUNTS (COUNTS ONE, TWO AND THREE)**

       The government's opposition is long on rhetoric but short on cites to the record. Indeed, the government repeatedly misstates the evidence in its effort to sustain the Public Corruption Counts. Yet no amount of rhetoric can create a *quid pro quo* where none exists. The Court should enter a judgment of acquittal on the Public Corruption Counts because the government has failed to establish that Defendants provided anything of value to Michael Lorusso with the necessary corrupt intent to influence Lorusso in the performance of a specific official act.

**I.     THE GOVERNMENT HAS FAILED TO PROVE A SUFFICIENT NEXUS BETWEEN THE ALLEGED THINGS OF VALUE AND THE OFFICIAL ACTS**

       Remarkably, the government completely retreats from the testimony of its star witness, Mr. Lorusso, who testified quite clearly that there was no *quid pro quo* or any nexus between any particular thing of value that he received from Defendants and any specific official act. Tr. 3077-78, 3350, 3626. The government also minimizes Lorusso's testimony regarding his genuine friendship with Mr. Esherick and, despite Lorusso's semantics about being

"friendly" with Douglas Jemal, his similarly genuine friendship with Mr. Jemal. Most importantly, however, the government's opposition reflects a misunderstanding of the types of payments that fall within the reach of the bribery statute.

The government makes the following representations in an effort to demonstrate that the items of value provided to Lorusso fall within the reach of the bribery statute. Yet none of the types of payments described, even if supported by the government's strained interpretation of the purely circumstantial evidence, would violate the bribery statute and its specific *quid pro quo* requirement.

- The government claims that Defendants provided Lorusso with hotel accommodations in Las Vegas in 2001 "with the corrupt intent of influencing [Lorusso] in what they assumed would be future lease dealings." Opp'n at 35 (emphasis added). If Defendants only assumed there would be future lease dealings, the accommodations obviously were not connected to a specific, identifiable future official act. See Sun-Diamond, 526 U.S. at 405 (payments "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future" are not sufficiently connected to a specific official act);

- The government claims that Defendants gave Lorusso the Rolex watch "to reward him for the acts he already committed on their behalf," Opp'n at 35 -- at best a gratuity -- and "to further influence him, by communicating to him that further deeds would go rewarded as well." Id. Under this scenario, the thing of value is again not connected to any particular official act and is more akin to a payment to promote goodwill or warm feelings, which do not fall within the statute. See United States v. Sun-Diamond, 138 F.3d 961, 967 (D.C. Cir. 1998) ("[W]e have refused to allow the official act requirement to be satisfied by some vague hope of inducing warm feelings toward the donor");

- The government claims that the defendants gave Lorusso things of value on a month by month basis "as the reward, that is the bribe payment for the previously performed acts." Opp'n at 36. The government's statement is an oxymoron because a bribe payment, by definition, cannot be a reward for past official action. United States v. Brewster, 506 F.2d 62, 68 (D.C. Cir. 1974) ("[t]he gratuity section [], unlike the bribery section [], applies to past official acts as well as future ones.") (emphasis added).

- The government also states that these "reward" payments also served as "further inducement in advance of the next set of official acts they intended to influence." Opp'n at 36. It is clear, however, that no specific official acts were identified at the time Defendants provided any particular thing of value; there was at most merely an expectation that Defendants might have official matters before Lorusso in the future, which is an insufficient nexus. Sun-Diamond, 526 U.S. at 405-06 ("'any effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be *in a position to act* favorably to the giver's interests,'" is an insufficient nexus).

The evidence in this case (or lack thereof to be precise) reveals conclusively that the government's entire case on the Public Corruption Counts rests on the "course of conduct" theory of bribery that the Fourth Circuit alone has endorsed in United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998) and United States v. Quinn, 359 F.3d 666, 673-74 (4th Cir. 2004). Yet the Fourth Circuit's dicta in Jennings, which itself involved 18 U.S.C. § 666, cannot be squared with the Supreme Court's holding in Sun-Diamond. Compare Sun-Diamond, 526 U.S. at 414 (to establish a violation of the gratuities statute, "the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given."), with Jennings, 160 F.3d at 1014 (to establish a violation of the bribery statute, "each payment need not be correlated with a specific official act.").

The Fourth Circuit's interpretation is also inconsistent with D.C. Circuit authority with respect to the temporal focus of the statute. The Fourth Circuit stated that under the bribery statute, "the timing of the payment in relation to the official act for which it is made is (in theory) irrelevant." Jennings, 160 F.3d at 1014. However, the D.C. Circuit has explicitly recognized that "[b]ribery is entirely future-oriented . . . involv[ing] the present giving, promise, or demand of something in return for some action in the future . . . ." Shaffer, 183 F.3d at 841. The Fourth Circuit's interpretation is inconsistent with this requirement of an explicit *quid pro quo*.

