**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES, | |
| v. | Crim. No. 05-359-1, -2, -3 (RMU) |
| DOUGLAS JEMAL, et al., | |
| Defendants. | |

## DEFENDANTS' MOTION TO RECONSIDER THIS COURT'S RULING EXCLUDING THE ROVERSON BANK RECORDS

In September, 2004, after the Government had found the $25,000 wire transfer from Fernando Villegas to Lorusso's attorney, and after Villegas decided to cooperate against him, Lorusso knew that he could not defend against a charge of receiving bribes from Villegas. So Lorusso walked into a proffer in September, 2004, with the FBI, volunteering information against a big target–prominent local businessman Douglas Jemal. Though he was perfectly willing to provide information against Douglas Jemal, Norman Jemal, and Blake Esherick in that initial proffer, he never mentioned receiving cash from any of them. During that proffer, the FBI confronted Lorusso with a $6,000 cash deposit to his Citibank account on August 29, 2001, and numerous large cash deposits to his Citibank account in 2002. Lorusso lied, denying any memory of the source of this cash.

At a second proffer, with his deal for cooperation against Jemal in danger of falling apart, Lorusso suddenly remembered picking up $10,000 in cash from a cigar box in a conference room at Douglas Development before he made a trip to New York with OPM staff in August.

Lorusso said what he knew the Government wanted to hear-- that the $6,000 cash deposited in his account on August 29, 2001 was the remainder of the $10,000 in cash he had received from Blake Esherick before his New York trip. As was revealed at trial, however, at the time he began fabricating this explanation for the $6,000 deposit, Lorusso did not know that he left for the New York OPM trip on Saturday, August 4, 2001, and that his his bank records showed separate trips to an ATM machine to withdraw $600 in cash on August 4, then $500 in cash on August 18.

In that second proffer, Lorusso also said that he received $5,000 in cash from Esherick in the summer of 2002, but that Esherick then asked for the money back to by a couch for his girlfriend. When the Government found that Esherick had bought a couch with cash on October 7, 2001, the investigative team thought it had the corroboration it needed, and embarked on a two-year investigation and prosecution Douglas Jemal, literally ignoring investigation of others associated with Lorusso.

"Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" United States v. Smith, 232 F.3d 236, 241 (D.C. Cir. 2000) *quoting* F.R.E. 401.

The Roberson bank records strongly suggest that: 1) the $6,000 that Lorusso deposited on August 29, 2001 came from Steven Roberson rather than Blake Esherick; and, 2) Esherick did not give Lorusso $5,000 in cash in October 2001. Accordingly, these records are relevant and should be admitted into evidence.

The Roberson bank records establish that, in August of 2001 – the very month in which Lorusso claims to have received the $10,000 payoff from Esherick – Roberson withdrew a total

of $21,900 in cash from Roberson International's Riggs Bank account and $7,920 from Roberson Trucking's Riggs Bank account.[1] See DX 1168A and 1168B. On August 22, 2001, just one week before Mr. Lorusso deposited the $6,000 in cash that he claims came from Blake Esherick, Roberson wrote and cashed a $6,000 check on the Roberson International account.[2] See DX 1168A, 024-25. This transaction, viewed by itself or in conjunction with the other cash withdrawals totaling nearly $24,000, supports an inference that the source of Lorusso's $6,000 was Roberson rather than Blake Esherick. Accordingly, the Roberson bank records are relevant and admissible.

**Lorusso has already admitted that he had a corrupt relationship with Roberson.** The two men conceived and executed a criminal scheme through which the citizens of the District of Columbia were forced to foot the bill for the purchase of Mr. Lorusso's Audi by Faith

[1]This is nearly twice as much cash as Mr. Roberson withdrew the following month, when he cashed $12,050 in checks from the Roberson International account and $300 from the Roberson Trucking account.

[2]On that same day, Mr. Roberson deposited $6,000 cash into the Roberson Trucking account. See 1168B. That very month, however, he wrote two checks (dated 8/2/01 and 8/14/01) on the Roberson International account to Roberson Trucking. See 1168A and 1168B. The fact that Mr. Roberson knew how to transfer funds between accounts without making a cash withdrawal suggests that the $6,000 cash withdrawal and deposit was not a standard transfer of funds but, rather, was an illicit transaction of some sort.

Scott and Darnell Dunson. Tr. at 3004-05. Lorusso has also admitted that he directed Fernando Villegas of International Builders -- another man with whom Lorusso had an admittedly corrupt relationship – to make over $200,000 worth of payments to Roberson for work even though Lorusso admitted that he did not know whether this work was actually done. Tr. at 3671.