The government has failed to prove that Defendants acted with corrupt intent to influence any specific official act of Lorusso by giving him any particular thing of value. The lack of a nexus between the alleged things of value and the alleged official acts requires a judgment of acquittal on the Public Corruption Counts.

## II.   THE GOVERNMENT HAS FAILED TO PROVE THAT DOUGLAS AND NORMAN JEMAL CONSPIRED WITH MICHAEL LORUSSO

The government does not dispute that the Indictment charges all three of the Defendants with conspiring with Michael Lorusso to commit the offense of bribery. Yet when asked whether he participated in any conspiracy with the Defendants, Lorusso identified only the so-called "special projects fund" conspiracy with Blake Esherick. The government does not dispute Lorusso's testimony that the "special projects fund" conspiracy was utterly inconsistent with the interests of Douglas and Norman Jemal because, if true, it involved Messrs. Esherick and Lorusso skimming money from Douglas Development without Douglas or Norman Jemal's knowledge.

In an effort to sidestep this evidence, the government states: "The fact that Lorusso may have perceived Esherick's interests to be divergent from Douglas Jemal's, even if true as to one issue, is hardly dispositive as to [Douglas and Norman Jemal's] participation in the conspiracy charged in Count One." Opp'n at 42. Apparently, the government believes that Douglas and Norman Jemal conspired with Lorusso to commit bribery at the same time that Lorusso claims to have conspired to steal from Douglas and Norman Jemal. The government's theory is illogical and inconsistent with the actual evidence elicited from Lorusso at trial. The Court should enter a judgment of acquittal on Count One as to Douglas and Norman Jemal.

### III. THE GOVERNMENT HAS NOT PROVEN AN HONEST SERVICES FRAUD BASED ON THE "CONFLICT OF INTEREST" THEORY

Defendants contend that the government has failed to prove the "conflict of interest" theory of honest services fraud for the reasons stated in their opening memorandum and will not repeat those arguments here. However, the government's claim that this charge is supported by evidence that Defendants concealed their relationship with Lorusso is completely unfounded. Opp'n at 45. In support of this assertion, the government cites primarily conduct by Lorusso that cannot be attributed to Defendants -- such as Lorusso's failure to inform Elchino Martin that he was staying in a room that had already been paid for by Douglas Development.

The government's other claims are meritless. The government claims that Defendants did not reserve a room in Lorusso's name at the Bellagio, Opp'n at 45, but ignores the fact that Douglas Development had booked the rooms months in advance and happened to have an extra room because some of the Douglas Development employees were going late to the conference. Tr. 2855, 3313. The government also relies on Lorusso's claim that he had his brother sign in at the Bellagio hotel while standing near the Defendants, Opp'n at 45, without acknowledging that there is no evidence that any of the Defendants ever saw Peter Lorusso sign the guest card (which itself is hardly an effective attempt at concealment). The government also claims that despite booking a room in Lorusso's name at the Barbary Coast in 2002, the Defendants somehow engaged in deception by using the Douglas Development address, Opp'n at 45, when the rooms obviously were booked in a block under the same address. Finally, the government also argues that Douglas Jemal's American Express bills provide no information as to the identity of the person for whom he purchased boots and meals, Opp'n at 7, as if the manner in which American Express created its monthly statement could somehow reflect concealment by Douglas Jemal.

In reality, there is no credible evidence in the record that Defendants attempted to conceal their relationship with Lorusso. For this and the other reasons cited in Defendants' opening memorandum, the government has failed to prove any honest services fraud based on a "conflict of interest" theory.

### IV.    THE GOVERNMENT'S OPPOSITION MISSTATES THE ACTUAL EVIDENCE IN THIS CASE

The government's opposition literally cites only two transcript pages, and fails to quote from relevant testimony or cite to any specific exhibits introduced at trial. Instead, the government has characterized the evidence with broad generalities and sweeping statements apparently from government counsel's memory. In so doing, the government has repeatedly overstated and mischaracterized the actual evidence elicited at trial. There are too many misstatements in the government's 65-page opposition to address individually in the limited time that Defendants have had in which to prepare this reply memorandum. However, the following examples are representative of the liberties that the government took when describing the record in this case:

1. **Things of value given to Lorusso:**

    • Government's claim: "Throughout the summer, and thereafter, the defendants, in one or more combinations, provided … a custom-tailored suit." Opp'n at 6.

    • Actual Evidence: Lorusso, on <u>direct</u> and cross- examination, testified that he did not receive a custom-tailored suit from the Defendants. Tr. at 3071; 3336-37.