Additionally, Lorusso admits that $36,553 worth of payments to Roberson International were made with his District of Columbia credit card between May 3, 2001 and February 12, 2002.[3] Tr. at 3670; see also DX 975. It is important to note that a $2,200 charge to Roberson International was made on August 29, 2001, the very day that Lorusso made the $6,000 cash deposit to his Citibank. Two days later, two more Roberson International charges -- totaling $3,128 – appear on Mr. Lorusso's credit card. Thus, within two days of Mr. Lorusso's $6,000 cash deposit, Roberson received $5,328 in payments from Lorusso's District of Columbia credit card. In light of Lorusso's illicit relationship with Roberson, the jury could certainly infer from the Roberson bank records that $6,000 of the more-than-$20,000 in cash that Roberson withdrew in August of 2001 made its way into Lorusso's account on August 29, 2001.

In short, this evidence casts doubt on the central allegation in this case – that Blake Esherick gave Lorusso $10,000 in cash. The **only** evidence that the Government can cite as proof of this payment other than the self-serving testimony of Michael Lorusso is the $6,000 deposit of cash from an unidentifiable source some four weeks after the alleged cigar box payoff. Tr. 4155. These Roberson bank records strongly suggest an alternative, and far more likely,

[3]DX975 contains all the charges on Lorusso's D.C. government credit card. The Roberson occurred in increments between $2,000-2,500 from May-October, 2001, with the exception of one additional credit card transaction in February, 2002, when Lorusso and Roberson executed their false invoice scheme to buy Lorusso's Audi.

source of this $6,000. There is no question that this evidence is relevant and critical to the defense in this case. See Smith, supra.

These bank records also contradict Lorusso's allegations regarding the $5,000 cash payment that he allegedly received from Blake Esherick in October 2001. For this reason as well, they are relevant and should be admitted into evidence.

On direct examination, Lorusso testified that Blake Esherick gave him $5,000 in cash in October 2001. Tr. at 2945-46. (This testimony was a marked departure from Lorusso's prior statements to the FBI and the Grand Jury that the $5,000 payment occurred in the summer of 2002.)[4] He claimed that, soon afterwards, Esherick asked for this money back so that he could buy his girlfriend a couch from Domain Furniture. Tr. at 2946.

Lorusso admitted during cross examination that he withdrew $7,000 from his bank account just two days before Blake Esherick purchased a couch from Domain Furniture. On redirect, however, Lorusso claimed that he loaned this entire $7,000 to Mr. Roberson who needed the money to pay his employees. Tr. at 3641. According to Lorusso, Roberson repaid

---

[4]Mr. Lorusso tried to explain the discrepancy on cross-examination stating, "I typically am very bad with dates. [] I tend to remember things around actions or specific occurrences." Tr. at 3364-65. Curiously, however, Mr. Lorusso's alleged recollection of the pay-off occurring in the summer of 2002 **was** tied to an action and/or specific occurrence. He assured the Grand Jury that he could remember the pay-off took place in the summer "Because he gave it to me [] on his outdoor deck-patio which is where we customarily spoke because it wouldn't be in full view of anyone." Grand Jury Testimony at 69. Obviously, October is not a summer month.

him within a day or two and then "it was my belief that repaid money that I gave to Blake." Tr. at 3641.

On recross examination, however, Lorusso claimed that he was unsure whether he gave the entire $7,000 that he withdrew on October 5 to Roberson. He testified that it was his "best recollection" that he used the funds that he was repaid by Roberson to give to Blake to purchase a couch. Tr. at 3674. When confronted with the fact that he had earlier testified that the money he gave to Blake to purchase the couch was the $5,000 that Blake had given him a day or two prior, Lorusso said , "I didn't demark the money and put it in a shoebox and put labels on it from whence its origin." Tr. at 3675. Indeed, Lorusso refused even to admit that he had testified that the money he gave to Blake was the money he had received from Roberson. Instead, Lorusso claimed that "I testified that it's a possible scenario." Tr. at 3675.

The jury attempted to clarify the considerable confusion caused by Lorusso's self-contradictory testimony by asking the following question, "[Y]ou stated in your testimony that Mr. Roberson paid the $700 [sic] back and then you gave it to Blake. Why?" At first, Lorusso said, "I don't understand the term 'why.'" Tr. at 3679. He soon added, "The best of my recollection is that I gave money – I took $7,000 out of the bank. I don't know exactly how much I gave Mr. Roberson. And he gave me that money back. That also got co-mingled with the money that Blake had originally given me. And through that, in a sense, shoebox pile of money I gave Blake the $5,000 to buy the couch." Tr. at 3679.