2. **Lorusso's perception of his conspiratorial relationship with Defendants:**

    • Government's Claim: "Moreover, Lorusso's sworn statement that he himself perceived he was in a conspiratorial relationship with the defendants, <u>where he would do things for them in exchange for the things of value</u>, is entitled to credit." Opp'n at 11 (emphasis added).

- Actual Evidence: On <u>direct</u> examination, Lorusso testified:

    <u>There was no one-to-one relationship between an item of value and a specific lease or other thing</u>. In other words, there was no incentivized program. No one said to me, when you sign this lease you will get this thing.

    Tr. at 3077 (emphasis added).

3. **Evidence of damage supporting the $38,000 invoice for D.O.E.S. Relocation Expenses:**

    - Government's Claim: The government recognizes that evidence exists to support the defendants' claim that overtime costs were incurred during the move and that painting, cleaning, elevator and sprinkler repairs or service were required, but contends that "<u>there is no evidence whatsoever that supports any other damage</u> for which the $38,000 invoice could be proper." Opp'n at 14.

    - Actual Evidence: The $38,000 invoice also contains a line item for "Lobby Floor Protection not provided by movers" (GX 251) and the government's witnesses testified that:

        Q. And the main lobby was hardwood flooring, correct?

        A. Yes, it was.

        Q. And these movers used metal dollies that didn't have rubber wheels on them, do you remember that?

        A. Not so much as saying, hey, they don't have rubber wheels, but from looking at the damage that was the conclusion I came to.

        Q. I see. So you didn't see the dollies coming through per se, but after they came through you saw major scratches and gouges on the hardwood floor, correct?

        A. That is correct.

        Q. And there was no question in your mind that those gouges and scratches were caused by the movers?

        A. That is correct.

        Q. Because, of course, this is a brand new building and the hardwood floor was spotless prior to this move?

        A. That is correct.

> Q. And, again, the reason for the hardwood floors were damaged is because the movers did not put masonite down on the floors?
>
> A. That is correct.

Tr. at 1723-24 (Bruce Frazier).

> Q. Okay. And do you recall that the movers -- well, first of all, let me back up. Movers like this typically lay something that's called masonite down on the floors to protect it, correct?
>
> A. Right. Good moving companies will put protection in place. They'll put masonite, it's approximately a quarter inch cardboard type material, on the floor….
>
> Q. And these movers did not do that, at least adequately. Is that fair to say?
>
> A. Well, if they had done that, there wouldn't have been a lot of move damage.
>
> Q. Do you recall the lobby, what the flooring was?
>
> A. It was hardwood flooring.
>
> Q. Do you recall that damage to the hardwood floor took place during the move because of the lack of masonite on the floor?
>
> A. I recall that there was discussion about damage to the floors.

Tr. at 1634-35 (Kevin Clark).

4. **Esherick submitted $100,000 claim for reimbursement for Addison Road construction:**

• Government's Claim: The government twice claims that "Esherick submitted to Lorusso an unitemized $100,000 invoice in September 2001 for 'Build-out reimbursement' at Addison Road." Opp'n at 17, 53 (emphasis added).

• Actual Evidence: There is absolutely no evidence in the record to support the government's claim that Esherick submitted the invoice containing the $100,000 build-out reimbursement line item (GX 259).

5. **Defendants knew they couldn't obtain MTD commission through honest means:**

   •   Government's Claim: "The jury could conclude that the defendants knew or reasonably knew that if they had sought to obtain monies honestly and above board, they would have been thwarted, either by Morgan Stanley or by Jemal's partner; accordingly, they intentionally sought dishonest means with the intent to deceive." Opp'n at 25.

   •   Actual Evidence: The government's witnesses testified that the Defendants were entitled to the commission:

   > Q. I take it you made it very clear that the issue of the $430,000, in terms of the money itself, is not one which, as you sit here today, bothers you. You're satisfied that that was money to which he was entitled; is that correct?
   >
   > A. That's correct.

   Tr. at 2151 (Joseph Cayre).

   > Q. Understanding that you're not an attorney, is there anything about this request for commission for MTD that explicitly violates that agreement that's before you?
   >
   > A. In my opinion, I don't think there is, I don't believe so.

   Tr. at 1267-68 (Benjamin Black)

6. **Defendant's failed to notify Lorusso that Addison Road "could not even be used for its intended purpose." Opp'n at 33.**

   •   Government's Claim: The government claims that the Defendants have "trivialized" the zoning dispute concerning 4800 Addison Road because, even though the "spot zoning" that affected Addison Road was held unconstitutional in federal court, "[that] decision <u>had no bearing</u> on the unrelated zoning litigation." Oppn'n at 33, n.7 (emphasis added).