The Roberson International and Roberson Trucking bank statements cast doubt on Lorusso's story. There are no significant cash deposits or withdrawals on October 6, 2001 or October 7, 2001, the day that Esherick purchased the couch. <u>See</u> DX 1170A, 1170B.

Thus, within six weeks of the $6,000 cash deposit, Lorusso and Roberson were exchanging sums of cash in excess of $6,000. In the same time frame, Lorusso's DC Government credit card showed over $30,000 in unsubstantiated and suspect charges. This certainly supports an inference that the source of the August 29, 2001 cash deposit was Roberson rather than Blake Esherick. Accordingly, the bank records are relevant and should be admitted into evidence.

This Court ruled as an alternative ground for excluding the bank records that they were inadmissible under Rule 403. Presumably, this ruling was based upon the Government's claim that the jurors would be forced to try to decipher a mountain of disorganized bank records with no assistance from the parties. In fact, Defendants seek only to admit the Roberson International and Roberson Trucking bank records for the months of August 2001 and October 2001. Obviously, counsel for the defendants will argue, based upon these records, that Roberson was the source of the $6,000 cash that Lorusso deposited on August 29, 2001 and that Blake Esherick did not give Lorusso $5,000 cash in October 2001. The Government will attempt to refute this argument. With these opposing arguments serving as a guide, the jury will be able to review this small amount of records and determine whether Lorusso is telling the truth about these alleged cash payoffs from Esherick. There is no possibility that the admission of these four discrete bank statements will confuse or burden the jury. In any event, their relevance far outweighs any such danger. Accordingly, under Rules 401 and 403, this evidence must be admitted.

The Government argued that there are no witnesses to say that Roberson gave cash to Lorusso. It should not surprise the Court that neither man would admit this scheme. By contrast, there is only one witness to say that Blake Esherick made cash payments to a government

official–Michael Lorusso. The defense contends that Lorusso is lying. There is no corroborating evidence in the bank records of Douglas Development or Blake Esherick that they made unusual cash withdrawals or deposits in August or October, 2001.

There is overwhelming evidence that Lorusso and Faith Scott had a corrupt relationship with Roberson beginning in May 2001, when Lorusso's DC Government credit card payments to Roberson started. Lorusso and Roberson were swapping large amounts of cash by early October, 2001. Lorusso arranged to have Roberson submit a false $25,000 invoice to the DC Government in February, so that Lorusso could receive $18,000 to pay off his Audi. During the rest of 2002, Lorusso directed Fernando Villegas to make payments of roughly $225,000 to Roberson, when Villegas did not know whether Roberson had done any work. During the same time frame, Lorusso did precisely the same thing with Great Scott Moving. Lorusso directed Villegas to pay $300,000 to Great Scott Moving, bills that Lorusso said were inflated by 100%, so that Lorusso could get cash from Great Scott. Shockingly the Government never asked Lorusso about the charges to Roberson on his DC Government credit card. This evidence would likely be enough to convict Lorusso of fraud in connection with the credit card charges to Roberson and the $225,000 in payments to Roberson, if he were not the Government's star cooperator. For Assistant U.S. Attorneys to suggest that Lorusso should be believed about his relationship with Roberson is truly shocking, particularly when government counsel should know that Roberson has at least two felony drug convictions, and lied to the FBI about the $25,000 invoice and the Audi transaction.

**CONCLUSION**

For the foregoing reasons, the Roberson bank records should be admitted.

Respectfully submitted,

Reid H. Weingarten (D.C. Bar #365893)
Brian M. Heberlig (D.C. Bar #455381)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-3000

Michele A. Roberts
Jeffrey M. King
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4306

Christopher B. Mead
London & Mead
1225 19th Street, N.W.
Suite 320
Washington, D.C. 20036
(202) 331-3334

Counsel for Douglas Jemal

Stanley M. Brand

Ross Nabatoff

The Brand Law Group

923 Fifteenth Street, N.W.Washington, D.C. 20005

(202) 662-9700

Counsel for Norman Jemal

Paul Kemp

Carol Elder Bruce

Venable LLP

575 7th Street, N.W. Washington, D.C. 20004

(202) 344-4400

Counsel for Blake Esherick

Dated: October 18, 2006