   •   Actual Evidence: A cursory reading of the Memorandum Opinion in <u>Jemal's Fairfield Farms, LLC v. P.G. County</u> (DX946) makes it clear that the zoning ordinances at issue are in serious dispute. Indeed, the Court found that "Plaintiff has produced evidence that the ordinances' classification involves invidious or arbitrary discrimination and is unrelated to a legitimate governmental interest." <u>Id.</u>

7. **Defendants paid for Lorusso's accommodations in Las Vegas in 2001 and did not reserve a room in Lorusso's name:**

• Government Claims: The government contends that the jury could reasonably find that "the defendants paid for Lorusso's hotel accommodations in Las Vegas in 2001 with the intent to corruptly influence him in connection with the leasing of Addison Road." Opp'n at 35. In addition, the government claims that the fact that "defendants did not reserve a room in Lorusso's name at the Bellagio" is evidence that the Defendants sought to conceal their relationship with Lorusso. Opp'n at 45.

• Actual Evidence: The government ignores that fact that the evidence in the record indisputably establishes that the hotel room at the Bellagio was reserved on a nonrefundable basis before Mr. Esherick extended the invitation to Lorusso to use the unoccupied room. Lorusso himself testified:

> Q. So isn't it true, sir, that Blake Esherick, in the course of your dealings with him after you met him, invited you to come to Las Vegas and stay in a room that had already been paid for?
>
> A. He did, but I believe that Douglas also ratified or stated, yes, you should come.
>
> ***
>
> Q. Now, you knew when you're going out to Las Vegas <u>that a room had been secured and paid for by Douglas Development, and it was vacant because Jack Brownell couldn't get out before the following week</u>?
>
> A. That's correct.
>
> Q. And Blake asked you if you wanted to come to Las Vegas and stay in that room; isn't that true?
>
> A. Blake was my primary contact on that, yes.

Tr. at 2855, 3313 (emphasis added).

8. **The master lease at 77P Street is "suspect and tainted:"**

• Government Claim: "Starting with the very first lease, the 77P Street lease of April 2001, every other lease, and every other dollar obtained pursuant to those leases, is suspect and tainted." Opp'n at 52.

• Actual Evidence: The government ignores not only the testimony of government witnesses Mallus and Kauffman who testified that the master lease

- 10 -

was the result of an arm's length negotiation between outside brokers that was in the best interests of the District, Tr. at 1826, 2385-86, but the statements made by Mr. Dubester in his opening statement:

> In March of 2001 Mr. Lorusso is presented with the opportunity to lease space on behalf of the District of Columbia at 77 P Street. This was for the Department of Employment Services which moved in June. Mr. Lorusso - let it be clear that the initial interest of the D.C. Government in that space we are not alleging to have occurred because of any corrupt motive or inducement.

Tr. at 352-53.

9. **Defendants voided the checks written to reimburse the District for the tenant commission pool payments:**

• Government Claim: "At one point, they wrote a check or checks to reimburse the D.C. Government but they voided the checks." Opp'n at 53 (emphasis added).

• Actual Evidence: David Medding, the DDC employee responsible for voiding the reimbursement checks did not recall being given any instructions to void the checks. Tr. at 890-91. Medding also testified:

> Q. Mr. Jemal, when he saw that check, did not say to you, what, are you nuts? The District's already paid this. Void it. He didn't tell you to do that, did he?
>
> A. No, he did not.
>
> Q. In fact, he signed the check, correct?
>
> A. Yes.
>
> Q. Now, you told us that you didn't send it off because at that time you didn't determine that there were funds available, correct?
>
> A. Correct.
>
> Q. But you did not not send that check because anyone directed you that DDC was not going to pay the District? No one ever said that to you, right?
>
> A. No. It was never indicated that we would not pay that.

Tr. 936-37.

Defendants have based their Rule 29 motions on actual excerpts of testimony and citations to the transcript that are easy to verify. Rather than cite the record, the government's opposition reads more like a closing argument -- albeit one that would be objectionable in many respects for misrepresenting the evidence -- than a legal analysis of the evidence. The Court should grant Defendants' well founded motions that are based on the evidence (or lack thereof) in this case.

## V.   CONCLUSION

For the foregoing reasons, the Court should enter a judgment of acquittal on the Public Corruption Counts (Counts One, Two and Three).

Respectfully submitted,

Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334

Counsel for Douglas Jemal

          Stanley M. Brand
          Ross Nabatoff
          The Brand Law Group
          923 Fifteenth Street, N.W.
          Washington, D.C. 20005
          (202) 662-9700

          Counsel for Norman Jemal

          Paul Kemp
          Carol Elder Bruce
          Venable LLP
          575 7th Street, N.W.
          Washington, D.C. 20004
          (202) 344-4400

          Counsel for Blake Esherick

Dated: October 16, 2006