COPY

UNITED STAT        CURITIES AND EXCHANGE COMMISSION

In the Matter of:                )
                                 )
Resource F, LLC                  )    File No. B-1678
                                 )

WITNESS:  Michael Lorusso

PAGES:    1 through 192

PLACE:    United States Securities and Exchange Commission
          Boston District Office
          73 Tremont Street, Suite 600
          Boston, Massachusetts 02108-3912

DATE:     Friday, March 23, 2001

          The above-entitled matter came on for deposition
testimony pursuant to notice, at 11:08 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

          STEVEN QUINTERO, ESQUIRE, Staff Attorney
          GREGORY S. GILMAN, ESQUIRE, Staff Attorney
          United States Securities and Exchange Commission
          Boston District Office
          73 Tremont Street, Suite 600
          Boston, Massachusetts 02108-3912
          (617) 424-5900

On Behalf of the Witness):

          PHILIP X. MURRAY, ESQUIRE
          The Pilot House
          Lewis Wharf
          Boston, Massachusetts  02110
          (617) 723-5454

Diversified Reporting Services, Inc.
(202) 296-9626

2

C O N T E N T S

WITNESS:                                                    EXAMINATION

Michael Lorusso                                                  3

EXHIBITS:                    DESCRIPTION                    IDENTIFIED

SEC  1              Commission Supplemental              4
                   Information Form 1662

SEC 83             Subpoena ad testificandum            6

SEC 84             Curriculum Vitae, Lorusso            7

SEC 75             Correspondence, Bathhurst           28
                   to Dyer, 2/25/00

SEC 20             Private Placement Memorandum        60
                   2/99, Resource F

SEC 22             Dechert, Price & Rhoads             64
                   PO, 2/99

SEC 34             Accountants Compilation             90
                   Report Cover Letter,
                   6/16/99

SEC 65             Fax Cover Sheet for                 95
                   Resource F to Vaccaro

SEC 24             Resource F, LLC Member             112
                   Names, Addresses & Status

SEC 41             Unidentified Document              123

SEC 85             Monthly Statements,                127
                   VonStrasdas to Dyer
                   Re: Distribution

SEC 93             Unidentified Document              147

SEC 91             "Dear Client" Letter               154
                   on Resource "F" letterhead,
                   Palm Beach Office, 1/8/01,
                   VonStrasdas

SEC 82             Unidentified Document              155

Diversified Reporting Services, Inc.
(202) 296-9626

3

P R O C E E D I N G S

1
2          MR. QUINTERO:  On the record at 11:08 a.m., March
3    23rd, 2001.
4          Would you please raise your right hand, Mr.
5    Lorusso?
6    Whereupon,
7                    MICHAEL LORUSSO,
8    having first been duly sworn, was called as a witness herein
9    and testified as follows:
10                    EXAMINATION
11         BY MR. QUINTERO:
12    Q    Could you please state and spell your full name for
13    the record?
14    A    Michael Lorusso, the last name is spelled
15    L-O-R-U-S-S-O.
16         MR. QUINTERO:  Mr. Lorusso, my name is Steven Y.
17    Quintero and with me is Greg Gilman, we are officers of the
18    Commission for the purposes of this proceeding and this is an
19    investigation by the United States Securities and Exchange
20    Commission In the Matter of Resource F, LLC, to determine
21    whether there have been violations of certain provisions of
22    the federal securities laws.  The facts developed in this
23    investigation, however, may constitute violations of other
24    federal or state civil or criminal laws.
25         Now, prior to the opening of the record, you were

Diversified Reporting Services, Inc.
(202) 296-9626

4

1    provided with a copy of the Formal Order of Investigation in

2    this matter and this (indicating) is this document right here

3    in front of you, it will be available for your examination

4    during the course of this proceeding.

5            BY MR. QUINTERO:

6        Q    Mr. Lorusso, have you had an opportunity to review

7    the Formal Order?

8        A    Yes, I have.

9                            (SEC Exhibit No. 1 was marked

10                           for identification.)

11           MR. QUINTERO:  And prior to the opening of the

12   record, you were also provided with a copy of the Commission

13   Supplemental Information Form which has been previously

14   marked as Exhibit One, it's this (indicating) document that

15   is in front of you.

16           BY MR. QUINTERO:

17       Q    Have you had an opportunity to review Exhibit

18   Number One?

19       A    Yes, Sir.

20       Q    And do you have any questions concerning Exhibit

21   One?

22       A    No, I do not.

23           MR. MURRAY:  I have one question and that is

24   strictly, Mr. Lorusso had contact with Ms. Bailey as it

25   relates to his participation here which was always of a

1  voluntary basis and I just wanted to know what the position

2  of the SEC is as to whether you are going to construe this

3  subject to a subpoena or as a voluntary participation.

4          MR. QUINTERO:  This is subject to a subpoena.

5          MR. MURRAY:  Okay.

6          MR. QUINTERO:  Once we get a Formal Order and we

7  bring someone in for testimony, it's generally subject to

8  that subpoena and therefore --

9          MR. MURRAY:  Okay.

10          MR. QUINTERO:  -- not voluntary.

11          THE WITNESS:  Right, I was contacted by

12  e-mail and spoke to her that same day --

13          MR. QUINTERO:  Yes.

14          THE WITNESS:  -- and planned the time to come here

15  immediately so --

16          MR. QUINTERO:  Okay.

17          THE WITNESS:  -- I want to show my ability to make

18  myself available to these proceedings.

19          MR. QUINTERO:  Oh, absolutely and what I mean to

20  say by the fact that once we get the Formal Order, we

21  generally do it all by subpoena, it's just to say that you

22  shouldn't read anything into how we construe it, whether it's

23  voluntary or not and generally just as a matter of policy,

24  we'll subpoena people to come in once we have the authority

25  under the Formal Order.

6

1          BY MR. QUINTERO:

2      Q    And Mr. Lorusso, are you represented by counsel

3    today?

4      A    Yes, Attorney Philip Murray.

5          MR. QUINTERO:  And would Counsel please identify

6    himself with the firm affiliation address and phone number?

7          MR. MURRAY:  My name is Philip Murray, I represent

8    Mr. Lorusso, my offices are at the Pilot House, Lewis Wharf

9    in Boston, my phone number is (617) 723-5454 and I am a sole

10   practitioner.

11                              (SEC Exhibit No. 83 was marked

12                               for identification.)

13         MR. QUINTERO:  Okay, Mr. Lorusso, I hand you a copy

14   of a subpoena that is dated March 14th, 2001, it has been

15   marked as Exhibit 83.

16         BY MR. QUINTERO:

17     Q    Is this a copy of the subpoena you are appearing

18   pursuant to today?

19     A    Yes, sir.

20     Q    And would you please direct your attention to the

21   attachment to the subpoena which is found on page two and

22   three of Exhibit 83, which calls for the production of

23   documents.  Did you conduct a diligent search for the

24   documents responsive to this request?

25     A    I did, I had moved, six months ago or so, to

7

1   Washington, D.C. where I am currently employed.  Most of the
2   documents or all the documents that I had pertaining to an
3   appointment with Mr. Dyer was returned to Mr. Dyer, about two
4   or three months after I left his employ I made a search and
5   provided an additional box of material to Mr. Dyer so to the
6   best of my ability, I have no documents pertaining to Mr.
7   Dyer.
8       Q    And when did you make the search and give him that
9   other box?
10      A    That was at least eight or nine months ago, sir.  I
11  have not been employed by Mr. Dyer for over a year.
12      Q    So therefore did you produce all responsive
13  documents that were in your possession, custody or control?
14      A    Yes.
15      Q    And did you withhold any documents for any reason?
16      A    No.
17          MR. QUINTERO:  Before we go into any further
18  questions, let me remind you, Mr. Lorusso, that each question
19  will require a verbal response and that we must speak clearly
20  and one at a time in order to create a clear record.  Also
21  let me remind you, Mr. Murray, that the SEC does control the
22  record, which means that if you wish to go off the record,
23  just please make that request through me.
24                          (SEC Exhibit No. 84 was marked
25                           for identification.)

1           MR. QUINTERO:  Mr. Lorusso, I hand you a copy of

2   the document that has been marked as Exhibit 84, it appears

3   to be a resume' or CV for you, Mr. Lorusso.

4           THE WITNESS:  That's correct.

5           BY MR. QUINTERO:

6       Q   And directing your attention to the top of Exhibit

7   84, is that your current home address?

8       A   It is not, when I spoke to the attorney from the

9   SEC, I gave my correct home address which is 2006 Columbia

10  Road, Northwest, Number 33, Washington, D.C., 20009.

11      Q   Okay, and I take it that is not the correct phone

12  number, your correct phone --

13      A   That is a cell phone that I still have.

14      Q   Okay.

15      A   This was the most current resume' that I had.

16      Q   Okay, and what is your current phone number?

17      A   My current phone number is area code (202) -- give

18  me that --

19          MR. MURRAY:  744-2773.

20          THE WITNESS:  2773.

21          BY MR. QUINTERO:

22      Q   And you've mentioned that you have a cell phone as

23  well?

24      A   Yes.

25      Q   And what is that number?

1          A    That's the same number as on this (indicating)

2    form.

3          Q    And that number is (617) 306-0010?

4          A    That is correct, sir.

5          Q    And do you have any fax numbers at your home

6    address?

7          A    I do not.

8          Q    Do you have any e-mail addresses besides the one

9    that is contained on Exhibit 84?

10         A    Just the BIGINC@MSN.com.

11         Q    You mentioned that you left Mr. Dyer's employment

12   about a year ago or over a year ago, where are you currently

13   employed?

14         A    I currently work in Washington, D.C. area, doing

15   property management, my whole -- basically, all I've ever

16   done is real estate work.

17         Q    So you are currently employed with Boston

18   Industrial Group?

19         A    I actually work for the city of -- it's not really

20   a city but the District of Columbia.

21         Q    Do you have an office?

22         A    Yes.

23         Q    And where is that?

24         A    It's at 441 4th Street, Northwest, Washington,

25   D.C., 20001.

10

1    Q    And what is the --

2    A    The suite number is 721-N.

3    Q    And what is the phone number there?

4    A    (202) 724-4400.

5    Q    Is there a fax number there?

6    A    There is one, I don't know it off the top of my
7    head.

8    Q    And do you have an e-mail associated with your
9    work?

10    A    I use the BIGINC e-mail.

11    Q    Okay, don't you have an e-mail that's DC.GOV?

12    A    We were changing the e-mail server, it was my first
13    initial and then it changed to something, I don't recollect
14    what it is off the top of my head.

15    Q    Do you use that e-mail address?

16    A    I don't, I use the --

17    Q    Mr. Lorusso, could you please state your social
18    security number?

19    A    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.

20    Q    And your place and date of birth?

21    A    Norwood, Massachusetts, 8/31/1965.

22    Q    And directing your attention to the second page of
23    Exhibit 84, under the heading of "Education" --

24    A    Uh-huh.

25    Q    -- did you, in fact, attend and graduate from the

1    University of Florida with a master's in arts and real estate

2    and urban analysis in 1998?

3        A    Yes, I did.

4        Q    And did you, in fact, attend and graduate from

5    Florida Atlantic University with a bachelor of science in

6    real estate in 1996?

7        A    I did.

8        Q    And you attended American University in Washington,

9    D.C. from 1988 to '89?

10        A    Yes, those dates are approximate but that's

11    correct.

12        Q    And did you obtain a degree from American

13    University?

14        A    No, I did not, I took courses and then completed my

15    course work at the Florida Atlantic University.  The course

16    work at American was also for a bachelor of science in real

17    estate.

18        Q    Besides the degree at the University of Florida,

19    any other postgraduate education?

20        A    No, I have an undergraduate degree and a master's

21    degree.

22        Q    And did you work in at an entity called "Bunker

23    Hill Group, LLC"?

24        A    When I worked in it, it was called "Bunker Hill

25    Aviation, LLC", I believe the name was changed after I had

1    left.  I changed the name on the CV to reflect if the people

2    had called Mr. Dyer for a reference.

3        Q    And what leads you to believe that the name was

4    changed?

5        A    That's what the phone -- when you called the phone

6    number, that's the answer you received, the person said

7    "Bunker Hill Group".

8        Q    Did you ask Mr. Dyer about that?

9        A    No, I spoke to a secretary and she said they had

10   changed the name.  I was always employed under the name,

11   "Bunker Hill Aviation, LLC".

12       Q    And what does Bunker Hill Aviation -- or what did

13   Bunker Hill Aviation do during your tenure there?

14       A    Well, would you like me to speak on how I met and

15   was employed by Mr. Dyer or --

16            MR. MURRAY:  Just answer --

17            THE WITNESS:  -- just that question?

18            MR. MURRAY:  -- the question.

19            MR. QUINTERO:  I certainly will get -- I'm

20   certainly getting to that.

21            THE WITNESS:  Okay, okay.

22            Bunker Hill Aviation was a entity that invested in

23   airline oriented things, it was an emerging hedge fund that

24   invested in aircraft leasing, he had previously done some

25   work with -- I'm trying to think of the entity -- owned some

Diversified Reporting Services, Inc.
(202) 296-9626

1   planes that went to the Bahamas called -- it's out of Fort

2   Lauderdale, I can't think if that's owned by Gulfstream now

3   but it was a company that primarily was engaged in the

4   purchase and use of aviation assets.

5          BY MR. QUINTERO:

6      Q   Did you do anything else during your tenure?

7      A   Well, Bunker Hill only did those things.

8      Q   Okay, were there other related entities that did

9   other things?

10     A   When I met Mr. Dyer, he had, I think, 30 companies,

11  I, to this day, don't know what all of them do but they did a

12  range of things from timber to finance, to financing

13  companies to -- I don't even know.

14     Q   Anything else?

15     A   Not that I'm aware of.

16     Q   Well, why don't we go back to how you came to be

17  employed --

18     A   Okay.

19     Q   -- with Mr. Dyer?  If you could describe how that

20  occurred.

21     A   Mr. Dyer had a office on One Lewis Wharf in Boston

22  and he had leased, from my family, an office at 440

23  Commercial Street in Boston and I got to know him in the

24  landlord, tenant relationship and he was having -- his son

25  was moving to the west coast and he needed somebody to do

14

1    some back office type support for his company, Bunker Hill,

2    and that was in -- those discussions were around August, when

3    I had just finished graduate school so over a period of six

4    months we sort of got together and he began leasing space in

5    our building at 440 Commercial Street, leaving the One Lewis

6    Wharf space.

7        Q    Okay, and was that August of 1998?

8        A    I think that was August of 1999 but I could be --

9    it could -- it probably -- yes, August of 1998.

10       Q    It says on your CV that you graduated --

11       A    Right.

12       Q    -- in 1998.

13       A    Right.  I completed the course work in August and I

14   think, actually, they gave me the degree in January because

15   they don't have a August commencement so I'm trying to

16   recollect the date with regards to employment with Mr. Dyer

17   but I'll have to go backwards, 2001 --

18       Q    Okay, during this --

19       A    I think it was 1999.

20       Q    1999, so prior to August of what you believe to be

21   1999, were you employed in any capacity by Mr. Dyer for any

22   of his entities?

23       A    No, I was in graduate school.

24       Q    And I direct your attention back to Exhibit 84,

25   just the CV and under your experience for Bunker Hill Group,

1    LLC it states 1998 to 2000?

2        A    Right.

3        Q    Does that refresh your recollection as to the year?

4        A    I think I -- because I did start doing work, I

5    think, in December of that year so I probably put it down as

6    1998.

7        Q    Okay, if you started doing work for him in December

8    of 1998, where was the gap between December, '98 and August

9    '99?  What were you doing?

10       A    If I had a calendar or something I could better --

11   may I borrow a pen for a second?  I just need to --

12       Q    Sure.

13       A    -- go backwards in time.

14           (Pause)

15           THE WITNESS:  I left Mr. Dyer's employee at the end

16   of 2000, in approximately this month -- January, February,

17   March, 2000 and I worked --

18           MR. QUINTERO:  Why don't we go off the record at

19   11:25 a.m.?

20           (Whereupon, at 11:25 a.m., a brief recess was

21   taken.)

22           (Whereupon, at 11:25 a.m., the examination was

23   resumed.)

24           MR. QUINTERO:  Back on the record at 11:25 a.m.

25           BY MR. QUINTERO:

16

1  Q    Before we restart, Mr. Lorusso, I just wanted to

2  confirm with you that during our break, there were no

3  discussions between you and the staff concerning this

4  investigation, is that correct?

5  A    That's correct.

6  MR. QUINTERO:  Is that correct, Mr. Murray?

7  MR. MURRAY:  That's correct.

8  BY MR. QUINTERO:

9  Q    All right, Mr. Lorusso, I believe the question I

10  had for you was whether the date that is contained on Exhibit

11  84 in your CV for your employment at Bunker Hill Group which

12  states 1998 to 2000 refreshes your recollection as to the

13  year in which you began.

14  A    It does, I've made a little map of my time here, I

15  graduated from the University of Florida in June of 1998, did

16  not finish all of my course work until probably around August

17  of that year.  I believe, in August -- excuse me -- I believe

18  it was -- August, September -- October of that year, 1998, I

19  met Mr. Dyer and we had negotiations and before the end of

20  that year, I started to do some, we'll call it pro bono but

21  just -- I was just helping Mr. Dyer, particularly with

22  regards to I.T. functions, telling him what computers to buy

23  and other things because he was a much more elder gentleman

24  and did not have experience in that area so that was around

25  December of 1998.  My full employment with Mr. Dyer, where I

17

1    received a paycheck, began on the -- I think it's June of

2    1999.

3          MR. MURRAY:  It might be clear if you indicated for

4    the record why you were in contact with Mr. Dyer at that time

5    as to where he was located.

6          THE WITNESS:  Again, Mr. Dyer was a tenant in our

7    building and had office space on the fourth floor and my

8    office space was on the second floor so I saw him often.

9          BY MR. QUINTERO:

10    Q    Did he, at some point, move up to the fifth floor?

11    A    He did later, our firm vacated and moved to another

12    floor.

13    Q    Okay, and was that prior to you coming on as a paid

14    employee?

15    A    Yes.

16    Q    And during the period between December of '98 and

17    June of 1999, approximately how much of your time was spent

18    helping Mr. Dyer?

19    A    Very little time, after the -- when he was up and

20    running, he had a person named Todd Litton who was employed

21    at the firm and was doing most of the work, he also had some

22    secretarial staff which ranged -- you know, the temporary and

23    other staff, I don't recollect their names.  All the work

24    prior to my employment with Mr. Dyer was specific to

25    computers.

18

1      Q      Okay, approximately how many hours per week were

2   you spending?

3      A      Oh, it wasn't -- it was, you know, "My computer

4   doesn't work, can you come down and look at it?", it was

5   not -- it wasn't even -- you couldn't even describe it in

6   hours per week, maybe one or two.

7      Q      Okay, and when did you leave Mr. Dyer's employment?

8      A      Sometime around March of 2000.

9      Q      So you were employed with him less than a year?

10     A      That's correct.

11     Q      Now, beginning in June of 1999, what were your

12   duties and responsibilities for Mr. Dyer?

13     A      Mr. Dyer had an extensive personal real estate

14   holding and given my background in real estate, I was

15   employed to look at leases and things, try to find back rent,

16   there were some CPI adjustments and other things that had not

17   been taken into account, to just deal almost exclusively with

18   his real estate portfolio.

19     Q      And what are CPI adjustments?

20     A      The consumer price index and commercial leases of

21   greater than 10 or 20 years, there's often an adjustment

22   based on the consumer price index so these leases would

23   increase in value or the rent derived for Mr. Dyer would

24   increase.  I found a number of leases for properties that he

25   held in the state of Maine where no one had initiated

19

1    correspondence with regards to these leases so I calculated

2    them off the leases and reported back to Mr. Dyer that he

3    should seek the increase in rent for these properties.

4        Q    Okay, you mentioned that these were personal real

5    estate of --

6        A    These were --

7        Q    -- Mr. Dyer's?

8        A    Yeah, these were -- all of the things that I worked

9    on with regards to real estate were real estate acquired

10   probably 10, 12, 15 years ago when he was employed by Eastern

11   Airlines.

12       Q    Okay, so these were held in Mr. Dyer's name as --

13       A    They were held in various partnerships or entities

14   but they were not held in, shall we say, under the modern

15   companies, under the companies crafted within the last number

16   of years.

17       Q    Besides your work on real estate matters, what else

18   did you do for Mr. Dyer?

19       A    I originally -- given my work with computers, I

20   took information that he received from his partner, Mr.

21   VonStrasdas and compiled that into a spreadsheet format,

22   that spreadsheet format was provided to me from the then

23   advisors to the fund, I'm trying to think, it's a accounting

24   firm in Boston that specializes in hedge funds.

25       Q    Was is Grant, Thornton?

Diversified Reporting Services, Inc.
(202) 296-9626

20

1      A    Grant, Thornton, yes.  Grant, Thornton gave me a
2    model partnership allocation form and I would fill in the
3    information that was provided by both Dyer and VonStrasdas.
4      Q    You mentioned that VonStrasdas was a partner of Mr.
5    Dyer's, is that correct?
6      A    As I believe it was set up because it was set up
7    prior to my arrival, the fund was set up in Nineteen -- I
8    believe it -- 1998 or 1999 but all that work was done by Todd
9    Litton.
10     Q    You mentioned a fund, what fund are you talking
11   about?
12     A    Well, I don't know, the fund as described by the
13   documents here, which is the Resource "F" fund --
14     Q    I'm sorry, what --
15     A    -- or Resource "F", LLC.
16     Q    Okay, when you say "these documents", you're
17   referring to the subpoena?
18     A    I'm referring to the subpoena --
19     Q    And the Formal Order of Investigation?
20     A    Yeah.
21     Q    Okay.
22     A    B-1678.
23     Q    Any other duties and responsibilities for Mr. Dyer?
24     A    No, 80% of my time was spent with regards to real
25   estate, probably 10% spent with regards to computers and then

1    10% working on the fund things.  The fund things were only

2    data collecting, in other words, somebody would give me

3    information, whether it was Mr. Dyer or whether it was the

4    advisors to the fund and I would just collect them in a

5    manner and put them on a computer.

6         Q     Directing your attention back to Exhibit 84, which

7    is your CV, specifically to the text under "Bunker Hill

8    Group, LLC", which sets out purportedly what your duties and

9    responsibilities were, the first lines says, "Provide a

10   strategic real estate direction for an emerging hedge fund

11   that held half of its assets in real property", what does

12   that refer to?

13        A     Well, the previous fund that he had ran held half

14   its assets in real estate, that's really me describing all

15   his groupings of companies for lack of confusion to the

16   reader that -- I worked on the -- half of the assets that I

17   deal with were real estate, they were necessarily all owned

18   by the named fund here.

19        Q     Resource "F"?

20        A     Resource "F", actually, none of them were owned by

21   Resource "F".

22        Q     Who owned them?

23        A     Again, those partnership entities that were 10 or

24   15 or 20 years old.

25        Q     Okay.  When you say, "an emerging hedge fund", what

1    do you mean?

2        A    That it was not seasoned, that it was not -- it

3    was, for lack of a better word, new.

4        Q    Did Mr. Dyer actually set up a hedge fund to hold

5    these properties during the time that you worked with him?

6        A    He set up a number of funds, none specifically to

7    hold real estate, although it was his sincere desire to go

8    back to the model that he had at Eastern Airlines, which was

9    to hold 50% of the fund's assets in real estate.  During my

10   tenure, I believe no new real estate was purchased by Mr.

11   Dyer in any of the time frame that I was there.

12       Q    On the last line under "Bunker Hill Group, LLC", it

13   states, "Provided the due diligence for the acquisition of an

14   under valued golf course development", what does that refer

15   to?

16       A    The hedge fund -- or I don't know which actual

17   group so we'll just say one of Dyer's companies 'cause I was

18   not a party to the transaction, was interested in purchasing

19   a golf course in Cordele, Georgia.  I went down and surveyed

20   the golf course, which included, I believe, a hundred acres

21   of buildable lots, trying to do the performance for the sale

22   and reversion of the buildable lots.

23       Q    Was that a golf course called "Falcon Run"?

24       A    It was called something else, I think, at that

25   point in time.

23

1        Q     Was it later changed to "Falcon Run"?

2        A     Yes, I think that's the name of it.  I was only

3    involved in the real estate part of it, the operations and

4    the subsequent things were past my time frame.

5        Q     And when did you go down and conduct the due

6    diligence at this golf course?

7        A     I think I went down twice, I know I went down once,

8    I cannot recollect the dates, off the top of my head but I

9    believe it would be in the winter of my employment.

10       Q     So the winter months of 1999?

11       A     That's correct.

12       Q     And did any of Mr. Dyer's entities actually

13   purchase the golf course?

14       A     I believe the entity of Bunker Hill Aviation

15   purchased a golf course.

16       Q     And why do you believe that?

17       A     I had some of the material of notes and on other

18   things but I was not at the closing nor was I preparing

19   documents for the closing.

20       Q     Now, in performing your due diligence on the golf

21   course, did you look at the financial situation at the golf

22   course?

23       A     We found the golf course to be in bad financial

24   situation, we found it to be in a less than desirable area

25   for a golf course, although it was, you know, in an okay area

24

1    for a housing development.

2        Q    What was it about the golf course's location that
3    made it a bad area for --

4        A    It was in not a high income area, it was not in an
5    area consistent with golf.  There were also, I believe, three
6    to five golf courses within a 20 minute drive.

7        Q    Who held the first mortgage on the golf course?

8        A    I don't know.

9        Q    Did you look into that as part of your due
10   diligence?

11       A    No, my due diligence was particular to the going
12   forward of building lots or building out the lots.

13       Q    Did you make a recommendation after you conducted a
14   due diligence on that golf course?

15       A    I did not, one of the things about Mr. Dyer was, he
16   would send you to do things and not give you adequate
17   resources or time or then would switch you to something else
18   so I went down once, looked around, went to the courthouse to
19   see -- you know, got a plat, there was a subdivision map,
20   brought those back, gave them to Mr. Dyer, Mr. Dyer then
21   employed a appraiser to appraise the land and then that was
22   the end of my involvement with the course.

23       Q    Did he ask you your opinion on whether he should go
24   forward with the purchase of the golf course?

25       A    I think I -- he didn't ask me for my opinion, I

25

1    thought that, you know, the other things that we had

2    previously stated, that it was not in an area consistent with

3    high golf, it was better suited for a housing development but

4    I never prepared any kind of report or formal recommendation

5    to him, it basically was shifted to other people.

6         Q    Did you make an oral recommendation to him?

7         A    I don't recollect.

8         Q    Well, did you tell him your opinion one way or

9    another concerning the golf course?

10        A    Well, I think it -- I said, you know, "This is not

11   the greatest deal in the world".

12        Q    What were the terms of a possible purchase of the

13   golf course?

14        A    I don't know.  Actually, I believe that when I went

15   down, it was actually after the purchase of the golf course,

16   just so you know the time line so my recommendations with

17   regard to the sale were irrelevant because it was just trying

18   to make use of the asset.

19        Q    Were you aware of Mr. Dyer's plans to purchase the

20   golf course prior to the purchase?

21        A    No.

22        Q    And where did Mr. Dyer get the funds to purchase

23   the golf course?

24        A    I have no idea.

25        Q    Do you know an individual by the name "George

26

1  Bathhurst"?

2       A    George Bathhurst is the son of Mr. Dyer's oldest

3  friend who happens to live in England.  I met Mr. Bathhurst

4  twice, both times in the presence of Mr. Dyer but besides

5  that, I don't know Mr. Bathhurst.

6       Q    When did you meet Mr. Bathhurst?

7       A    I met him in October of 1999 and then once he came

8  to the office in Boston, he often came and visited Chuck and

9  stayed at Chuck's home but I did not participate in those.

10       Q    What was the substance of the meeting in October of

11  '99 with Mr. Bathhurst?

12       A    The substance of the meeting was just talking about

13  investments.

14       Q    Can you be more specific?

15       A    There was no real specifics, it was -- I was sort

16  of like the junior guy who was brought in to add legitimacy

17  to a conversation, I wasn't a participant in the

18  conversation.

19       Q    Did an investment in the golf course come up at

20  all?

21       A    Absolutely not.

22       Q    What type of investments were discussed?

23       A    Mr. Bathhurst had invested in Georgia in trees

24  called "Folonius trees", they're fast growing trees and

25  investments in things like that, he often invested in the

27

1      United States.

2          Q    Did Mr. Bathhurst's investment with Polonius trees

3      or the company that held that have any connection to the golf

4      course?

5          A    I believe that the person who managed the Polonius

6      operation, I came later to learn, had something to do with it

7      but I did not know what that relationship was.  Again, I did

8      not do the due diligence with regards to the sale of the

9      property or the purchase of the property.

10         Q    And how did you come to learn of this connection

11     later on?

12         A    Just through discussions that Mr. Dyer --

13     overhearing things in the office.

14         Q    Discussions Mr. Dyer had with others?

15         A    With the manager of the Polonius operation.

16         Q    And what was his name?

17         A    I don't remember.

18         Q    I'm sorry, and where was the October, '99 meeting

19     you mentioned?  Where did that take place?

20         A    That was in New York.

21         Q    Anyone else present?

22         A    Was a gentleman named Mr. Letts from Singapore who

23     was also an investor in the Polonius trees, an attorney named

24     Mr. Dexter Wadsworth and Mr. Dyer and myself.

25         Q    Was there any discussion of a fund that Mr.

28

1    Wadsworth was starting up?

2        A    Mr. Wadsworth doesn't have a fund but there was

3    some discussions with regards to Mr. Bathhurst directing

4    money for some investment but there was no consummation or --

5        Q    How do you know there was no consummation?

6        A    There was no consummation with regards to Dexter.

7        Q    And how do you know that?

8        A    Because he kept calling, saying, you know, they

9    would --

10       Q    Mr. Wadsworth kept calling?

11       A    Yes.

12       Q    Okay, and where was the money supposed to go?

13       A    I don't know.

14                         (SEC Exhibit No. 75 was marked

15                          for identification.)

16           MR. QUINTERO:  Mr. Lorusso, I hand you a copy of a

17    document that has been previously marked as Exhibit 75, it is

18    a letter dated February 25th, 2000 from George Hervey-

19    Bathhurst to Chuck Dyer.

20           BY MR. QUINTERO:

21       Q    Is George Hervey-Bathhurst the same Mister --

22       A    Yes, that's --

23       Q    -- Bathhurst we've been referring to?

24       A    Yes.

25       Q    Okay, and directing your attention to the first

              Diversified Reporting Services, Inc.
                        (202) 296-9626

29

1    sentence of Exhibit 75, which says, "Dear Chuck, I refer to

2    our meeting in New York last October between Charles Letts,

3    Dexter, yourself and myself", was that the October meeting in

4    New --

5        A    Yes, sir.

6        Q    -- York you were referring to?

7        A    Yes, sir.  As you can see by my omission, I was not

8    a key player by any means in this meeting.

9        Q    Did you have an understanding that Mr. Dyer held

10   money for Mr. Bathhurst and Mr. Letts during that time

11   period?

12       A    At the time of the October meeting?

13       Q    Yes.

14       A    No, I believe he did not hold money.

15       Q    Did he, at some later point, hold money for Mr.

16   Letts and Mr. Bathhurst?

17       A    I believe that Mr. Letts and Mr. Bathhurst,

18   collectively, I don't know if individually, wired funds to

19   Chuck's offshore account, which is called "Antietam".

20       Q    And what is Antietam?

21       A    I have no idea, it's a account at Barclays Bank,

22   it's specifically set up that I cannot or no one but Mr.

23   Dyer, it's a verbal recognition account, can inquire, move or

24   send money from that account so I have no knowledge of what

25   goes or comes from there.

1    Q    How does a vocal recognition account work?

2    A    The people in the wire room recognize that it's

3    Chuck calling.

4    Q    And how do you know that Mr. Letts and Mr.

5    Bathhurst wired funds to Antietam?

6    A    I believe that Mr. Dyer told me or Mr. Bathhurst

7    called and said that they were wired because he asked us to

8    confirm that they had been received.  I believe that I asked

9    Mr. Dyer and I sent a receipt to Mr. Bathhurst, based on Mr.

10   Dyer's affirmation.

11   Q    And was this amount $550,000, collectively?

12   A    I believe.

13   Q    And what was Mr. Dyer to do with the money?

14   A    Mr. Dyer was to hold it for investment but not -- I

15   believe he was -- again, I wasn't a full participant at the

16   meeting but I believe it was to direct the money to another

17   investment.  What Mr. Dyer was trying to -- Letts and

18   Bathhurst live outside the United States and what Dyer was

19   trying to do was, saying that his funds had a good measure of

20   record keeping and that you should -- if he was -- become

21   funds of funds, if that made sense, that Dyer would receive

22   the money and he would be able to provide good record

23   keeping.

24   Q    I'm not sure I follow you.  Funds of funds, what is

25   the significance of that?

31

1       A    That instead of whatever those two gentlemen --

2  because they do not live outside the United States so for

3  example, if they were going to invest more money in Polonius

4  trees, instead of sending money to a Polonius tree

5  partnership, that they would send the money to Dyer, this is

6  my understanding.

7       Q    Sure.

8       A    In other words, I --

9       Q    I understand.

10      A    I did not participate in this meeting but it was my

11  understanding that they would send the money to Dyer and then

12  Dyer would be able to, as being someone inside the United

13  States, better monitor the investment and his investment

14  vehicles could then provide a measure of accountability,

15  transaction records, statements, those types of things that

16  would not -- he was trying to sell sort of a big business

17  back office in the scenario.

18      Q    And was Mr. Dyer or any of his entities going to

19  receive compensation for doing this?

20      A    No.

21      Q    And why was Mr. Dyer going to do it?

22      A    I believe it's 'cause of the longstanding

23  friendship with George.  I think that if there was profit

24  made, they would share in that but again, that was a

25  discussion that they must have had singularly.

32

1        MR. MURRAY:  Can we just take a couple of seconds

2    here?

3        THE WITNESS:  Yeah.

4        (Whereupon, a conversation was conducted between

5    the Witness and his counsel, outside the hearing of the court

6    reporter.)

7        MR. MURRAY:  Thank you.

8        BY MR. QUINTERO:

9        Q    And during the time that Mr. Dyer was going to hold

10   this money before it went to a different investment, was Mr.

11   Dyer going to pay out any interest or anything of that nature

12   to Mr. Bathhurst or Mr. Letts?

13       A    I have no knowledge of that.

14       Q    Was that discussed?

15       A    No.  With regards to the clients, Dyer forbade

16   anyone in the office to speak directly to the clients.  You

17   were allowed to receive the phone call and you know, tell

18   Chuck they were on the phone or try to find him but you were

19   not encouraged to speak substantively to them, that was Mr.

20   Dyer's job, they were Mr. Dyer's clients.

21       Q    Just so I understand, your testimony concerning the

22   issue of Mr. Dyer's offer to do the record keeping and the

23   back office type of work, you learned that during this

24   October meeting in New York?

25       A    That's correct.

33

1    Q    Was there any further discussion of these topics

2    with Mr. Dyer?

3    A    No.  I honestly thought that the matter was dead,

4    as the money received in Antietam is not under my control and

5    we had no further dialogue with Dexter Wadsworth.

6    Q    Were you going to have a role in the back office

7    operations for this money?

8    A    I probably would have run the -- you know, done the

9    physical record keeping but as the -- it was never sent to,

10   quote, unquote, my department or in my purview.

11   Q    And was there any discussion of sharing of profits

12   at this meeting?

13   A    Between which entities?

14   Q    Well, with any entities.

15   A    I don't recollect.

16   Q    Okay, was there any discussion between -- you said

17   once the money, the 550,000 in this case, went from Mr. Dyer

18   to either Mr. Wadsworth or some other type of investment, was

19   there going to be a sharing of profits from the end

20   investment?

21   A    I believe he was just looking for -- he had a

22   stated management fee and I think he was looking for the

23   management fee plus his share of the up side but that would

24   be speculating, I mean on --

25   Q    And where do you derive your belief?

Diversified Reporting Services, Inc.
(202) 296-9626

34

1          A     Because on the most of the deals that he had done

2     in that time period, they included some kind of profit

3     sharing and a measure of a base management fee.

4          Q     Okay, so if I understand correctly, Mr. Dyer was

5     not going to charge anything for holding onto the money, is

6     that correct?

7          A     That's correct.

8          Q     But he may have charged, been planning to charge,

9     an administrative fee and perhaps a sharing of the profits

10    once the money left his hands to some end investment?

11         A     Correct, when it was placed, yes, that's my belief.

12         Q     And you base that belief on any discussions you had

13    with Mr. Dyer?

14         A     Based on previous, his previous deals.

15         Q     And what were those deals?

16         A     No, just that the hedge fund paperwork and

17    everything stated the amount of profit sharing and a

18    collection of the up side.

19         Q     And when you refer to that hedge fund, you're

20    talking about Resource "F"?

21         A     The Resource "F", yes.

22         Q     Directing your attention to the second paragraph of

23    Exhibit 75, which begins, "Sometime after November 2nd, the

24    date of the golf course purchase, you informed me that you

25    had used some of the $550,000, you certainly did not seek

35

1    permission or indeed receive it.  If we wanted to buy the

2    golf course, we certainly could have purchased it by an

3    entity under our control".  Do you have any knowledge of a

4    dispute between Mr. Bathhurst and Mr. Dyer concerning the

5    purchase of the golf course?

6         A    Only after the purchase of the golf course.

7         Q    And what do you know about that?

8         A    I knew that Mr. Bathhurst had called on several

9    occasions, looking for Mr. Dyer to discuss this matter with

10   him.

11        Q    And how do you know that was the basis of Mr.

12   Bathhurst's call?

13        A    He stated it, Mr. Bathhurst said that he had used

14   the funds without permission, Mr. Dyer stated that he had

15   called Mr. Bathhurst and got his permission.

16        Q    And when was the first time that Mr. Bathhurst

17   called about this dispute?

18        A    Well, if the date of the closing of the golf course

19   was November 2nd, it would be sometime right after that, I

20   don't recollect.

21        Q    Okay.

22        A    Mr. Bathhurst typically called Mr. Dyer at home, as

23   he was an overseas person and did not call the office.

24        Q    Okay, and in terms of the call that you picked up,

25   that was sometime shortly after the closing date of the golf

36

1  course purchase, is that correct?

2       A    Yes, sir.

3       Q    And that was the time in which Mr. Bathhurst

4  indicated that Mr. Dyer did not have his permission to use

5  the funds?

6       A    Correct.

7       Q    Was there any documentation from either Mr. Dyer or

8  Mr. Bathhurst that indicated -- I'm sorry, scratch that.

9            Prior to the golf course purchase, was there any

10 documentation from either Mr. Bathhurst or Mr. Dyer which

11 would indicate whether Mr. Dyer received prior permission to

12 purchase the golf course using Mr. Bathhurst's funds?

13      A    I have no knowledge of that permission nor do I

14 have any documentation nor knowledge of any documentation.

15      Q    Did Mr. Dyer talk to you about his reasons for

16 putting some of the funds, some of the $550,000 into the golf

17 course?

18      A    He did not.

19      Q    Did you derive any understanding as to why Mr. Dyer

20 did so?

21      A    I only learned months or weeks afterwards that he

22 did.

23      Q    That he, in fact, used the funds for that purpose?

24      A    Correct because again, I wasn't even aware "A",

25 that the funds had come in and "B", his use of the funds

37

1    would be of no knowledge to me.

2       Q    And when you did learn that Mr. Dyer had made the

3    purchase --

4       A    He stated --

5       Q    -- did you learn why he did so?

6       A    He stated that George Bathhurst had asked for his

7    help in securing the golf course.

8       Q    And why did Mr. Bathhurst ask for Mr. Dyer's help

9    to purchase the golf course?

10      A    I have no idea, you'd have to ask the two

11   principals.

12      Q    Did Mr. Bathhurst own the golf course?

13      A    No, he did not.

14      Q    Does he have some sort of equity position in the

15   golf course?

16      A    He did not.

17      Q    I mean, at any time.

18      A    He did not.

19      Q    Does Mr. Bathhurst or any entity under his control

20   have a second mortgage from Mr. Dyer for the golf course?

21      A    I believe he received one approximately eight or

22   nine or ten months after this as a way to establish surety

23   that he would receive some of the funds back but it was not a

24   proactive, it was not part and parcel of the original

25   transaction.

Diversified Reporting Services, Inc.
(202) 296-9626

38

1    Q    Was there any effort made to refinance Bunker

2   Hill's interest in the golf course?

3    A    I believe there was but there wasn't a sufficient

4   cash flow out of the golf course.  The golf course, I also

5   believe, was held -- there was a million something dollar

6   note held by a local bank in the name of one of Chuck's

7   entities so it was not -- I don't know -- again, I don't know

8   how much money was used or for what it was used for but the

9   mortgage was written to Dyer.

10   Q    Or to one of --

11   A    To Mr. Dyer's --

12   Q    -- Mr. Dyer's --

13   A    Yeah, I'm sorry.

14   Q    -- entities?

15   A    Yes.

16   Q    Did you participate in any efforts to refinance

17   Bunker Hill's interest in the golf course?

18   A    I may have participated in -- not document

19   preparation but just putting together things like the rounds

20   of golf played and things like that but not in a paralegal or

21   a sense of a closing, no.

22   Q    And so specifically what efforts did Mr. Dyer or

23   one of his entities take to refinance Bunker Hill's position

24   in the golf course?

25   A    I actually believe he asked for an extension first

Diversified Reporting Services, Inc.
(202) 296-9626

39

1     and then --

.2         Q    Extension?  I'm sorry.  Extension for what?

3         A    It was a short term note, I believe he asked for an

4    extension.  Again, this is conjecture on my part.

5         Q    It was based on?  What is your conjecture based on?

6         A    That it was a short term note and the funding

7    stayed in place.

8         Q    Okay.

9         A    It was not foreclosed upon.

10         Q    So you believe that Mr. Dyer may have asked for an

11    extension on the note, what else did Mr. Dyer do, if

12    anything?

13         A    I don't know what his actions were with regards to

14    refinance the golf course.

15         Q    Did he seek refinancing from the bank that held the

16    note?

17         A    He may have, I don't --

18              MR. MURRAY:  You mean, other than the extension?

19              MR. QUINTERO:  Yes.

20              THE WITNESS:  You mean permanent financing?

21              MR. QUINTERO:  Yes.

22              THE WITNESS:  I have no knowledge of that.

23              BY MR. QUINTERO:

24         Q    Back in the November, '98 time frame -- I'm

25    sorry -- November, 1999 time frame, after Mr. Dyer purchased

40

1   the golf course, did he discuss, with you in any way, how he

2   was going to repay Mr. Bathhurst for the money that was used?

3        A    His statements were, "We saved him, he should be

4   happy that", you know, "we got involved" but --

5        Q    Saved him from what?

6        A    The foreclosure.

7        Q    I'm trying to understand, then, what was Mr.

8   Bathhurst's connection with the golf course?

9        A    I don't know and didn't know so I don't know what

10  he was speaking about.

11       Q    Were you confused at the time?

12       A    I was confused at the time but I mean, with regards

13  to some of the things that Chuck did, that was not uncommon.

14       Q    Did you ask him any questions?

15       A    No, because again, it wasn't part of my scope of

16  duties.

17       Q    Directing your attention to the last paragraph on

18  the first page of Exhibit 75, which states, "On behalf of my

19  client, Brian West, please arrange his withdrawal from

20  whatever entity you allocated him to contrary to his

21  instructions and send that money directly to Von.  Please

22  confirm that this has been undertaken".  Are you familiar

23  with the gentleman by the name of "Brian West"?

24       A    My knowledge of Brian West is limited to the fact

25  that he is a friend of George Bathhurst's.

41

1    Q     Are you aware of any dispute that arose concerning

2    whether Mr. West's money was directed to Von?

3    A     No, but with regards to the setup of the fund and

4    offshore and onshore clients, I would not have any knowledge

5    of that.

6    Q     Did Mr. Bathhurst mention Mr. West, at all, at any

7    time with you?

8    A     He may have made comments like that or just saying,

9    you know, "Get Chuck to make sure he gives West his money

10   back", but again, I had knowledge of -- I would just give the

11   message to Mr. Dyer.

12   Q     Did you discuss the topic, at all, with Mr. Dyer?

13   A     No.

14   Q     And did Mr. Dyer, in fact, have Mr. West's money?

15   A     I have no knowledge.

16   Q     Were you going to say something?

17   A     No, I -- again, reiterating that if money, if

18   money, had come in from Mr. West, it would have come into the

19   account in the Bahamas and Antietam.

20   Q     And why do you believe that?

21   A     No -- but -- 'cause that's where anybody outside

22   the United States money would go and so I would -- you know,

23   it would not have come to onshore.

24   Q     And why do you believe that anyone who is offshore

25   would send it to the Antietam account in the Bahamas?

Diversified Reporting Services, Inc.
(202) 296-9626

42

1    A    That was his longstanding instructions.

2    Q    Communicated to you?

3    A    Communicated through our office, through all its

4    letters, through any correspondence.

5    Q    And was this in connection with Resource "F"?

6    A    It was in connection with any entity.

7         MR. MURRAY:  Just for clarification of the record,

8    when you say he might have made comments like that, do you

9    mean like the last paragraph --

10        THE WITNESS:  I'm sorry.

11        MR. MURRAY:  -- of that letter?

12        THE WITNESS:  I'll read the -- "On behalf of my

13   client Brian West, please arrange withdrawal from the entity

14   and allocate the money, instructions, send the money directly

15   to Von", not in necessarily those words but I had -- if he

16   had made comment, and remember, this is a year, year and a

17   half ago, my recollection is -- would place Brian West, Von

18   and money in the same sentence, besides that, I have no

19   direct recollection as to what those entities were or how

20   they were connected.

21        BY MR. QUINTERO:

22   Q    Turning back to your duties at Bunker Hill and

23   those who worked there, who else, besides yourself, worked at

24   Bunker Hill during your tenure?

25   A    Todd Litton was an attorney who was employed prior

Diversified Reporting Services, Inc.
(202) 296-9626

43

1    to my arrival, he left officially the day I started.  Mr.

2    Dyer, then, as opposed to employees, used a number of, we'll

3    call them consultants or firms or he used advisory firms such

4    as Grant, Thornton, he used accountants, he used -- but no

5    one was an employee of the firm.

6         Q    Besides you?

7         A    There were other employees that had various tenures

8    with the firm but I was the sole employee for a period of

9    time.  I mean, there were secretaries and other things but

10   they came from temp firms and some lasted as little as days

11   and weeks.

12        Q    Are you familiar with an entity called "Mustang

13   Capital'?

14        A    Mustang Capital, I believe, was once a registered

15   investment advisor or related to an entity, it was something

16   that was started years ago by Mr. Dyer and when I came on, it

17   was run by a gentleman named "David Conary", out of the state

18   of Maine.

19        Q    Was there any work done for Mustang Capital in Mr.

20   Dyer's offices in Boston?

21        A    No.

22        Q    It was all Mr. Conary, up in Maine, doing the work?

23        A    Right, correct, it was in Bethel, Maine.

24        Q    And what did Mr. Conary do for Mustang Capital?

25        A    I believe he made trades and I believe he was a

Diversified Reporting Services, Inc.
(202) 296-9626

44

1    registered investment advisor, did not have, if anything, you

2    know, monthly contact with him.  These were, I believe, old

3    clients that he had had with regards to his Eastern Airline

4    days.

5        Q    When you say "he", you're talking about Dyer?

6        A    Yeah, Dyer, yes.

7        Q    Are you familiar with an entity called "Hawthorne

8    Associates"?

9        A    I've heard the name but I'm not familiar with what

10   they did in the scope of their business.

11       Q    Is it your understanding that that was another

12   entity owned by Mr. Dyer?

13       A    That's my understanding.

14       Q    Are you familiar with an entity called "Hawthorne

15   Distributors"?

16       A    I'm more familiar with that in what it used to be,

17   it was the distribution account when he was a registered

18   investment advisor.

19       Q    When you say "he", again, Mr. Dyer?

20       A    Yes.  As the name describes, that was the account

21   where they distributed --

22       Q    Moneys to its clients?

23       A    Yes.

24       Q    Are you familiar with an entity called "Abbot and

25   Dunbar"?

Diversified Reporting Services, Inc.
(202) 296-9626

45

1    A    I've heard the name but I don't know what it is.

2    Q    Is it associated with Mr. Dyer?

3    A    Yes.

4    Q    And how do you know that?

5    A    I've seen the letterhead and he's made discussion

6    of Abbot and Dunbar clients but I have no knowledge as to

7    their names or their nature of their relationship.

8    Q    Are you familiar with the entity called "Northeast

9    Aviation"?

10   A    I have heard the name, have -- that's besides

11   that -- basically, when I say I've heard the name, it's

12   talking with the accountants, trying to do forensic audits

13   and looking backwards where we would find documents or names

14   on sheets of paper but that would be the limit of my

15   knowledge so it wouldn't be a discussion knowledge, it would

16   be from a forensic or paper standpoint.

17   Q    You mentioned forensic audits, what accounting

18   firms conducted forensic audits?

19   A    I use that term myself, he didn't -- anytime you go

20   after the sort of old stuff, I would call it a forensic audit

21   but he employed Bob Lavigne as an accountant.

22   Q    Could you spell that?

23   A    I don't know the spelling of that.

24   Q    Okay.

25   A    And he also employed other various, including

46

1   Grant, Thornton.

2       Q    Northeast Aviation was associated with Mr. Dyer?

3       A    Based on what I had seen in looking at old papers.

4       Q    I believe you testified earlier that you left Mr.

5   Dyer's employment in March of 2000, why did you leave?

6       A    He moved, he picked up his office and left.

7       Q    Okay, where did he move to?

8       A    He didn't tell me for about two weeks, he was

9   supposed to move home.  He had no income and I suggested that

10  he dissolve the Boston office and move home and he did that

11  for a period of time and then evidently was doing something

12  else, I have no knowledge of anything after that time frame.

13      Q    Were you being paid on a salary basis?

14      A    I was paid on a salary basis, yes.

15      Q    And what was your salary?

16      A    My initial annual salary was 60,000 per year.

17      Q    Okay, did that change over time?

18      A    It went up in, I believe, December or January and

19  then --

20      Q    Of 2000?

21      A    Of -- yes, of 2000 and then it went down to a

22  dollar, ninety-eight.

23      Q    Literally?

24      A    Literally.

25      Q    Okay.

47

1      A    He carried me on the health insurance for a period

2 of time so he paid me --

3      Q    I see.

4      A    -- a dollar ninety-eight or something.

5      Q    But you continued to do work for him between

6 December, January and March, 2000?

7      A    Once he had moved, I did not continue to do any

8 work, I had no --

9      Q    And when did he move?

10     A    I believe it was March.

11     Q    Okay, but I'm asking you, you continued to work for

12 the dollar ninety-eight, the health insurance, I guess,

13 basically?

14     A    No, no, no, that was when he moved.

15     Q    Oh, I see.  I'm sorry, you said that -- I thought

16 you had said the salary changed in the December, January time

17 frame.

18     A    It went up.

19     Q    Oh, I'm sorry, to what?

20     A    I think it was 80,000 and then within a month, it

21 was de minimis --

22     Q    Right.

23     A    -- but I was purely compensated as a salaried

24 employee.

25     Q    And did you receive the promised salary during that

48

1    time period?

2        A    One of my initial concerns, because I had prior

3    knowledge of Mr. Dyer before joining his employment, was that

4    he employ a payroll service to pay the salary and that he put

5    the money in ahead of time to pay the salaries.

6        Q    When you say you had prior knowledge of Mr. Dyer,

7    are you talking about in the landlord, tenant relationship?

8        A    In the landlord, tenant relationship.

9        Q    Does Mr. Dyer have difficulties in paying for rent

10   from time to time?

11       A    No more than other people who have differing

12   assets.

13       Q    What do you mean by "differing assets"?

14       A    Who had a vast amount of different entities spread

15   out so sometimes he would be slow in paying.

16       Q    Did you have any other basis for insisting on the

17   payroll company being involved?

18       A    Discussions with Todd Litton prior to my

19   employment.

20       Q    And what were the substance of those discussions?

21       A    Dyer would just write him a check and it would sit

22   on his desk until he signed it.  He had a service do the

23   calculation of the payroll taxes but it would not come effect

24   until he signed the check and he often was traveling or

25   otherwise.  Mr. Dyer was almost rarely in the office and

Diversified Reporting Services, Inc.
(202) 296-9626

49

1    worked almost exclusively from home or traveled and so I

2    wanted to make sure that I did not run into that problem.  I

3    did not have any -- I only had hearsay knowledge of it from

4    Mr. Litton but I wanted to avoid that and actually, there was

5    no issues with regards to my pay when I worked for Mr. Dyer.

6            MR. QUINTERO:  We can go off the record at 12:12

7    p.m.

8            (Whereupon, at 12:12 p.m., a brief recess was

9    taken.)

10           (Whereupon, at 12:25 p.m., the examination was

11   resumed.)

12           MR. QUINTERO:  Back on the record at 12:25 p.m.

13           BY MR. QUINTERO:

14   Q    Before we get restarted, Mr. Lorusso, I just wanted

15   to confirm with you that during our break, there were no

16   discussions between you and the staff concerning this

17   investigation, is that correct?

18   A    That's correct.

19           MR. QUINTERO:  Mr. Murray, is that correct?

20           MR. MURRAY:  That's correct.

21           MR. QUINTERO:  And prior to our break, we were

22   discussing the reasons for you leaving Mr. Dyer's employment.

23           BY MR. QUINTERO:

24   Q    In addition to the fact that Mr. Dyer moved out of

25   his space, were there any other reasons?

Diversified Reporting Services, Inc.
(202) 296-9626

50

1    A.    Well, there was no funds to continue employment.

2  Also as noted by my resume', all the work that I'd ever done

3  from a professional standpoint has been in real estate, the

4  real estate nature of the work had diminished so I went on

5  and now I am employed in the real estate field, which is my

6  area of expertise'.

7    Q    When was the last time you spoke to Mr. Dyer?

8    A    I spoke to him the day I received the subpoena.  I

9  did not speak to him, I called his office and said, you know,

10  "What's going on?", but prior to that, it was probably six or

11  eight months ago.

12    Q    Did you get a call back from Mr. Dyer in this most

13  recent time period?

14    A    He called me back and said, "Oh, well, yeah, our

15  lawyers are working on it, don't worry about it".

16    Q    Anything else?

17    A    No.

18    Q    How long was that conversation?

19    A    Less than two minutes.  I fathomed, from that call,

20  that I should then get representation for myself.

21    Q    Did you ask him any other questions?

22    A    No.

23    Q    I believe you testified earlier about an individual

24  by the name of "Von" or "VonStrasdas", is that correct?

25    A    Yes, the full name as known to me was "Voldemar

Diversified Reporting Services, Inc.
(202) 296-9626

1    VonStrasdas", he was listed on a number of the correspondence

2    as the co-managing member of Resource "F" and Resource "F",

3    Alpha.

4        Q    Have you ever met Mr. VonStrasdas?

5        A    I met him twice in our office.

6        Q    When was that?

7        A    That was during the period of my employment, I

8    think, early on he came in within the month or two months of

9    my employment and we went to lunch down the street and then

10   the second time he might have come in for five or ten

11   minutes.  The meetings were -- the lunch meeting was at lunch

12   and it was very casual and informal but we had no, you know,

13   sit around a conference table type meeting.

14       Q    Who else was present at that lunch?

15       A    Just myself and Chuck Dyer.

16       Q    Was business discussed?

17       A    No.

18       Q    And when did the second meeting take place?

19       A    I don't remember, I believe there was a second

20   meeting and I think it was -- he was in our office and I

21   walked in and he was there one day and I saw him and I said

22   "Hello" and walked away.

23       Q    What was Mr. VonStrasdas' background?

24       A    I don't know.

25       Q    And how did he and Mr. Dyer meet?

Diversified Reporting Services, Inc.
(202) 296-9626

52

1      A    I don't know.

2      Q    Did you ever ask Mr. Dyer?

3      A    No, they had met, I know, previous to my

4   employment, they seemed very friendly but I did not inquire.

5      Q    Was he involved, in any way, with the Christian

6   Science Church?

7      A    I believe he was but I have no direct knowledge of

8   that.

9      Q    And why do you believe that?

10      A    He would come to Boston and attend church meetings

11   and that was the occasion, during a church meeting time, that

12   he came in to visit us.

13      Q    Did he tell you that that's what he was doing?

14      A    I think Chuck did.

15      Q    You've mentioned Resource "F", what is Resource

16   "F"?

17      A    It's my understanding that Resource "F" was a hedge

18   fund, that understanding was reinforced that we employed a

19   hedge fund accounting firm of Grant, Thornton and I think it

20   was Dedrick (sic), Price and Rhoads who were the fund's legal

21   counsel.

22      Q    And when was Resource "F" formed?

23      A    Prior to my arrival.

24      Q    Do you know when?

25      A    No, I do not.

1    Q    And did the hedge fund have an investment focus?

2    A    The investment focus was aviation.

3    Q    Anything else?

4    A    The focus was aviation.

5    Q    Was it involved in any other investments?

6    A    I don't know, Mr. Dyer was the sole investment

7    advisor, for lack of a better term.

8         MR. MURRAY:  Your whole focus is while he was

9    employed there, isn't that correct?

10        THE WITNESS:  Yes.

11        MR. QUINTERO:  That's correct.

12        MR. MURRAY:  Okay, so it's -- okay.

13        BY MR. QUINTERO:

14   Q    Did you learn at some later time that Resource "F"

15   was involved in other investments?

16   A    Again, Mr. Dyer directed the investments so I don't

17   know what they were.

18   Q    Well, I'm just asking you, did you, at some later

19   time, learn that Resource "F" had investments other than in

20   the airline industry?

21   A    I knew that there was some relationship with Mr.

22   VonStrasdas but I didn't know what that relationship was.

23   Q    And did that result in investments in something

24   other than airline or aviation?

25   A    I don't know because I don't know -- aviation is a

54

1    broad range of topics and it could be anything from hedging

2    the loss of an engine to something else so I wouldn't know,

3    by the name of an investment, whether it was aviation or not

4    and also when I say that the focus was aviation, it does mean

5    that it was solely a aviation fund for direct investment, it

6    also held shares of stock in other things.

7         Q    Such as?

8         A    Stock of airline companies and companies like Cisco

9    Systems that would run the back office of large computers for

10   aviation.

11        Q    Resource "F" held these investments?

12        A    Yes.

13        Q    Approximately how much, in these publicly traded

14   stocks, did it hold?

15        A    I don't know, Mr. Dyer was the sole trader with

16   regards to the accumulation and disposition of those stocks.

17        Q    And how do you know that it held shares in Cisco

18   and --

19        A    I'm using --

20        Q    -- some airline stocks?

21        A    Well, I'm using Cisco as an example, I know it held

22   stock in, for example, Southwest Airlines and held stock in

23   other companies, it also held some high tech companies that

24   had an aviation focus.  The reason I know this was that there

25   would be a account sent to us with the name, "Resource 'F'"

55

1    that -- where these stocks were held and then Mr. Dyer took

2    that every month and brought it home.

3        Q    The stocks that Resource "F" held in Southwest

4    Airlines, wasn't that less than $5,000?

5        A    I don't know, off the top of my head.  I thought

6    the entire portfolio was between a hundred and fifty and two

7    hundred and fifty thousand dollars at one time.  Again, we're

8    speaking about the time of my employment.

9        Q    Yes, so during the time of your employment, as far

10   as you knew, Resource "F" held between a hundred and fifty to

11   two hundred fifty thousand dollars?

12       A    That's correct.

13       Q    In its investment portfolio?

14       A    Correct.

15       Q    And what was your involvement with Resource "F", if

16   any?

17       A    I compiled, from various sources, the accounting

18   necessary to provide monthly -- excuse me, strike that --

19   quarterly client statements as to the people that's solely

20   for Resource "F" clients.  Mr Dyer did the accounting and

21   correspondence to non-Resource "F" clients, he also did the

22   correspondence for Resource "F" clients but I did the

23   compiling of the data from various sources, whether it be

24   account statements or transaction registers, those type

25   things.

1     Q     Anything else concerning your involvement with

2     Resource "F"?

3     A     I think that's about it, I was not authorized -- it

4     had a bank account, I was not an authorized signer, I

5     couldn't move money, I mean, I --

6     Q     Where did it have bank accounts?

7     A     I don't know.

8     Q     Did it have an account at Boston Private Bank?

9     A     I believe that's where it did but it could have

10    more than one, I don't know.

11    Q     Where you a signatory on that account?

12    A     I was not.

13    Q     Did it have an account with Brown Brothers

14    Harriman?

15    A     I believe it did.

16    Q     Were you a signatory on that account?

17    A     I was not.

18    Q     And you mentioned an Antietam account in the

19    Bahamas at Barclays, is that correct?

20    A     That's correct.

21    Q     And who is that associated with?

22    A     I believe, Charles Dyer was the sole signatory on

23    that account.

24    Q     Did money from Resource "F", in any way, flow to

25    that account?

1        A    Yes.

2        Q    And how do you know that?

3        A    Our office sent faxes to move that money.  Again,

4    Mr. Dyer would have to physically confirm each wire transfer

5    himself.

6        Q    In addition, were there any other bank accounts

7    besides the three that I've just mentioned associated with

8    Resource "F"?

9        A    I don't think, associated with Resource "F".

10       Q    Associated with other entities?

11       A    I think he had a number of bank accounts, including

12   Wainwright Bank, BankBoston, the one on One Boston Place,

13   most of them were mortgage type arrangements.  Again, my

14   focus was mostly on the mortgage bank accounts as opposed to

15   the transaction accounts.

16       Q    You mentioned a law firm that was counsel to

17   Resource "F" which I believe is called "Dechert, Price and

18   Rhoads", did you have any contact with Dechert?

19       A    I initially did, Todd Litton had spoke to them and

20   then there was some discussion about a number of things with

21   regards to the fund, Blue Sky Laws, registration of people in

22   the fund and so we collected the information about the

23   members of the fund and sent that off to them.

24       Q    And when was that?

25       A    It was ongoing.

58

1      Q      Throughout your tenure?

2      A      Throughout my tenure.

3      Q      So you had ongoing contact to that extent with

4  Dechert throughout your tenure?

5      A      Every three months or so, I mean, it was not -- the

6  contact was very minimal.

7      Q      Who was your contact there?

8      A      I don't remember.

9      Q      A gentleman by the name of "John O'Hanlon"?

10     A      Maybe once or twice but it was mostly at a lower

11  lever, like a secretary or a clerk.

12     Q      You mentioned some of these contacts had to do with

13  Blue Sky filings, what type of information did you obtain for

14  that?

15     A      We gave them all the information we had with

16  regards to the name, location, social security number of the

17  members of the fund.

18     Q      And do you know in, in fact, Blue Sky filings were

19  made?

20     A      I do not.

21     Q      Did you have any role in the preparation of a

22  private placement memorandum for Resource "F"?

23     A      The original private placement memorandum was

24  completed prior to my arrival and I did not, with regards to

25  the Resource "F" memorandum, no.

Diversified Reporting Services, Inc.
(202) 296-9626

59

1    Q    Did you have any role in the preparation of a

2    private placement memorandum for Resource "F" Alpha fund?

3    A    I believe the Resource "F" Alpha fund was --

4    switched the control of that fund to Haynes and Boone in

5    Dallas and they did a draft, we worked on the draft that we

6    gave to Haynes and Boone.

7    Q    And when was that?

8    A    Throughout my employment.

9    Q    Was that draft or was that PPM ever completed?

10    A    No.

11    Q    What was the status of the PPM at the time that you

12    left?

13    A    They had sent their first draft in a PDF format so

14    it couldn't be altered or changed and that's as far as it

15    went.

16    Q    Did Dechert, Price also work on a draft of an Alpha

17    fund PPM?

18    A    I believe they did also but I don't know that that

19    got any farther than discussions about -- I believe, Mr. Dyer

20    flew to Dechert's headquarters in Wilmington or outside of

21    Philadelphia to talk about a second fund but no affirmative

22    action was done in our office with regards to a second fund.

23    COURT REPORTER:  One moment for a tape change.

24    (Pause)

25    COURT REPORTER:  Please continue.

Diversified Reporting Services, Inc.
(202) 296-9626

1           BY MR. QUINTERO:

2      Q    What distinction, if any, was there between the

3  first Resource FPPM and the draft Alpha fund PPM?

4      A    The draft Alpha -- let me just speak globally.

5  There was a thought of creating two funds, one fund would be

6  aviation oriented and one fund would be not limited to

7  aviation, as a number of the people that Chuck had spoke to

8  had stated that they, at this time, did not feel that

9  aviation was a stable investment.

10     Q    What people are you referring to?

11     A    He just responded that people that he had spoken

12  to, prospective clients had thought he was doing well and

13  enjoyed his investment philosophy but they didn't think that

14  airline stocks were necessarily a great investment.

15     Q    Were there ever any investors in the Alpha fund?

16     A    I don't think the Alpha fund ever existed.

17                   (SEC Exhibit No. 20 was marked

18                    for identification.)

19         MR. QUINTERO:  I hand you a document that has been

20  previously marked as Exhibit 20, on the front cover it states

21  it is a private placement memorandum dated February, 1999,

22  Resource "F", LLC.

23         BY MR. QUINTERO:

24     Q    I ask you to take a look at that, Mr. Lorusso --

25     A    It appears --

61

```
1       Q    -- and tell me if you've seen this before.

2       A    It --

3            MR. MURRAY:  Look at it before you --

4            THE WITNESS:  Okay.

5            MR. MURRAY:  Make sure you look at it.

6            THE WITNESS:  No, no, no, I understand.  It appears

7    to be the offering memorandum that was in force that was

8    created prior to my arrival.  I have not read the offering

9    memorandum as it is approximately 50 pages but from its title

10   and date, it appears to be the Dechert, Seimens offering

11   memorandum.

12           BY MR. QUINTERO:

13      Q    I Direct your attention to page 139 and you will

14   find the Bates stamped pages on the bottom right-hand corner,

15   have you found it?

16      A    Yes.

17      Q    It appears to be a page that's entitled, "Resource

18   'F', LLC Investment Options", and it asks for one to indicate

19   the percentage mix of "A" and "B" shares desired, do you know

20   whether there's any distinction between "A" shares and "B"

21   shares of Resource "F"?

22      A    I don't, I do not and I also know that this is not

23   part of the original offering memorandum.

24      Q    And how do you know that?

25      A    I am familiar with the original offering
```

62

1    memorandum, this also lists the phone number of Mr.

2    VonStrasdas on the top left corner and the format is

3    inconsistent with the rest of the offering memorandum.

4        Q    Okay.  I direct your attention to the portion on

5    "A" shares where it states, "Investment grade financial

6    obligations only", were you aware of any such investment

7    option in Resource "F"?

8        A    I knew that for -- again, prior to my arrival, it

9    was my understanding that there were co-managing members of

10   this fund, they were Mr. VonStrasdas and Mr. Dyer.  Mr.

11   VonStrasdas did not want to have his people invest in the

12   aviation portion and therefore if we look at -- describe the

13   "B" shares, the negative instead of the affirmative, I

14   believe, means the airline.

15       Q    Specifically it says, "Other than 'B' shares, other

16   than investment in investment grade financial obligations as

17   described in the memorandum",  you read that to mean the

18   aviation --

19       A    I think that that --

20       Q    -- business?

21       A    -- was his intention.

22       Q    When you say "his", who is "his"?

23       A    VonStrasdas'.

24       Q    Okay.

25       A    Again, to my knowledge, this was not part of the

63

1    original offering memorandum as created by --

2              MR. MURRAY:  Don't speculate.

3              THE WITNESS:  Okay, that would be speculation, as

4    he said but I have received, on my computer in the past, the

5    offering memorandum directly from them, it did not include

6    this page.

7              BY MR. QUINTERO:

8        Q    When you say "them", you're talking about Dechert,

9    Price and Rhoads?

10       A    That's correct.

11       Q    Okay, have you seen this document, that is, page

12   "D" 139 in Exhibit 20?

13       A    I have seen the document, yes.

14       Q    And when have you seen it?

15       A    I've seen it typically with regards to VonStrasdas'

16   clients.

17       Q    What's the distinction between VonStrasdas' clients

18   and any clients that Mr. Dyer may have?

19       A    From a practical standpoint, none.

20       Q    Well, from an impractical standpoint?

21       A    Who introduced them to the fund.

22       Q    And what significance did that have, if any?

23       A    It really didn't, it had no mechanical -- they were

24   his clients as opposed to Chuck's clients.

25       Q    Were they all clients of Resource "F"?

1    A    They were all clients of Resource "F".

2    Q    Did you have any understanding of what investment

3    grade financial obligations were?

4    A    No.

5    Q    Did you ever ask Mr. Dyer?

6    A    No.

7    Q    Did you ever ask Mr. VonStrasdas?

8    A    The one or two times that I met with VonStrasdas,

9    it was purely social and we did not discuss work.

10    Q    Did you discuss it with anybody?

11    A    No.

12    Q    Did you wonder what they were?

13    A    Not particularly.

14    Q    And why not?

15    A    Because within the fund, there was no segregation

16    of the investments that people were put into.

17                            (SEC Exhibit No. 22 was marked

18                                for identification.)

19        MR. QUINTERO:  Mr. Lorusso, I hand you a copy of a

20    document that has been previously marked as Exhibit 22.

21        BY MR. QUINTERO:

22    Q    Have you seen this document before?

23    A    It's marked, "Memorandum Number O98, N. Harbur",

24    I'm not familiar with this particular document but it appears

25    to be one of the February, 1999 Dechert, Seimens offering

65

1    memorandi.

2         Q     Okay.  You keep saying "Seimans", are you perhaps

3    referring to Eckert, Seimens?

4         A     Eckert, Seimens, I'm sorry.

5         Q     Which is a different law firm from Dechert, Price

6    and Rhoads, is that correct?

7         A     I mean Dechert, Price and Rhoads.

8         Q     Okay.

9         A     I'm sorry.

10        Q     Did Eckert, Seimens have any role in the

11   preparation of any of the PPMs?

12        A     Not to my knowledge, I can't remember who the -- I

13   believe it was -- DPR was the firm that did the offering

14   memorandum.

15        Q     Okay.

16        A     Again, that was all done prior to my arrival.

17        Q     Direct your attention, Mr. Lorusso, to the second

18   page of Exhibit 22, which is entitled, "Executive Summary", I

19   ask you to take a look at that and tell me if you've seen

20   this executive summary before.

21        A     I believe it was the correspondence that

22   VonStrasdas sent to Chuck.

23        Q     So you have seen this before?

24        A     I have seen it, I believe, once.

25        Q     I direct your attention to the first sentence of

1    the first paragraph that reads, "Resource 'F' 'A' shares

2    provide for a one year investment opportunity with

3    reinvestment for additional 12 month periods made available

4    per approval of application for extension.  Profits are paid

5    out monthly, net of fund expenses and fees", and then in

6    parenthesis it states, "Historically, payments to investors

7    have been more than four point five percent monthly".

8        A    I see that information there, sir.

9        Q    And did you have any discussions with Mr. Dyer

10    concerning the payout of four point five percent monthly?

11        A    No, and what's interesting is, you have this

12    compiled in an offering memorandum.  When they were sent out

13    by our office, the offering memorandums were bound and did

14    not include this information.

15        Q    So the office did send out offering memoranda to

16    potential clients or potential investors?

17        A    Probably less then 20.

18        Q    And who, in the office, sent them out?

19        A    Mostly, Mr. Dyer or Mr. Dyer instructed someone to

20    prepare a federal express package to send out and he included

21    various -- he always sent out a personal letter with the

22    package which he --

23        Q    You --

24        A    -- typically hand wrote.

25        Q    Did you participate in the preparation of these

Diversified Reporting Services, Inc.
(202) 296-9626

67

1    packages?

2        A    I may have once or twice, I believe I sent, to

3    either a client or VonStrasdas, one or two offering

4    memorandums but they did not include this language.

5        Q    And how do you know that?

6        A    Because they were bound and they were the ones that

7    we had used.  This particular --

8            MR. MURRAY:  You mean the ones you sent out didn't?

9            THE WITNESS:  The ones I sent out did not include

10   this language, "098", the Nathan Harbur one, page one, page

11   two, page three, page four and page five, ending at number

12   "I" -- letter "I" was the first page of the offering

13   memorandum.  Again, these pages so mentioned are of a

14   different format and include the telephone number of Mr.

15   VonStrasdas and the Palm Beach address as opposed to having

16   no markings of such kind on the other pages.

17           MR. MURRAY:  Is there -- excuse me.  Is there some

18   way we can mark these pages so that they're identifiable on

19   the record, either as sub-exhibit numbers or something like

20   so that you can --

21           MR. QUINTERO:  No, because these are part of the

22   Exhibit and certainly we can try and make it clear on the

23   record that the, you know, pages two, three, four, five and

24   six, in order on Exhibit 22 --

25           MR. MURRAY:  Are they Batesed?

68

1          MR. QUINTERO:  They are not Bates stamped.

2          MR. MURRAY:  They're not Batesed?.

3          MR. MURRAY:  Maybe if we just define them as to

4     what it says at the top and at --

5          THE WITNESS:  Right.

6          MR. MURRAY:  -- the bottom, it might be easier.  I

7     just want to make clear what --

8          MR. QUINTERO:  Right, that's why we're going

9     through --

10          MR. MURRAY:  -- he's involved in.

11          MR. QUINTERO:  That's why we're going through --

12          THE WITNESS:  Right.

13          MR. QUINTERO:  -- and then we --

14          MR. MURRAY:  Yeah.

15          MR. QUINTERO:  -- talked about it, at the -- at the

16     top it's "Executive Summary" then --

17          MR. MURRAY:  Yeah.

18          MR. QUINTERO:  -- your testimony --

19          THE WITNESS:  Right.

20          MR. QUINTERO:  -- went forward from there.

21          BY MR. QUINTERO:

22     Q    Before we get back into it, just directing your

23     attention back to the first page of Exhibit 22, specifically

24     to the name, "N. Harbur", you just testified this was Nathan

25     Harbur, how do you know that it's Nathan Harbur?

69

1       A      His name appeared on the client summary sheet that

2    I had sent to DPR.

3       Q      Okay.

4       A      I believe that the letter, the executive summary,

5    was correspondence that Von was sending to his clients, it

6    was not, again, sent by the Boston office or from Dyer's

7    office.

8       Q      Okay, but these clients of VonStrasdas are clients

9    of Resource "F"?

10      A      That's true but they are, for lack of a better

11   term, VonStrasdas' clients as opposed to -- they were

12   introduced to the fund by VonStrasdas as opposed to by Dyer.

13   As Mr. VonStrasdas does not work out of the Boston -- did not

14   work out of the Boston, I had only met him once, I have no

15   knowledge of what he sent to his clients, these were not

16   produced in the Boston office.

17      Q      Directing your attention to the sentence in the

18   first paragraph of the executive summary which states, "The

19   primary US custodians of the fund are Brown Brothers Harriman

20   and Company and Boston Private Bank and Trust".  Did Resource

21   "F" have a custodial account with Brown Brothers Harriman and

22   Company or Boston Private Bank and Trust?

23      A      Not to my knowledge.

24      Q      The next sentence says, "The international

25   custodian for the fund is Barclays Bank, other double 'A'

1  international custodians may be added on as the need arises".

2  Did Resource "F" have a custodial account with Barclays Bank?

3      A    I know they had an account with Barclays Bank, I

4  don't know the nature of that account.

5           MR. MURRAY:  And again to be clear, this is while

6  he was employed.

7           THE WITNESS:  While I was employed and actually,

8  let me clarify that, I do not believe that Resource "F", in

9  the name "Resource 'F'", had an account at Barclays.

10          BY MR. QUINTERO:

11     Q    That was the Antietam account you referred to

12  earlier?

13     A    That's correct.  You seem to be focusing on this

14  piece of paper, I've seen this paper once maybe a year and a

15  half ago and it was, I think, directed at VonStrasdas'

16  correspondence, I have no other knowledge, I'm happy to go

17  through this line by line and answer all the questions but

18  you know, this is not something that was initiated by our

19  office and I only knew of it because it sort of showed up one

20  day.

21     Q    And when did it just show up?

22     A    No, I mean, I saw it with regards to -- I think

23  Chuck had asked what Von had been sending his clients for

24  information.

25     Q    And in response to that, Mr. VonStrasdas sent the

1    executive summary?

2        A    Correct.

3        Q    Did Mr. Dyer have any role in the creation of the

4    executive summary?

5        A    No, he did not.

6        Q    How do you know that?

7        A    Because he stated so, he was not pleased with this

8    representation of the fund.

9        Q    Specifically what was he not pleased with?

10        A    Pretty much the whole thing.

11        Q    Did he feel that any of it was inaccurate?

12        A    Well, I -- you should ask --

13        Q    Well, I'm sorry.

14        A    You should --

15        Q    Did he tell you that --

16        A    I find the --

17        Q    -- that any of this was inaccurate?

18        A    I find the whole thing to be very inaccurate.

19            MR. QUINTERO:  And when did this --

20            MR. MURRAY:  That didn't --

21            MR. QUINTERO:  -- conversation take place?

22            MR. MURRAY:  -- answer his question, answer his

23    question.

24            THE WITNESS:  Mr. Dyer felt that this was an

25    inaccurate description of -- and he stated that to me.

Diversified Reporting Services, Inc.
(202) 296-9626

72

1              BY MR. QUINTERO:

2         Q    When did you see the executive summary?

3         A    Probably six months into my tenure.

4         Q    So that would put us somewhere in the November,

5    1999 time frame?

6         A    Yes.

7         Q    Did Mr. Dyer tell you that was the first time he

8    saw the executive summary?

9         A    There was an executive summary that Mr. Dyer stated

10   that VonStrasdas produced to the counselors of the fund, I

11   don't know if it's this one and they both expressed that they

12   had displeasure.  I think that this is the one that

13   resurfaced but I have no knowledge of that.

14        Q    You're saying that Dechert, Price and Rhoads

15   expressed displeasure at this executive summary?

16        A    I don't know if it was this executive summary, they

17   expressed a concern as to the wording of some of the things

18   and they made sure that that was not part of the offering

19   memorandum.

20        Q    And when did Dechert, Price and Rhoads express the

21   displeasure?

22        A    They expressed it to Chuck, I had learned, when

23   Chuck and discussed this some six months later, that when

24   they had started the fund VonStrasdas and him had met and

25   provided this stuff, a number of items to them but I mean, I

1    have no -- it's all hearsay and just discussions with Chuck

2    about these entities things.

3         Q    Directing your attention to the second paragraph of

4    the executive summary for Exhibit 22, the middle of the

5    paragraph where it says, "On behalf of the client, the fund

6    will deploy the invested funds to an international subsidiary

7    of Resource 'F' 'A' shares with custody at Barclays Bank or

8    an alternate custodial bank of double 'A' rating.  These

9    funds are combined with the funds of an underwriter and are

10   held in custody at a double 'A' international bank to be

11   maintained as collateral for the underwriting", in

12   parenthesis, "financing of the purchase of double 'A'

13   investment grade obligations", and then parenthesis, "five

14   years or less to maturity".  Have you ever heard that

15   description of the "A" shares investment before?

16        A    No.  I mean, I -- again, I have seen this piece of

17   paper in passing but we never used the investment philosophy

18   as described in this.

19        Q    What were the "A" shares invested in or the funds

20   that went into the "A" shares, what were they invested in?

21        A    Mr. Dyer did all the investments, I have no idea.

22        Q    Did Mr. Dyer do the "A" share investments?

23        A    There was no delineation between "A" and "B" share.

24        Q    Then why was there a delineation in the document we

25   saw in Exhibit 20 where it's asking investors to choose

74

1  between "A" shares and "B" shares?

2      A    If you will recollect, that was inserted by Mr.

3  VonStrasdas.  As far as Mr. Dyer was concerned, there was

4  no -- especially -- when this memorandum was completed, there

5  was no "A" or "B" share, no alternate, it was just you

6  invested in the fund and the fund, under his stewardship,

7  invested it at his pleasure.

8      Q    At some point that changed, did it not?

9      A    There were no "A" or "B" shares, what Mr. Dyer was

10  trying to do was create two funds.

11      Q    And he never created the second fund, is that

12  correct?

13      A    That's correct.

14      Q    So was there ever "A" shares and "B" shares for

15  Resource "F"?

16      A    I'm not being evasive in a sense that, was there

17  any material difference between any of the investment

18  vehicles that people were placed in or where the money came

19  or went?  Would that be saying the same question?

20      Q    Well, why don't you answer your own question then?

21      A    Well, no, no, I'm -- there's no -- there is no

22  difference between "A" and "B", there were no "A" and "B"

23  shares.  From a practical standpoint, there are no "A" and

24  "B" shares.

25      Q    Okay.

Diversified Reporting Services, Inc.
(202) 296-9626

1          MR. MURRAY:  While you were there?

2          THE WITNESS:  While I was there.  Oh --

3          MR. QUINTERO:  Well --

4          THE WITNESS:  -- and while -- that I was privy to.

5          BY MR. QUINTERO:

6      Q    Was Mr. Dyer's airline investments -- and let me

7   ask you this.  Did Resource "F" actually invest in aviation?

8      A    Yes.

9      Q    And in what manner did it do so, other than the

10  publicly traded stocks that you mentioned earlier?

11     A    It attempted to purchase a regional airline

12  called -- "Corporate Airlines" was the actual name, Corporate

13  Airlines out of someplace in the Carolinas, I believe and he

14  had an agreement, in principal, to purchase a controlling

15  interest in the airline.  He had also previously controlled

16  the interests of Paradise Island Airlines in the Bahamas,

17  utilizing dash ten -- excuse me -- dash eight, thirty-seven

18  passenger airplanes, he was also trying to get air service

19  into Branson, Missouri, using that partnership with Corporate

20  Airlines so he had a signed agreement with Corporate Airlines

21  to do that stuff.

22     Q    And did Mr. Dyer use funds from investors in

23  Resource "F" in support of any of these endeavors?

24     A    I have absolutely no idea.

25     Q    And why is it that you believe, then, that Mr. Dyer

1    invested Resource "F" funds in aviation?

2       A   Well, because I think that was the vehicle that he

3    used, either that or one of his other entities but the only

4    entity that was really alive at that time was Resource "F",

5    he might have been doing -- trying -- and that was when we

6    were talking splitting the fund, he was trying to maybe split

7    it into Resource "F", Alpha.  I don't know what actual entity

8    did, although I know he had an agreement to do such, to

9    invest in those entities.

10       Q   And for those investors who chose "A" shares --

11    well, let me ask you this.  Did you see any choosing between

12    the "A" shares and "B" shares with respect to investors in

13    Resource "F"?

14       A   I did see that page, was it 139?

15       Q   In Exhibit 20, yes, D-139 --

16       A   Now --

17       Q   -- in Exhibit 20.

18       A   Okay, in this -- again, this is not part of the

19    original offering memorandi, although it's stamped as it is,

20    it has the VonStrasdas' telephone number on the top but with

21    regards to some VonStrasdas clients, this piece of paper was

22    in their file when I came to the fund.  This is also

23    showing -- both of these and I think that the N. Harbur one

24    are not executed, they're blank.

25       Q   Did funds invested by those investors who chose "A"

1    shares used by Mr. Dyer for investments in aviation?

2        A    All I did was keep track of what other people told

3    me where the money went to, I have no idea with what Mr. Dyer

4    did with the -- I was not on the investment selection

5    committee.  If you look at the offering memorandum, you will

6    find that Chuck Dyer is the sole -- in the original February,

7    1999 Resource "F" offering memorandum, Chuck Dyer is the sole

8    investment advisor, Chuck Dyer solely picked all the

9    investments for the fund and he often wouldn't -- you know,

10   he's a very secretive person, well, for the lack of a better

11   word, he's a very quiet and confidential person and would not

12   necessarily tell you what he did.

13       Q    And he did not, in this case?

14       A    No.

15       Q    Directing your attention to the four point five

16   percent monthly that's mentioned in the first paragraph of

17   the executive summary, did Mr. Dyer's aviation investments

18   pay out four point five percent to investors in Resource "F"?

19       A    I don't think so, I don't -- there was a

20   spreadsheet I created that showed the amount actually

21   distributed to clients, I do not believe that it was that

22   great.

23       Q    What was it?

24       A    It varied from month to month, sometimes it was

25   four percent and in the last four or five months of my

1    tenure, it was one, three, zero percent, it ranged.

2        Q    And what was the source of that greater return?

3        A    I have no idea.

4        Q    Was it from Mr. Dyer's activities?

5        A    I -- the money -- we -- and I believe I saw, on

6    your side, a wire sheet -- excuse me -- a description of

7    activity sheet from VonStrasdas that listed the amount to be

8    distributed to a person, that's all we did, was compiled that

9    information and send it along.  Again, we functioned

10   primarily as a back office.

11        MR. QUINTERO:  We'll go off the record at 1:05 p.m.

12        (Whereupon, at 1:05 p.m., a luncheon recess was

13   taken.)

14                    * * * * *

15           A F T E R N O O N   S E S S I O N

16        (Whereupon, at 1:56 p.m., the examination was

17   resumed.)

18        MR. QUINTERO:  Back on the record at 1:56 p.m.

19        BY MR. QUINTERO:

20        Q    Mr. Lorusso, just directing your attention back to

21   Exhibit 22 --

22        A    Yes, sir.

23        Q    -- and to the third page of that Exhibit, which is

24   dated May, 1999 --

25        A    Okay, that's the third unmarked page, it says,

79

1    "Resource 'F'" on the top, May, 1999?

2         Q    Yes, to subscribers to Resource "F", LLC and the

3    subject is, "Two share classes, 'A' and 'B' shares,

4    investment grade quality of 'A' shares, one hundred percent

5    of the return on 'A' shares to be short term capital gain",

6    do you have that?

7         A    I have that.  Again, with regard --

8              MR. MURRAY:  Wait 'til he asks the question.

9              THE WITNESS:  Okay, I was just going to say, it

10   wasn't --

11             MR. MURRAY:  Wait 'til he asks the question.

12             THE WITNESS:  Go, ask the question.

13             BY MR. QUINTERO:

14        Q    Have you seen this before?

15        A    No.

16        Q    And what were you going to say, Mr. Lorusso?

17        A    I was going to say, again, these are the four pages

18   that were not included in the offering memorandum, the five

19   pages or -- they're unmarked and --

20        Q    Okay.  I direct your attention to the first

21   sentence in the body of this memorandum dated May, 1999,

22   where it states, "To satisfy the institutional demand for

23   investment grade or double 'A' quality in their portfolios,

24   the managing members of Resource 'F', LLC have established

25   two classes of shares to be made available to subscribers

80

1   immediately", did this, in fact, occur?

2        A    As I stated, I have no knowledge of this piece of

3   paper, I have no knowledge of the information in it.

4        Q    At this point I'm not asking you whether you've

5   seen this or have knowledge of the existence of this

6   particular document, I'm asking you if the information I just

7   read off did, indeed, happen.  Was there two classes of

8   shares established?

9        A    As previously stated, there was no differentiation

10  between any of the shares in Resource "F".

11       Q    But were there two shares --

12       A    There was no --

13       Q    -- classes of shares established?

14       A    There were no differentiation between any of the

15  shares in Resource "F".

16       Q    So there were no "A" shares and no "B" shares?

17       A    There was no differentiation in the shares in

18  Resource "F".

19       Q    All right, Mr. Lorusso, I'm not asking you if there

20  was any practical differentiation, I'm asking you whether

21  the --

22       A    There were no "A" shares, there were no "B" shares,

23  there were no "Z" shares, there's no "Q" shares.  Again, this

24  is a document produced by someone else, describing -- making

25  reference to something in a complete another office, I have

81

1     no knowledge nor reason to know why they would say that but

2     is was no differentiation.  All of the people who invested

3     money in Resource "F" that I was provided the information to

4     do the bookkeeping or back office function to, there was no

5     tick marks, "A", "B", "C", "D", no indifferent investment

6     track, no indifferent investment philosophy, no anything.

7          Q     Okay.  Wasn't it your testimony earlier that when

8     your office received back certain documentation from

9     investors, that there was a checkoff for "A" shares or "B"

10    shares?

11         A     No, that was not my testimony, I said that some of

12    Mr. VonStrasdas' clients had, in their file, when I came to

13    the fund, the piece of paper in Exhibit 20, 139, which is

14    also unexecuted in this -- some of them were also unexecuted,

15    notice that the format and name and address is the same as

16    the documents you are raising questions of.

17         Q     And in these files, did you see an investor make a

18    check mark in choosing between "A" shares or "B" shares?

19         A     On form 139?

20         Q     Yes.

21         A     On some forms 139, they were completed, the vast

22    majority were not completed nor were they in all files.

23         Q     So yeah, despite some investors, at least, making a

24    distinction between "A" shares and "B" shares by choosing one

25    or the other, you still say there is no difference in

Diversified Reporting Services, Inc.
(202) 296-9626

82

1   Resource "F"?

2       A    I didn't control the investment philosophy or the

3   vehicle, I wouldn't have known at the time.  If your question

4   was, at the time, would I have said, "Hey, from a record

5   keeping standpoint, what is the difference?",  I come to

6   realize later that there was no differentiation.

7       Q    Did you inquire to anybody as to what the

8   difference was?

9       A    Mr. Dyer stated he was splitting the fund, he

10  wanted to split the fund into "A" shares and "B" shares to

11  delineate aviation and non-aviation but then he maybe was

12  going to start "A" fund, the word "Alpha" would describe --

13  to Resource "F", "Alpha" means "A" share --

14      Q    Okay.

15      A    -- but none of that was ever done.

16      Q    All right, so is it then your testimony that these

17  investors checked off "A" or "B" but it had no effect

18  whatsoever on what they were getting in the investment?

19      A    Well, for example, we have Exhibit 20, Exhibit 20

20  is a blank offering memorandum.  Did investor in investor 20?

21  I don't know because it's not a name.  "N. Harbur", the

22  offering memorandum you have for "N. Harbur", it's in a

23  different place in the document, the document is blank so --

24      Q    You testified that in certain files from Mr.

25  VonStrasdas' clients, there was some checkoff of --

83

1       A    Form --

2       Q    -- of --

3       A    -- page 139, yes.

4       Q    Yes, and I'm asking you, for those investors who

5    checked off one or the other, you're saying, then, that there

6    was no --

7       A    It was my previous --

8       Q    -- it had no effect whatsoever?

9       A    There's no effect.

10           MR. MURRAY:  Wait 'til he asks the question and

11   then answer the question.

12           THE WITNESS:  Okay.

13           BY MR. QUINTERO:

14      Q    No effect whatsoever?

15      A    There was no effect whatsoever.  Also again, these

16   were in the files when I got them.

17      Q    Was Resource -- if they had checked off -- and

18   directing your attention back to D-139, "A" shares, which I

19   believe has to do with financial note obligations, they

20   checked off "A" shares, was Resource "F" still free to invest

21   that investor's money in aviation?

22      A    That would be a question to ask Mr. Dyer.

23      Q    Did you have any understanding of that?

24      A    No.

25      Q    Did you ever ask about that?

84

1       A    No.

2       Q    Directing your attention to the list at the bottom

3   of page three of Exhibit 22 which lists the auditors, legal

4   advisors and custodians, again this is in the document dated

5   May, 1999, for auditors it says, "Grant, Thornton", what

6   role, if any, did Grant, Thornton have with respect to

7   Resource "F"?

8       A    Grant, Thornton was the hedge fund advisor, meaning

9   that they, I believe, are an accounting firm and they

10  provided accounting assistance to the fund, they gave us a

11  partnership in other various forms and worked with Mr. Dyer

12  on -- he met with them on various occasions.

13      Q    Did you have any interaction with Grant, Thornton?

14      A    I never personally went to Grant, Thornton's office

15  nor met in person with anyone from Grant, Thornton.  My role

16  was working with a secretary or someone who would ask for a

17  particular document and I would forward it to them.

18      Q    So you spoke to no one other than a secretary at

19  Grant, Thornton then?

20      A    I may have spoken to, you know, a person but I

21  don't recollect who it was but the typical response was, a

22  call would come in and would be answered by the temp

23  secretary or there would be a message on the answering

24  machined or Chuck would say, "They need 'X'", and we would

25  just assemble "X" and send it to them.  Again, that was maybe

85

1    two or three times in my entire tenure.

2        Q    Did Grant, Thornton conduct an audit of Resource

3    "F"'s --

4        A    They did a --

5        Q    -- financials?

6        A    -- 1999 audit.  I know because I've seen the audit,

7    I did not participate in the audit because it was the period

8    of time prior to my employment, it was for all -- the 1999

9    audit was all transactions prior to 1999.

10        Q    Did you provide any documents --

11        A    No.

12        Q    -- in connection with that?

13        A    No, I was not in the employ.

14        Q    Was that for a particular quarter in 1999 or for

15    the entire year?

16        A    I believe it was for the entire year.

17        Q    So then were there no transactions involving

18    Resource "F" from the time that you started working at

19    Resource "F" -- at Bunker Hill, to the time you left?

20            MR. MURRAY:  I think his testimony was that the

21    audit was for the period prior to 1999.

22            THE WITNESS:  Correct.

23            BY MR. QUINTERO:

24        Q    Prior to 1999?

25            MR. MURRAY:  All the transactions up to 1999.

1           THE WITNESS:  Up to 1999.

2           BY MR. QUINTERO:

3      Q    I see, so it would be for the calendar year 1998?

4      A    Correct.

5      Q    Wasn't it your earlier testimony that Resource "F"

6  began sometime in either late '98 or early '99?

7      A    I believe it was 1998 but that's just conjecture, I

8  mean, it was up and running when I arrove (sic).

9      Q    And you say you saw the audit for the --

10     A    It was a small bound document that was sometimes --

11 was requested by perspective clients.

12     Q    And what did it say?

13     A    It gave asset balances, a rate of return, that kind

14 of information or basically it said, beginning of the period,

15 the fund had this much money, the end of the period, the fund

16 had this much money.

17     Q    And approximately how much money did it have at the

18 beginning of the period?

19     A    I have no idea.

20     Q    Approximately how much money did it have at the end

21 of the period?

22     A    I have no idea, I believe -- again conjecture, it

23 probably started at zero and I think it had about 300,000 but

24 I could be off by a factor of a hundred percent but it was

25 not in the millions by any --

1      Q    What was the rate of return?

2      A    I don't know, it actually did not calculate a rate

3    of return, it just stated a numeric sum.

4      Q    And was that sum paid out to investors?

5      A    I have no idea.

6      Q    Did you ask?

7      A    No, it was not -- well, that report was only

8    showing from a fund standpoint so again, as it dealt with the

9    period prior to my arrival, it was not of concern to me.

10      Q    Did Grant, Thornton do any work in connection with

11    1999 transactions from Resource "F"?

12      A    I believe they worked and I think a first quarter

13    report was produced.

14      Q    Was it an audited and report?

15      A    A compilation.

16      Q    What is the difference between a compilation and an

17    audit?

18      A    I'm not an accountant.

19      Q    Do you have an understanding that there is a

20    distinction between the two?

21      A    I understand that it's basically taking -- it

22    surmises our transactions, it basically just says, "Yeah, we

23    think these things happened", as opposed to verifying their

24    existence.

25      Q    Did you provide any documents to Grant, Thornton in

88

1    connection with that compilation?

2         A    I probably sent, once or twice, documents to them.

3         Q    What documents?

4         A    Would have been from the client's file folder, the

5    account balances and or the bank statements.

6         Q    Bank statements from Resource "F"'s accounts?

7         A    Resource "F"'s account.

8         Q    One account?

9         A    Again, I did not -- the Antietam account was not

10   mailed to the office.

11        Q    Right, so I'm asking in terms of what you sent over

12   to Grant, Thornton.

13        A    The Resource "F" account.

14        Q    Where?

15        A    Boston Private Bank.

16        Q    How about an account at Brown Brothers Harriman?

17        A    Those were usually taken by Chuck when they came

18   in.

19        Q    So you did not send those to --

20        A    No, I --

21        Q    -- Grant, Thornton?

22        A    -- did not, I think Mr. Dyer did.

23        Q    Why do you think that?

24        A    Because I think they received them.

25        Q    And again, why do you think that?

1      A     I don't know.

2      Q     I'm sorry, did you --

3      A     No, I -- I mean, they're aware of the accounts but

4  again, all that stuff went to Mr. Dyer so --

5      Q     But how do you know that they were aware of those

6  accounts?

7      A     It's in the offering memorandum.

8      Q     I'm sorry, I thought you were talking about in

9  connection with the compilation.

10     A     Oh, let's back up.  I believe that they were

11 included, I have no knowledge of whether they were included.

12     Q     Well, wasn't the offering memorandum completed by

13 the time you --

14     A     Yeah.

15     Q     -- had arrived?

16     A     Uh-huh.

17     Q     Excuse me?

18     A     Yes.

19     Q     I'm sorry, you just have to say "Yes" or "No".

20     A     Yes, I'm sorry.

21     Q     And you believed -- well, back up.

22           Did Grant, Thornton have any role in the

23 compilation of -- in the preparation of the private placement

24 memorandum?

25     A     No.

1    Q    How do you know that?

2    A    They were hired after it was completed.

3    Q    Did you have a part in hiring them?

4    A    No.

5    Q    Who did?

6    A    It happened prior to my coming.

7    Q    Then how do you know that they were hired after the

8    PPM was completed?

9    A    At the time that the PPM was worked on, there was

10    another firm who was being considered as the advisors to the

11    fund.

12    Q    Was that Ernst and Young?

13    A    I have no knowledge.

14    Q    Well, how did you derive your knowledge that there

15    was another accounting firm involved?

16    A    The people who had worked there said that we were

17    going to use another firm but we didn't -- they didn't.

18    Q    What people are you referring to?

19    A    The accountant, Bruce Lavigne and Todd Litton but

20    as it referenced something that didn't happen, I didn't pay

21    attention to the name.

22                        (SEC Exhibit No. 34 was marked

23                         for identification.)

24        MR. QUINTERO:  Mr. Lorusso, I hand you a copy of a

25    document that has been previously marked as Exhibit 34, it is

1    entitled, "Accountant's Compilation Report", and up at the

2    top it says, "Draft, 6/16/99, 1:02 p.m.", and it's addressed

3    to the board of directors of Antietam, Inc.

4              BY MR. QUINTERO:

5         Q    Is this the compilation report that you were

6    referring to?

7         A    Yes, I believe it is.  This is actually a letter,

8    not the compilation report itself.

9         Q    So this was a cover to the compilation?

10        A    Yes, the compilation was a bound document.

11        Q    And why is it addressed to the board of directors

12   of Antietam, Inc. as opposed to, say, Resource "F"?

13        A    I have absolutely no idea.

14        Q    Did you ask?

15        A    No.  This letter accompanied the stack of reports

16   which was -- Antietam, Inc's address was not 440 Commercial

17   Street, Boston, Massachusetts.

18        Q    What was it?

19        A    I don't know.

20        Q    Was it in Massachusetts?

21        A    I have no knowledge of -- Mr. Dyer solely controls

22   Antietam, Inc.

23        Q    And how do you know that he did not operate it out

24   of 440 Commercial Street?

25        A    My family owns the building.

                    Diversified Reporting Services, Inc.
                           (202) 296-9626

92

1    Q    Yes, I understand that but is there only one entity

2    that can operate out of an office at a time?

3    A    We receive all the mail for the building.

4    Q    So you're saying you looked through Mr. Dyer's mail

5    and --

6    A    Our --

7    Q    -- you determined --

8    A    The mail is sorted by our mail sorting service and

9    we list all the names of the entities that are in the

10   building and that's not one of the entities in the building.

11   Q    Okay, did Mr. Dyer receive mail for other entities

12   other than Bunker Hill or Resource "F"?

13   A    Yes.

14   Q    At 440 Commercial --

15   A    Uh-huh.

16   Q    -- Street?

17   MR. MURRAY:  "Yes".

18   MR. QUINTERO:  Antietam was --

19   MR. MURRAY:  "Yes" or "no".

20   THE WITNESS:  Yeah, yes.

21   BY MR. QUINTERO:

22   Q    And Antietam was not one of them?

23   A    I believe Antietam was not one of them.

24   Q    Did the report go to 440 Commercial Street?

25   A    I do not think it did.

Diversified Reporting Services, Inc.
(202) 296-9626

93

1    Q    And why do you think that?

2    A    Because it was addressed to Antietam.

3    Q    And did it have a different address on there?

4    A    This form has no address.

5    Q    I understand that but other than your assumption

6    that it was at another address because you never saw Antietam

7    associated at 440 Commercial Street -- I mean, what is the

8    basis of your belief that the report went someplace else?

9    A    All the other correspondences for Antietam -- if

10   the documents were truly for Antietam, they -- none of them

11   were ever delivered to 440 Commercial Street.

12   Q    And what is the basis of your belief?

13   A    Because we never received any documents addressed

14   to Antietam at 440 Commercial Street.

15   Q    Okay, and do you believe this compilation report

16   was for Antietam or for some other entity?

17   A    This is a piece of paper, not an -- not a -- if you

18   would like me to speculate about the report that I don't have

19   in my hand --

20        MR. MURRAY:  Don't speculate.

21        THE WITNESS:  -- I'm not going to.

22        BY MR. QUINTERO:

23   Q    Well, I'm asking you about the report, you said

24   you -- you testified that you saw the report, did you not?

25   A    Do you have the report?

Diversified Reporting Services, Inc.
(202) 296-9626

1      Q    If I -- do I have the report?  I don't have it to

2   show you at this point, no.  You've testified you saw --

3           MR. MURRAY:  Try to answer --

4           MR. QUINTERO:  You testified --

5           MR. MURRAY:  Try to answer the --

6           THE WITNESS:  Okay, yeah.

7           MR. MURRAY:  -- question that --

8           MR. QUINTERO:  -- that you saw the report.

9           MR. MURRAY:  -- he's asking.

10          THE WITNESS:  Okay, I did see the report.

11          BY MR. QUINTERO:

12     Q    And the report was for what entity?

13     A    I have no idea.

14     Q    Did you have some understanding at the time as to

15   what entity?

16     A    I -- the report -- okay, Grant, Thornton, who did

17   the report, was employed by Resource "F" so it surprises me

18   in this piece of paper that I've never seen, that it was

19   addressed to Antietam.  The report, in my belief, was for

20   Resource "F".

21     Q    Okay.

22     A    Okay, but I don't have the benefit of the report --

23     Q    Okay.

24     A    -- and I'm not -- I -- when you keep saying

25   "report" and you hand me a piece of paper, this is not a

Diversified Reporting Services, Inc.
(202) 296-9626

95

1    report and I'm --

2        Q    Okay.

3        A    -- sorry if I'm stressed at you because I'm not

4    trying to be.

5        Q    Is there a particular reason why Grant, Thornton

6    did not audit the financial information for Resource "F"?

7        A    (No response)

8        Q    Why did Grant, Thornton do a compilation rather

9    than an audit?

10        A    I think it was due to newness and this was for one

11    quarter, they wanted to do an audit but they were going to do

12    it at the end of the year, annually.

13        Q    And did Grant, Thornton do an annual auditing

14    report --

15        A    Not during my tenure.

16        Q    -- for 1999?

17        A    Not to my knowledge.

18                        (SEC Exhibit No. 65 was marked

19                         for identification.)

20        MR. QUINTERO:  I hand you a document that has been

21    previously marked as Exhibit 65, on it this appears to be a

22    fax cover sheet for Resource "F", LLC, address at 440

23    Commercial Street, Fifth Floor, Boston, it's to an "M.

24    Vaccaro", V-A-C-C-A-R-O, from Mike Lorusso.

25        BY MR. QUINTERO:

Diversified Reporting Services, Inc.
(202) 296-9626

1     Q    Is this document something that you faxed to a "M.

2     Vaccaro"?

3     A    I believe M. Vaccaro worked for the firm of Grant,

4     Thornton who has a New York fax machine number referenced.  I

5     am looking at the offering memorandum and the fax number of

6     the auditor on page three matches the fax number for M.

7     Vaccaro on the cover page.

8     Q    And who is M. Vaccaro?

9     A    He was a accountant employed by Grant, Thornton.

10    There was an issue with regards to a double counting that

11    they could not -- they were having problems with the

12    compilation and Mr. Dyer gave me this handwritten report to

13    fax to them which was faxed to us but the photocopying has

14    removed the fax number, the piece of paper was faxed to us.

15    Q    Okay, and what was the exact issue of the double

16    counting?

17    A    I think it was an issue of -- was this the 15th?  I

18    don't remember the particular issue but it was -- I think

19    they double counted the $12,300 transaction or they needed to

20    know who the $12,300 transaction was going to.

21    Q    Okay, and who was it supposed to go to?

22    A    I don't recollect, it's not stated on this form.

23    Q    Doesn't it say, "To Washington Mutual", and have

24    a --

25    A    Well, it does but I don't know --

1     Q     -- account number?

2     A     I don't know what the -- I don't know the person.

3     Q     Okay, and Mellon Chase Corporation, is that --

4     that's listed there as a beneficiary, does that refresh your

5     recollection?

6     A     Mellon Chase, I believe, is one of VonStrasdas'

7     entities.  The issue, as I believe it was, was a partnership

8     or -- I'm trying to think of the correct term for a hedge

9     fund -- the managing member equity distribution and whether

10    the 12,300 had been sent to VonStrasdas or not --

11    Q     Okay.

12    A     -- but this -- again, this was not me initiating

13    the transaction, this was taking the documentation and

14    sending it to our accountants.

15    Q     Okay.  Now, was there a performance fee that was

16    supposed to be paid to the managing members of Resource "F"?

17    A     It was, I don't remember what it was, off the top

18    of my head.

19    Q     Again, taking Exhibit 22 and directing your

20    attention to page 10 with the heading of, "Performance

21    Allocation From Invested Members To Managing Member" --

22    A     Yes.

23    Q     -- I ask you to read the first sentence to

24    yourself.

25    A     "The managing member receives a performance

98

1    allocation equal to 20% of the net gain, realized and

2    unrealized" -- in brackets -- "of each investing member's

3    capital account for the fund for the applicable period".

4         Q    Does that refresh your recollection as to the

5    performance allocation that would be given to the managing

6    member?

7         A    Yes, as stated before, I knew there was a

8    performance allocation, I just didn't remember the exact

9    amount.

10        Q    And is, it in, fact 20%?

11        A    It states here, 20%.

12        Q    And was there an agreement between Mr. Dyer and Mr.

13   VonStrasdas as to how that 20% would be split between the

14   two?

15        A    It was split 50, 50.

16        Q    Was there also an administrative fee associated

17   with Resource "F"?

18        A    Yes, I believe it was five percent but I'm sure

19   we'll find it in here.

20        Q    Directing your attention to page eight, which is

21   entitled  "Fees and Expenses", the subheading, "Management

22   Fee", where it states that, "The managing member will be paid

23   a monthly asset base management fee equal to zero point one

24   two five of one percent of the capital account of each

25   member", in parenthesis, "approximately one point five

Diversified Reporting Services, Inc.
(202) 296-9626

1  percent on an annual basis".

2      A    I stand corrected, it is -- it's stated as one

3  point five percent.

4      Q    Is that consistent with your memory or does this

5  refresh your recollection as to the --

6      A    Yes, again --

7      Q    -- correct amount?

8      A    -- I knew there was a management fee, I haven't

9  been doing this for a year and a half and that was solely to

10  support the Boston office.

11     Q    So in fact, that went to Mr. Dyer, is that correct?

12     A    Yes.

13     Q    Now, just directing your attention to the second

14  page of Exhibit 65, which is a document that you faxed to Mr.

15  Vaccaro, if you can just go through the numbers and I

16  understand that you did not initiate this but if --

17     A    Right.

18     Q    -- having worked with it, if you could help me in

19  terms of understanding what --

20     A    Well, I --

21     Q    -- everything means.

22          MR. MURRAY:  Wait 'til he asks the question.

23          THE WITNESS:  Well, no, I got --

24          BY MR. QUINTERO:

25     Q    Okay, so beginning with under where it says, "To

Diversified Reporting Services, Inc.
(202) 296-9626

1    Palm Beach Office", Resource "F" has a balance of -- it

2    appears to be two million, fifty thousand dollars.

3          A    That's correct.

4          Q    Is that the balance of what Resource "F" has in

5    assets?

6          A    The date of the letter is dated 15 March, '99 --

7          Q    Yes.

8          A    -- and I'm trying to remember if I was there then,

9    I think that was before me but -- unless that was the year I

10   was -- but I believe it's the -- it's -- stated in here, it

11   appears to be the balance of the fund at that given point in

12   time.

13         Q    Okay.

14         A    Okay, but I have no other way to cross reference

15   it.

16         Q    Sure.

17         A    This is a --

18         Q    I understand.

19         A    This is a handwritten document as opposed to --

20         Q    Sure, I'm just asking --

21         A    -- a spreadsheet.

22         Q    -- you to explain what it says here, not

23   necessarily whether it's, in fact true or not.

24         A    Right.  I believe it's the fund balance.

25         Q    Okay, and then it says, "Multiply that by 1.325",

101

1    which appears to be explained by 1.20, is that 1.20 the 20%

2    that was referenced as the performance fee for --

3         A    I did not do the calculation, it appears to be.

4         Q    Okay, and then .125 is the monthly asset based

5    management fee per Resource "F", is that correct?

6         A    That's what it appears to be.

7         Q    Okay.  Now, just directing your attention back to

8    Exhibit 22, page 11 and I just ask you to just look at the

9    first sentence under the heading of, "Performance Allocation

10   From Investing Members To Managing Member", where it

11   states --

12        A    On page 11, I have --

13        Q    I'm sorry, page --

14        A    -- risk --

15        Q    -- 10, excuse me.

16        A    To re-read, "The managing member receives --

17        Q    Well, you don't have to re-read it, you don't have

18   to read it out loud but --

19        A    Okay.

20        Q    Go ahead and finish reading, actually, the

21   entire --

22        A    Right.

23        Q    -- paragraph there.

24        A    Yes, I did.

25        Q    Is the 20% performance allocation fee based on the

102

1    total amount of funds that Resource "F" has or on the net

2    profit that it makes from those funds?

3         A    It would be on the net profit made.

4         Q    Okay, and the calculation as performed on this

5    particular document, going back to Exhibit 65, page two, does

6    it appear that that 20% was based on the fund balance or on a

7    profit payout?

8         A    All it says is, "Balance", there's a number of

9    documents that I left in Mr. Dyer's employ that would explain

10   what the balance was at that period of time, I don't have the

11   benefit of them so I don't know whether it is the fund

12   balance or the quote, unquote, profit.

13        Q    Okay, I'm just asking you, looking at page two of

14   Exhibit 65, what appears to be done on this particular sheet?

15        A    Again --

16        Q    Not whether --

17        A    No, no --

18        Q    -- the fund balance --

19        A    No, I --

20        Q    -- was, indeed, two million --

21        A    I don't want to --

22        Q    -- or not.

23        A    I will answer the question but I will also make the

24   caveat, it's in someone's handwriting, not my own, it is not

25   at the benefit of a spreadsheet, it just has the word,

1    "Balance, two million, fifty thousand dollars", and then it

2    has arithmetic.  I don't know, I cannot derive, from this

3    piece of paper, whether they mean the balance of the fund in

4    total or the balance of the -- in brackets, profit.

5        Q    Okay, fair enough.  Did you have any other

6    communications with Mr. Vaccaro at Grant, Thornton besides

7    this fax?

8        A    I know I spoke to him on the phone a few times and

9    then I believe he left the firm.

10       Q    Did you speak to any other accountants at Grant,

11   Thornton during your tenure with Mr. Dyer?

12       A    I did, another person with an Italian name that I

13   can't think of but again, with regards to the fund advisors,

14   we would speak and they would ask us for things and then we

15   might go two or three months without speaking to them again

16   so it was not in -- we were not in constant contact.

17       Q    Let's go back to your real estate work for Mr.

18   Dyer.

19       A    Uh-huh.

20       Q    Now, did Mr. Dyer pay for rent of space for

21   Resource "F" in Florida?

22       A    During my employ, he did.

23       Q    When was that?

24       A    When did he -- I don't have the benefit of the

25   lease but I believe he began in the winter of my employment

1    for three or four months to rent an office in Florida.

2         Q    Where was the office?

3         A    It was in Fort Lauderdale.

4         Q    What was the purpose of the office?

5         A    We were going to establish a Florida office.  I

6    had -- if you look at my CV, you'll see that I had spent a

7    lot of time in Florida and felt that the back office

8    function, given the cost of space in Boston and given the

9    cost of employees in Boston, was better served being in a

10   place with a lot less rent and a lot and cheaper salaries.

11        Q    So was Mr. Dyer also going to move down to --

12        A    It was --

13        Q    -- the Fort Lauderdale office?

14        A    It was his intention to work out of the Fort

15   Lauderdale office also.

16        Q    And to close the Boston office?

17        A    No, we were going to keep the -- we were going to

18   have the Boston office or he was going to have a Boston

19   office.

20        Q    Okay, how was it going to save money if you were

21   opening up an additional office?

22        A    Because the office would be smaller and the rent

23   for the Florida office was much less than the rent.

24        Q    So the rent in the smaller space in Boston, taken

25   together with the office space in Fort Lauderdale, was still

105

1    going to be less than what he was paying --

2        A    That's --

3        Q    -- for the Boston office?

4        A    Correct.  At the time, I believe he had a whole

5    floor and the rent was approximately $10,000 a month.

6        Q    Okay, and how much was the rent going to be -- how

7    much was the Fort Lauderdale rent?

8        A    I believe it was between one thousand and two

9    thousand dollars a month.

10       Q    Okay, and how much was Mr. Dyer going to pay for

11   the remaining space in Boston?

12       A    We were going to move him to another building that

13   was just a -- the firm, Mr. Dyer's firm, was going to move to

14   another building which I didn't control and that rent would

15   have been anywhere between a thousand and two thousand

16   dollars, he would just have an office.

17       Q    And did --

18       A    Both of those transactions came to fruition.

19       Q    So Mr. Dyer did, in fact, pay rent for the Fort

20   Lauderdale office?

21       A    He -- I believe -- did Mr. Dyer pay rent?  I don't

22   know, did we -- did Mr. Dyer sign and execute a lease for

23   space in Fort Lauderdale?  Yes.  Did he send a deposit and a

24   first month's rent?  Yes.  Did he continue to pay rent?  I

25   have no knowledge.

Diversified Reporting Services, Inc.
(202) 296-9626

106

1    Q    Did the back office operations for Resource "F"
2    move to the Fort Lauderdale office?
3    A    That was, again, the period of time -- Mr. Dyer
4    moved the front office to a smaller space on the waterfront
5    at the Pilot House, we were then to move the back office
6    space to Fort Lauderdale but then he left the Pilot House and
7    moved back home and I ceased to be in his employ.
8    Q    He still had the space in Fort Lauderdale though,
9    did he not?
10    A    I don't know.
11    Q    How long was the lease for?
12    A    I believe it was for 18 months, it was not a long
13    term lease, it was a sublet.
14    Q    So he would have still been under the lease at that
15    point in time, is that correct?
16    A    Correct.
17    Q    Was there any discussion of you going down to Fort
18    Lauderdale?
19    A    There was, initially.
20    Q    And what happened?  Why did you not go down to Fort
21    Lauderdale?
22    A    He closed the office.
23    Q    He closed the --
24    A    All the offices.
25    Q    Okay.  Was the Fort Lauderdale office used at all?

1       A      Never used.

2       Q      Mr. Lorusso, I believe you testified earlier that

3   the office in Boston did send out private placement memoranda

4   while you were employed by Mr. Dyer, is that correct?

5       A      That's correct.

6       Q      And approximately how many of those were sent out?

7       A      I'd say between 10 and 20.  Mr. Dyer typically sent

8   them out, we only sent them out if he was on the road and he

9   stipulated -- he usually dictated a letter to myself or a

10  secretary, mostly a secretary or a handwritten note and told

11  us where to send them.

12      Q      And were these clients of Mr. Dyer --

13      A      I --

14      Q      -- or clients of Mr. VonStrasdas or someone else?

15      A      I don't know, Mr. Dyer always initiated the

16  request, we never took unsolicited calls.  In other words,

17  the phones were very light, no one called and said, "Hey, I

18  hear you have a fund, please send me a prospectus", it was

19  typically people that Mr. Dyer was trying to get to invest in

20  the fund and he'd say, you know, "Please send Bill Smith one

21  at this address".

22      Q      Did Mr. VonStrasdas send out the private placement

23  memoranda?

24      A      Not from our office.

25      Q      Did he send it out?

Diversified Reporting Services, Inc.
(202) 296-9626

108

1       A    I'm not Mr. VonStrasdas so I don't know if he sent

2   any out.

3       Q    Okay, did you discuss, with him, whether he sent

4   out PPMs?

5       A    No, I did not.

6       Q    For sending out the private placement memoranda,

7   did you receive back any documentation from investors in

8   Resource "F"?

9       A    Not from the ones that I sent out.

10      Q    Okay, did the office in Boston receive any

11  documentation --

12      A    They didn't --

13      Q    -- from investors?

14      A    They did not invest in the fund.

15      Q    I'm sorry, who is "they"?  The people you sent out

16  to?

17      A    That's correct.

18      Q    And how do you know that?

19      A    Because -- well, I don't know that for a fact but

20  we did not receive any money in the Boston office which was

21  where it was stipulated in the offering memorandum the money

22  was to come.

23      Q    Okay.  Did you keep a log or some other record of

24  who the office sent out private placement memoranda to?

25      A    I did not, the office did.

Diversified Reporting Services, Inc.
(202) 296-9626

109

1    Q    And who was responsible for keeping that log?

2    A    I don't know.

3    Q    Where was the log kept?

4    A    I don't know.

5    Q    Did you see the log?

6    A    I think Mr. Dyer kept it but I didn't -- we rarely

7    went into his office, it was a mess.

8    Q    Well, on those rare occasions in which you

9    participated in sending out the PPM, did you enter that name

10   in the log?

11   A    I did not.  As I was instructed to at the time and

12   the place and the person by Mr. Dyer, I assume Mr. Dyer did,

13   they were not unsolicited.

14   Q    And how do you know that this log existed?

15   A    Mr. Dyer logged everything.

16   Q    Did you have any other basis besides his normal

17   business practice?

18   A    Nothing besides his normal business practice.

19   Q    And so your testimony, then, is the office did not

20   receive any documentation from investors in Resource "F"

21   back?

22   A    They did not receive -- we received almost no -- I

23   mean, there might be one isolated incident of things coming

24   directly from investors, they either came as a bundle from

25   VonStrasdas or from Dyer.

1       Q     I'm sorry.  From Dyer?

2       A     Yes.

3       Q     Isn't he part of the Boston office?

4       A     Right, but he would -- in other words, he would

5   hand then to us.

6       Q     I see, as opposed to getting it in the mail?

7       A     Correct.

8       Q     And how were those individuals receiving the PPMs?

9   How did those individuals receive their PPMs?

10      A     I don't know because I don't -- again, the -- I

11  didn't control the VonStrasdas office in Florida.  From Dyer,

12  I assumed they received them from Dyer.

13      Q     Did you have any contact with potential investors

14  in Resource "F"?

15      A     I had telephonic contact, whoever called, I didn't

16  discern whether they were potential investors or not.

17      Q     Did Dyer have contact with potential investors in

18  Resource "F"?

19      A     I'm assuming so, he was listed as the managing

20  member.

21      Q     I'm talking about potential, not actual investors

22  in terms of soliciting investors.

23      A     Can you restate the question?

24      Q     Yes.  Did Mr. Dyer have contact with potential

25  investors in Resource "F"?

111

1       A    If you mean did he speak to people who could be

2    potential investors, yes but you know --

3       Q    Did he speak to potential investors who had

4    received private placement memoranda?

5       A    Almost all the people that he sent private

6    placement memorandum to were his personal friends so he often

7    spoke with his personal friends, he did not send them to

8    people outside his circle.

9       Q    Was it your testimony that none of those folks

10   actually invested in Resource "F", to your knowledge?

11      A    Except for that I know Mr. Bathhurst did because

12   his name appears on the sheet, no one from the United States

13   or that was a "FOC", friend of Chuck, invested in the fund.

14      Q    Did you receive any questions from potential

15   investors in Resource "F" regarding the private placement

16   memorandum?

17      A    Whenever we did, we referred them to Mr. Dyer, as

18   per his instructions.

19      Q    Were there occasions in which you referred

20   potential investors to Mr. Dyer?

21      A    I'm sure there was but I don't recollect a

22   particular incident.  Again, almost exclusively, the people

23   that Mr. Dyer spoke to were his friends, they wouldn't --

24   they would just ask for him and say who they were, they

25   wouldn't ask us the nature of the call, they'd just say he

112

1    was a -- "I'm a friend of Chuck".

2                          (SEC Exhibit No. 24 was marked

3                          for identification.)

4              MR. QUINTERO:  Mr. Lorusso, I hand you a copy of a

5    document that has been previously marked as Exhibit 24, it is

6    entitled at the top, "Resource 'F', LLC Member Addresses", it

7    is the first two pages and then a third page says, "Resource

8    'F', LLC Client Names", and then the fourth and fifth page

9    appears to be a spreadsheet, it says, "Resource 'F', LLC

10   member status".

11             BY MR. QUINTERO:

12       Q    Taking the first two pages first, have you seen

13   this compilation of member addresses in Resource "F"?

14       A    I have seen it, yes.

15       Q    Who prepared it?

16       A    I believe, a secretary did.

17       Q    And taking the time to look at the list, are these

18   investors in Resource "F"?

19       A    It appears to be a list of investors in Resource

20   "F".

21       Q    And if we take it a column at a time, slowly, would

22   you just read to yourself, tell me which ones of these are

23   Mr. Dyer's clients as opposed to someone else's?

24       A    On the second name on the first column, Mr.

25   Bathhurst.

113

1    Q    Okay.

2    A    Changing the page, Mr. Billig, who I know was a

3  friend of George Bathhurst so I'm assuming that he was

4  a -- if he's a client, he was a Dyer client as opposed to

5  VonStrasdas' client.

6    Q    Okay.

7    A    That's an assumption.

8    Q    Sure.

9    A    Also too, Mr. Donert, Mr. Isley is a Dyer client,

10  to the best of my recollection.  Also Andrew Schriver, Derek

11  Green, Derek Green listed again, Coastwise Capital.

12    Q    And what was Coastwise Capital's connection to Mr.

13  Dyer?

14    A    It was a client.

15    Q    A client of Resource "F"?

16    A    A client of Resource "F".

17    Q    Who were the principals at Coastwise Capital?

18    A    I believe the Coastwise Capital is run by Brian

19  Nelson.

20    Q    Anyone else?

21    A    No.

22    Q    Do you have any connection with Coastwise Capital?

23    A    I do not.

24    Q    Did you, at any time?

25    A    No.

114

1     Q     Do you know Mr. Nelson?

2     A     Yes, he did our -- he was employed by a company

3   called "HR Logic", he did the firm's HR, paychecks so he was

4   known to by myself and Mr. Dyer.

5     Q     Did you know him outside of that capacity?

6     A     We had a drink once or twice but I haven't seen him

7   in eight -- twelve months.

8     Q     When did Mr. Dyer meet Mr. Nelson?

9     A     He met him in connection with getting a payroll

10  service up for the fund, which I believe was around that

11  April, May, June of the year that I came on the --

12    Q     Does Mr. Nelson have an ownership interest in HR

13  Logic?

14    A     No, no, he was just employed by HR Logic.

15    Q     And what did Coastwise Capital do?

16    A     I have no idea.

17    Q     Did Mr. Nelson talk to you about that at all?

18    A     No, he didn't.

19    Q     And turning to the last two pages of Exhibit 24, it

20  appears to be the spreadsheet for member status, who created

21  this spreadsheet?

22    A     I don't know, I'm assuming it's Todd Litton but the

23  dates don't indicate, it was not created by me.

24    Q     It was not created by you?

25    A     It was not created by me.

Diversified Reporting Services, Inc.
(202) 296-9626

1    Q    Hadn't Mr. Litton left by, for example, January of

2    2000, which is one of the dates?

3    A    Yes, he had and that's what surprises me because he

4    had -- Mr. Dyer had no one of the capacity to do this once

5    Mr. Litton and myself were not employed so it was probably

6    done by whomever he employs now.

7         MR. QUINTERO:  Okay.

8         (Pause)

9         BY MR. QUINTERO:

10    Q    During your tenure at Bunker Hill and Resource "F"

11    with Mr. Dyer, how much money had been invested in Resource

12    "F"?

13    A    I believe it was approximately 10 million dollars.

14    Q    Didn't you testify earlier that it only had --

15    A    In --

16    Q    -- assets of several hundred thousand?

17    A    In -- when you asked about the compilation created

18    by --

19    Q    No, I'm talking about prior to that, I know you

20    said that at the end of 1998 you thought it was in the

21    hundreds of thousands as opposed to millions but that like

22    very early on in the testimony I thought I had asked you

23    about what Resource "F" had in terms of its assets under

24    management.

25    A    I believe you were talking specifically about

Diversified Reporting Services, Inc.
(202) 296-9626

1    stocks and I talked about $250,000.

2        Q    Okay.

3        A    That's what I meant.

4        Q    Okay, so it held $250,000 in, say, publicly traded

5    stock?

6        A    That's correct, I believe that was the testimony.

7        Q    Okay, fair enough, I just wanted to get a

8    clarification on that.

9            Now, Mr. Lorusso, when the Boston office received

10    back the documentation from investors, what were the

11    documents?

12        A    We almost never received documents back, we

13    would --

14        Q    I'm sorry, via Mr. Dyer or via Mr. VonStrasdas.

15        A    Okay.  First of all, we would have to ask them and

16    there should be records of -- every time we sent a letter, we

17    saved them on the computers that were still there and we

18    would ask particularly Mr. VonStrasdas, we'd say we need

19    wiring instructions or offering memorandi for "XYZ" person

20    and they would either come in a package delivered from Mr.

21    Strasdas (sic) or they would just never come, then we

22    would -- and once they came, we'd put them in the file.

23        Q    Did you or anyone else examine the documents that

24    came back?

25        A    I probably did on occasion but I actually don't

Diversified Reporting Services, Inc.
(202) 296-9626

1  remember. Typically what was required was, their wiring

2  instructions to make payments to them so that was typically

3  delivered by facsimile and we then copied those and put them

4  in each person's file and then as -- so I certainly had

5  direct access to those but with regards to the overdue or,

6  you know, the compiled offering memorandi, I don't recall.

7       Q    When you say the offering memorandi, are you

8  referring to the subscription agreement?

9       A    Subscription -- collectively together, the -- yes.

10      Q    Do you recall getting back investor questionnaires

11 that asked about net worth or annual income of the investors

12 in Resource "F"?

13      A    We did receive some back and typically most of them

14 we received back were from the Dyer clients and then we

15 forwarded all that information off to DPR.

16      Q    Did anyone at the Boston office review the

17 information to see if it was correct on --

18      A    We reviewed -- Todd Litton, who was an attorney

19 prior to my arrival, reviewed it for errors and omissions,

20 looking for spaces where they had not ticked and in some

21 cases, some entities had compiled both the single entity form

22 and the corporate form and so we needed to call them and ask

23 them which they were.

24      Q    After Mr. Litton left, did anybody take over his

25 responsibilities in that regard?

Diversified Reporting Services, Inc.
(202) 296-9626

1      A    No.

2      Q    And it's your testimony that after Mr. Litton left,

3    no one looked at the subscription agreements and the like for

4    errors and omissions?

5      A    Mr. Litton was far more focused on that, due to his

6    legal background, he was the one who took a proactive stance

7    to receive them, I believe Mr. Dyer took over that function

8    but then that there was a lack of a proactive stance but what

9    we did receive, we sent to DPR.

10     Q    Dechert, Price and Rhoads?

11     A    That's correct.

12     Q    And once investors made the investment in Resource

13   "F", how did the funds get to Resource "F"?

14     A    Depending on if they were US or non US based

15   persona.

16     Q    Well, let's take the US based persona.

17     A    US based persona were supposed to be wired to the

18   Resource "F" Boston Private Bank and Trust account.

19     Q    And what happened to the money after that?

20     A    Mr. Dyer then moved them to the company in the

21   Bahamas called "Antietam".

22     Q    And what happened to the money after that?

23     A    I can't speak to Antietam because I was not allowed

24   to have any information on it.

25     Q    Did Mr. Dyer ever tell you what happened to the

119

1    money once it reached Antietam?

2         A    No.

3         Q    Did you ever ask him?

4         A    No.

5         Q    Of the approximately 10 million dollars that

6    Resource "F" took in that you were aware of during the time

7    that you were there at Bunker Hill, where was that money

8    invested?

9         A    It all went to Antietam.  After that, I don't know.

10        Q    So it was not invested, as far as you know, in

11   publicly traded securities, is that correct?

12        A    It was not -- again, a portion, I believe --

13        Q    Approximate --

14        A    -- at the maximum, $250,000 were in publicly traded

15   securities.

16        Q    And for the balance?

17        A    The balance was all -- again, when we're talking --

18   we had our discussion about "A" shares and "B" shares, they

19   all went to the same place.

20        Q    And which was?

21        A    Antietam.

22        Q    Okay.  Now then, shifting over to the international

23   investors.

24        A    Directly to Antietam.

25        Q    And did you know what happened to the money after

120

1    that?

2        A    I'm shaking my head in the negative, no.

3        Q    And again, did you ask anyone about what happened

4    to the money?

5        A    No, because without him telling me that money had

6    been sent to Antietam, I did not know so I would not know

7    if -- for example, you asked me about investors of Mr. Dyer,

8    some of them I'm aware of but I don't know what their

9    financial commitment to the fund is because I did not receive

10   the money.  One of the reasons I stopped doing what I was

11   doing was, there was -- I couldn't get access to records so I

12   couldn't provide my function.

13            COURT REPORTER:  One moment for a tape change,

14   please.

15            (Pause)

16            MR. QUINTERO:  Off the record at 2:52 p.m.

17            (Whereupon, at 2:52 p.m., a brief recess was

18   taken.)

19            (Whereupon, at 2:55 p.m., the examination was

20   resumed.)

21            MR. QUINTERO:  Back on the record at 2:55 p.m.

22            BY MR. QUINTERO:

23       Q    Mr. Lorusso, before we continue, let me just

24   confirm with you that during our short break, there were no

25   discussions between you and the staff concerning this

121

1    investigation, is that correct?

2        A    That's correct.

3            MR. QUINTERO:  Is that correct, Mr. Murray?

4            MR. MURRAY:  Yes, that's correct.

5            MR. QUINTERO:  Okay.

6            BY MR. QUINTERO:

7        Q    I believe before we broke, Mr. Lorusso, you

8    testified that one of the reasons why you stopped working for

9    Mr. Dyer was that you didn't have access to the records,

10   certain records, is that fair to say?

11       A    Correct.

12       Q    And what records are you referring to?

13       A    Well, I was continually asked to provide

14   information to the accountants with regards to transaction

15   histories so they could do complimations (sic) and audits and

16   where I did not control nor was I allowed to even inquire to

17   the offshore bank for duplicate copies of transaction

18   reports, other things, I felt that I could not rely on the

19   information I was given.

20       Q    By Mr. Dyer?

21       A    Or by Mr. VonStrasdas.  In other words, to go back

22   to 65 --

23       Q    Exhibit 65, yes?

24       A    This is the type of -- excuse me.  This is the type

25   of transaction record that was kept and please note it's

Diversified Reporting Services, Inc.
(202) 296-9626

122

1     written in hand.

2          Q     Okay, and you are referring to page two of Exhibit

3     65, specifically?

4          A     That's correct.

5          Q     Okay, so was it that you felt uncomfortable in some

6     way?

7          A     I felt that -- and this is over a period of time, I

8     felt that I could not adequately account for the money that I

9     didn't see because it was offshore.  Secondly, as stated in

10    my resume', my primary function was real estate.  We were

11    going to do some things in Florida, we were doing a lot of

12    things, once those things looked like they were not to come

13    to fruition, I didn't see continuing the employment and it

14    was an amicable -- he was going a different direction, I was

15    going another one, it was not contentious in any way.

16         Q     And did you feel uncomfortable making

17    representations to the accountants concerning documents?

18         A     I just gave them what I had, I didn't make any

19    representations.

20         Q     Okay, fair enough but why is it that -- I believe

21    you testified you felt like you could not rely on Mr.

22    VonStrascas and Mr. Dyer --

23         A     Well --

24         Q     -- for information?

25         A     -- the information that I gave to the accountants

Diversified Reporting Services, Inc.
(202) 296-9626

123

1    was correct but I was running out of information to give to

2    the accountants --

3         Q    I see.

4         A    -- and to speak -- I mean, this particular record

5    keeping type part of the job only occupied about a half hour

6    to an hour of one month's time.  In other words, we basically

7    took all the transactions that occurred, reviewed the bank

8    statements, typed them up in Excel spreadsheet, all of which

9    were left with Mr. Dyer when I ceased his employment.

10                        (SEC Exhibit No. 41 was marked

11                         for identification.)

12              MR. QUINTERO:  Mr. Lorusso, I hand you a copy of a

13    document that has been previously marked as Exhibit 41.  This

14    document is several pages, has a cover letter on Resource "F"

15    letterhead of the Palm Beach office, dated July 19th, 1999

16    addressed to Friends of Resource "F" "A" shares, "Resource

17    'F' 'A' Shares Year to Date Performance" is the subject line

18    and after that it appears to be various charts, outlining the

19    performance of a $100,000 investment in Resource "F".

20              BY MR. QUINTERO:

21         Q    Have you seen these charts before?

22         A    Yes, I created the charts, it was based on a

23    hypothetical $100,000 investment and it was based on the

24    period stated so it was actual dollars based on a person's

25    investment.  I believe a hundred thousand is the minimum of

1    the fund at that time so we took that as a base line and this

2    was just tracking the performance of that investment and it

3    was given only to clients.  This is a client letter.

4        Q    Okay, so it tracks it from January, 1999 through --

5        A    Right, we ignored --

6        Q    -- the end of June, 1999?

7        A    I ignored the 1998 partial year and again, when I

8    stated that I began working with Mr. Dyer in June or July of

9    that year, whatever the quarter date is for the third

10   quarter, these were one of the things that I did with regards

11   to the computer when I said I helped out like --

12       Q    Yes.

13       A    -- once or --  this is what I --

14       Q    Okay, so you did this before you became paid by Mr.

15   Dyer?

16       A    Not this one in particular.

17       Q    Okay.  Similar charts?

18       A    Yes -- not charts but similar accounting or

19   recording keeping.

20       Q    Okay.

21       A    It's on page one, two, three, four, five --

22       Q    Okay.

23       A    -- and again, to redirect back to your question

24   about when I felt uncomfortable, I felt uncomfortable with my

25   ability to produce this type of documentation.

Diversified Reporting Services, Inc.
(202) 296-9626

125

1    Q    Where did you receive the data to create these

2    charts?

3    A    Mr. VonStrasdas faxed a monthly performance report

4    based on -- just telling how much the fund had made, who was

5    to receive the money and how much the partner allocation was

6    so from that information, it was very easy to derive these

7    numbers.

8    Q    Did you verify if these numbers were, indeed,

9    truthful?

10    A    I verified, by speaking to him, that that was his

11    representation as to who would be paid.

12    Q    And you say that's Mr. VonStrasdas?

13    A    Yes, that was Mr. VonStrasdas.

14    Q    Did you do anything else to verify the veracity of

15    the figures you used in these charts?

16    A    No, they always came from him, they did not come

17    from Dyer but this was -- if your question is on -- I think

18    it's a two part question, "Did a hypothetical hundred

19    thousand dollar client receive this amount of money stated in

20    the graph and chart"?  Yes, 'cause I based it on -- we did

21    the wiring out of the Boston office so the instructions to

22    wire came from VonStrasdas along with the funds to wire so it

23    was very easy to take that information and compile this.

24    Q    Okay.

25    A    So it was done off actual dollars sent to clients.

126

1   Q Okay, so you did it off of that as opposed to just

2 some monthly statements that you received from Mr.

3 VonStrasdas?

4   A Correct, correct and at the end of my tenure what

5 was happening was, there was a power struggle, a difference

6 in opinion or whatever between Dyer and VonStrasdas and they

7 both set up their own back office to do the work so that's

8 why -- when there was no money trail to follow, in other

9 words, when I didn't physically wire the money to a client, I

10 had no knowledge that it was sent.

11   Q Okay, just so I understand, I just want to make

12 sure we've covered this fully, when the payouts to investors

13 occurred, what was the money trail?

14   A Again, back through Antietam, offshore clients paid

15 reverse, onshore clients paid through Resource "F".

16   Q So money then would come from Antietam to an

17 onshore Resource "F" account and then from the Boston

18 Private, presumably, is that correct?

19   A That's correct.

20   Q And then from Boston Private, it would be disbursed

21 to the US investors?

22   A That's correct.

23   Q And how did you know that the international

24 investors were being paid out of Antietam?

25   A We, as the office, not myself personally, but the

127

1    staff of temps and other clerical people would prepare, for

2    Chuck, the wire transfer out of the Antietam account, he then

3    had to send them himself, sign them himself and then verbally

4    call them and again, using their system of voice recognition,

5    in other words, they knew who he was, he would have to

6    confirm the money being sent so we were not able to send an

7    international wire.

8         Q    When you say "We", you're referring to the staff?

9         A    The staff, so with regards to that, we concentrated

10   on the onshore clients and let Mr. Dyer do the record keeping

11   and others for the offshore clients.

12                      (SEC Exhibit No. 85 was marked

13                      for identification.)

14        MR. QUINTERO:  Mr. Lorusso, I hand you a document

15   that has been marked as Exhibit 85.  These appear to be

16   several monthly statements, for lack of a better word, which

17   are the form of a memoranda from, appears to be, Mr.

18   VonStrasdas to Charles Dyer concerning distribution for

19   various months.

20        THE WITNESS:  Yes, and this would actually be

21   considered a distribution list.  The first thing that we

22   would do is verify that we had these people booked in our

23   system, that they were due money, that they weren't ghost

24   clients, then we had to rely on Mr. Dyer to confirm the

25   offshore people and then we prepared the wires to be executed

128

1      on Mr. Dyer's signature.

2                BY MR. QUINTERO:

3      Q      Now, just taking the first page of --

4      A      Uh-huh.

5      Q      -- this Exhibit -- is it Exhibit 85?  I'm sorry.

6      A      85, yes.

7      Q      Just so I understand what everything is, underneath

8      where it says, "Please verify our calculations for December

9      disbursements for immediate execution", this appears to be

10     dated 27 December 1999, it says, "Total Gains Received by the

11     Fund, $521,560 US dollars", and it appears to be derived from

12     a calculation of .059 times 8.840 "MM", what does the .059

13     signify?

14     A      I think it's the -- I don't want to speculate.

15     Those calculations, although important to this piece,

16     anything under "Client Distributions" were the only things

17     that we could verify and use because that money was not sent

18     to us, so to speak.

19     Q      Okay, so you're saying that the gains received by

20     the fund was not sent to you?

21     A      Correct.

22     Q      That was calculated by someone other than the

23     Boston office?

24     A      That's correct.

25     Q      Okay.  Would that have been Mr. VonStrasdas?

129

1     A     That's correct so if you look at the bottom of page

2     two, "D", 001905 --

3     Q     Yes.

4     A     -- you will see a subtotal, then "Withheld" and

5     then you'd have "Total Fund Payout, 379,124 US dollars".

6     Q     Yes.

7     A     Those are the numbers that we would verify that

8     they met, that all of these numbers in the spreadsheet --

9     Q     Yes.

10     A     -- starting with Ellison and Hanser, added up to

11     that amount, that they didn't appear twice.  If they appeared

12     twice, it was because they added additional money, that they

13     were due this money, those are the type of oversight that we

14     did, it was particular to the clients.

15     Q     Okay.  Was the 0.59 supposed to represent the rate

16     of return that the fund received?

17     A     That could be inferred but I don't know what it

18     means in this case.

19     Q     Okay, and did the 8.840 "MM" refer to eight

20     million, eight hundred and forty thousand dollars?

21     A     That's correct.

22     Q     Okay, and that's how much was in the fund at that

23     time?

24     A     That's correct, based on the information in front

25     of me.

130

1      Q    Okay, and is it your testimony that it was not the

2  Boston office who determined what the total gain of the fund

3  was?

4      A    This is what we would receive every month.  Noting

5  that it's dated 27 December, it was faxed 27 December.  We

6  would want, the disbursements were made in arrears so this

7  would be for the December disbursements and then again, we

8  would verify basically the client -- you can see circles and

9  ticks and other marks that were either made by myself or

10 someone else with regards to the fund just verifying the

11 amounts.  VonStrasdas did this in Word as opposed to Excel so

12 sometimes he made calculation errors at the bottom.

13     Q    I see.  Okay, just turning to client distributions

14 and taking the first name, which is "Richard Ellison", again,

15 this is on page D-1904 of Exhibit 85, it says, ".0456 times

16 300 'M'" is "300 M" $300,000?

17     A    That would be correct.

18     Q    And does the .0456 represent the rate of return for

19 Mr. Ellison in this case?

20     A    I believe that's what it represents.

21     Q    And who determines what the rate of return will be

22 for particular clients?

23     A    The rate of return is constant for all clients.

24     Q    Okay, and who makes the determination as to what

25 the rate of return will be in a given month?

1      A    Mr. VonStrasdas did, based on this document.

2      Q    Okay.  Did Mr. Dyer have any role in determining

3   what the rate of return would be for clients?

4      A    I believe that he did not.

5      Q    And what was the source of the rate of return for

6   the clients?

7      A    I don't know.

8      Q    Did you ever ask?

9      A    No.

10      Q    Was something done offshore?  Did you have any

11   understanding, whatsoever, of it?

12      A    No, my understanding was that it was past that wall

13   at Antietam.

14      Q    Did you have an understanding that it had something

15   to do with the investment that was described in the executive

16   summary that we looked at earlier?

17      A    No, I did not.  I did not think it was or wasn't, I

18   had no opinion.

19      Q    Did it make you wonder how these investors were

20   getting the equivalent of 50% a year on their investment?

21      A    You know, client distributions were my issue,

22   everything above that was somebody else's issue.

23      Q    No, I understand that.  I'm not asking whether you

24   had responsibility for them, I'm just asking if you

25   ever -- if that ever made you wonder how these clients were

132

1    getting 50% a year for this investment.

2        A    Well, the original thoughts for Dyer's fund, which

3    included jet engine leasing, you know, some other things like

4    that, showed possible profits in the fifty to a hundred

5    percent range annually.

6        Q    And did, in fact, Resource "F" invest in those

7    things?

8        A    I don't know.

9        Q    So was it your belief they did?  Is that what you

10    thought the source of it was at the time?

11        A    I had no -- in other words, once it went to

12    Antietam, I had no -- I can't speak to it, I have no

13    knowledge of where that went.  Excuse me.

14        Q    Okay, and then just back to the original question,

15    which was, did it make you wonder, in any way, how these

16    clients were getting the equivalent of 50% a year on their

17    investment?

18        A    No, not really because at the time, the stock

19    market had an annualized gain of 70%.

20        Q    Okay, so because of the bull market at the time, it

21    did not raise an eyebrow with you?

22        A    No, I mean, had it been 200%, maybe but I mean, it

23    was -- and the values changed monthly, it was not regular and

24    then -- this is the December.  I think the January and the

25    February showed one percent, one point one percent, zero

133

1     percent so there was a wild fluctuation, it was not just a

2     mathematical formula.

3          Q    Wasn't it roughly four point five percent a month

4     up through December of 1999?

5          A    That's correct.

6          Q    And then after that, it fluctuated?

7          A    Correct.  Well, it always fluctuated but it ranged

8     in the fours.

9          Q    Okay, and at what point in time did you stop

10    receiving the information needed to do your back office

11    function?

12         A    Around or about January or February of that year,

13    when the fund -- where is that?  March -- I think it was

14    March but I'm trying to look at the date of the -- March, I'm

15    showing one point two five percent.

16         Q    Okay, and that's in the document found at D-1917?

17         A    That's D-1917, yes.

18         Q    And it's dated 31 March, 2000?

19         A    Correct.  We did not receive any other paperwork,

20    it's dated 31 March, I don't know when it was sent, it

21    doesn't show.

22         Q    Did Resource "F" continue paying distributions to

23    its clients after March of 2000?

24         A    No.

25         Q    How do you know that?

134

1      A      During my tenure, it did not.

2      Q      Do you know whether it continued to pay its clients

3    after your tenure ended?

4      A      No, I do not, I have no knowledge.

5      Q      Did you invest in Resource "F"?

6      A      No.

7      Q      Did you invest in any entity associated with Mr.

8    Dyer or Mr. VonStrasdas?

9      A      No.

10     Q      Did you send moneys to an account named "Wall

11   Street South"?

12     A      Maybe, I'm trying to think.

13     Q      And who is the beneficiary of that account?

14     A      I don't know but this is a maybe, I'm not sure, I'd

15   have to review my records.

16     Q      How much money do you believe you sent?  Well,

17   where was the account that you believe you sent it to,

18   whether it was in the name of Wall Street South or some other

19   entity?

20     A      Where was it physically located?

21     Q      Yes.

22     A      I don't know.

23     Q      Where was the account?

24     A      It might have been in Florida.

25     Q      And what was it for?

135

```
 1              MR. MURRAY:  Does this have anything to do with
 2    Resource "F"?
 3              MR. QUINTERO:  That's what I'm trying to find out.
 4              THE WITNESS:  It doesn't have anything to do with
 5    Resource "F".
 6              BY MR. QUINTERO:
 7       Q    Well, why don't you tell me what it was for?
 8       A    I don't -- it was about a year and half ago and I
 9    don't have the records.
10       Q    What was the amount of the transfer?
11       A    I think it was a couple thousand dollars.
12       Q    So your testimony is that you do not know what it
13    was for?
14       A    I do not have the benefit of the information in
15    front of me.
16       Q    I understand you don't have the benefit of the
17    information in front of you, I'm asking you whether
18    you -- is it your testimony that you do not know what the
19    transfer was for?
20       A    It was for an investment but I don't what the exact
21    nature of the investment was.
22       Q    Who was the investment with?
23       A    I can't remember the particular investment name.
24       Q    Was there an individual associated with the
25    investment?
```

1          MR. MURRAY:  Can I ask a question here?  What he

2     has to do -- I thought the investigation related to Resource

3     "F" --

4          THE WITNESS:  Correct.

5          MR. MURRAY:  -- and not Mr. Lorusso.  Now, if the

6     nature of this thing is changing and I haven't had that much

7     time to speak to Mr. Lorusso, then maybe we should suspend

8     and if you want to direct questions at Mr. Lorusso, then we

9     can do that.

10          BY MR. QUINTERO:

11     Q     Mr. Lorusso, did you, in your conversation with Ms.

12     Bailey, indicate that you had invested in Resource "F" or

13     some similar investment?

14     A     What I expressed to her was that this relationship

15     had cost me an awful lot of money and time.

16     Q     And what money did it cost you?

17     A     It cost me lost profits, it did not cost me

18     directly out of pocket funds.

19     Q     What do you mean by "lost profits"?

20     A     It cost me a year and half of my life, listening to

21     somebody telling me stories of how he was going to start an

22     airline fund and how you could get in on the bottom level and

23     you can do all this stuff and I didn't go out and I had just

24     graduated from graduate school and I didn't go out and pursue

25     my given trade because I kept getting long-winded promises,

1    "Oh, you can fly", you know, "Once we get an airline, you can

2    fly over here and you can fly for free", and then we tried to

3    do things like do a golf course or do something else and the

4    initial phases were always good but it never came to

5    fruition.   If you also notice in my written response, I

6    indicated that I had no information on any of the entities

7    that you asked me for.   Also, when I was presented today with

8    the questions, I have no information, except for the

9    questions that I answered for you today on those questions so

10   if I am the -- if you're having an investigation against me

11   on something that I invested in two years ago that I don't

12   remember off the top of my head because I didn't prepare to

13   talk about any -- the wide range of things that I may or may

14   not have invested in, that's a different focus.

15        Q     Well, Mr. Lorusso, I mean, I'm bringing this up to

16   the extent that I asked whether you wired funds to a Wall

17   Street South account --

18        A     And I said --

19        Q     -- and you made an association between that account

20   and some investment that you made --

21        A     I said I may --

22        Q     -- some time ago.

23        A     No, and I was trying to answer you truthfully.

24   Instead of saying, "No", I said, "I don't believe I did but I

25   may have".

138

1        Q    Are you familiar with an individual by the name of

2   "Eric Resteiner"?

3        A    I do not know Mr. Resteiner, I knew of him, after

4   leaving the employ of Mr. Dyer, for six months.

5        Q    And when did you first hear of Mr. Resteiner?

6        A    I heard of Mr. Resteiner six months ago.

7        Q    From whom?

8             MR. MURRAY:  Does this have anything to do with

9   Resource "F"?

10            MR. QUINTERO:  Yes, it does.

11            MR. MURRAY:  Okay, then you can continue, that's

12   fine.

13            THE WITNESS:  Mr. Bathhurst informed me of Mr.

14   Resteiner.

15            BY MR. QUINTERO:

16       Q    And what did Mr. Bathhurst say about Mr. Resteiner?

17       A    He said that there was this guy named Mr. Resteiner

18   and Mr. Dyer told me about Mr. Resteiner, the gentleman that

19   works with Mr. Dyer now, whose name evades me.

20       Q    David Stockard?

21       A    David Stockard told me that the money in Resource

22   "F" was funnelled, his words, through Eric Resteiner.  I've

23   never met and never had correspondence with Eric Resteiner.

24       Q    And when did you have this conversation with Mr.

25   Stockard about Mr. Resteiner?

Diversified Reporting Services, Inc.
(202) 296-9626

139

1       A    I'd say at least three months ago.

2       Q    And you also mentioned that you heard about Mr.

3    Resteiner from Mr. Dyer, is that correct?

4       A    That's correct.

5       Q    And when was that?

6       A    Probably four or five months ago.  I hadn't spoken

7    to Mr. Dyer in that period of time, as previously stated.

8       Q    And what was the nature -- I mean, what was the

9    substance of that conversation?

10      A    What they -- every time I called to check in and

11   this was when I was more interested, you know, I mean, I had

12   just left the employ and I was seeing -- I left their employ

13   and was just checking in every other month to see how it was

14   going, whether the fund had paid, whether anyone knew what

15   was going on with Von and then I would hear stories and it's

16   just -- you know, it was just sort of like chatter but they

17   said -- evidently Mr. Dyer brought on Mr. Stockard to find

18   the assets and he was the one that mentioned -- and also I

19   spoke to Mr. Dyer about --

20      Q    What did Mr. Dyer say about Mr. Resteiner?

21      A    He just said that, "Oh, we found the guy, it's not

22   Von, it's Eric Resteiner", but again, well after the fact do

23   I know of the presence of anyone.  All of the dealings and --

24   they were short and you know, I met Von once, I know of.  I

25   think he was in the office one other time, that was our

1    single point of contact.  None of the -- I'd seen hundreds

2    and hundreds of things in documents, some of which you'd

3    asked me about and I mentioned that I'd seen them in passing

4    or I've not, I've never seen or heard Mr. Resteiner's name.

5        Q    Now, just going back to what you mentioned to Ms.

6    Bailey about -- I think you -- what were your words, in terms

7    of what you told her, concerning your --

8        A    Well, first, I was concerned because I wanted to

9    know what it was about and secondly, I was concerned because

10   she sent me the information by e-mail, thereby thinking that

11   she had no other way to get to me, so to speak so I was

12   worried that she was in a hurry to speak with me.  I called

13   her immediately after receiving that and I think I said I had

14   been harmed by this but also I -- you know, I had -- being an

15   employee, I had a significant amount of knowledge but I don't

16   remember exactly what I said to her.

17       Q    Did you tell her that you had invested with

18   Resource 'F" or a similar investment?

19       A    No, I did not.  I believe I stated I -- I might

20   have stated that I had been materially harmed by this group

21   but I didn't say I had invested.

22       Q    And the material harm you're speaking of refers to

23   the time that you spent working with Mr. Dyer?

24       A    That's correct.

25       Q    But you were being compensated by Mr. Dyer during

1   that time, were you not?

2       A    He was going to make me a partner, he was going

3   to -- we were going to do all these great things.  I mean, I

4   worked, you know, long hard hours and you know, did the tough

5   things when I had to and you know, he moved his office one

6   day.

7       Q    Without any warning to you?

8       A    Well, I knew he was going to move back to his home,

9   he then established a new office within two weeks.

10      Q    Is that the office in Danvers?

11      A    That's the office in Danvers, without any -- you

12  know, so much as a phone call.

13      Q    Did you wire funds to an entity under the control

14  of Mr. VonStrasdas at any time?

15      A    Not to my knowledge.

16      Q    Did you wire funds to an entity under the control

17  of Mr. Dyer at any time?

18      A    Never.

19      Q    During your tenure with Mr. Dyer, was there

20  correspondence sent out to investors in Resource "F"?

21      A    Mr. Dyer sent out quarterly performance reports and

22  personal notes, it was typically signed, "Mr. Dyer" and "Mr.

23  VonStrasdas", I don't -- and I believe -- it's conjecture but

24  Mr. VonStrasdas had a more intimate relationship with his

25  clients.

1        Q      When you say, "his clients", the clients that he

2   brought in?

3        A      That's correct.

4        Q      Were they also sent to Mr. Dyer's clients, such as

5   Mr. Bathhurst and the folks that you identified in Exhibit

6   24?

7        A      Which?  Mr. VonStrasdas' correspondence?

8        Q      Yes.

9        A      No, no.  Mr. VonStrasdas had often suggested that

10  we switch from quarterly to monthly, he wanted to get the

11  good word out, as he would say.

12       Q      Did Mr. VonStrasdas send correspondence or

13  communications more frequently than Mr. Dyer?

14       A      It's my belief but I have no -- he wanted to send

15  them monthly, I thought that he was sending them but that's

16  just conjecture on my part.

17       Q      And why do you believe that he was sending them out

18  monthly?

19       A      Because he wanted us to send them out monthly to

20  him.  He wanted us to provide him -- we provided him a

21  summary sheet of -- I don't see a copy here but it's

22  basically the information that if you looked at the sheet on

23  the hundred thousand dollar investment --

24       Q      Yes, that would be Exhibit 41.

25       A      -- it would be a one page sheet that would have

143

1    tracked the -- it's not included in there but it would be a

2    one page sheet that would track the person's actual

3    investment over time from their starting date and we were

4    providing those quarterly.  We gave a generic one to him,

5    based on that hundred thousand dollar investment, every month

6    because he wanted to see how it looked with the -- based on

7    the performance of that given month.  What he did with it, I

8    don't know but it's my assumption that he may have sent those

9    out.

10             MR. QUINTERO:  All right, why don't we just a short

11   break?  Off the record at 3:25 p.m.

12             (Whereupon, at 3:25 p.m., a brief recess was

13   taken.)

14             (Whereupon, at 3:40 p.m., the examination was

15   resumed.)

16             MR. QUINTERO:  Back on the record at 3:40 p.m.

17             BY MR. QUINTERO:

18       Q   Mr. Lorusso, before we continue, I just want to

19   confirm with you once again that during our break, there were

20   no conversations between you and the staff concerning this

21   investigation, is that correct?

22       A   That's true.

23             MR. QUINTERO:  And is that correct, Mr. Murray?

24             MR. MURRAY:  That is correct.

25             MR. QUINTERO:  Great.

Diversified Reporting Services, Inc.
(202) 296-9626

144

1          BY MR. QUINTERO:

2          Q    Did you have any communications with Mr. Dyer

3    concerning what Mr. VonStrasdas was doing with Resource "F"

4    funds?

5          A    No.

6               MR. MURRAY:  Could we put a time frame on these

7    things just so that they're clear, while he was employed?

8               THE WITNESS:  While I was employed?

9               MR. QUINTERO:  While you were employed, yes, very

10   good, thank you.

11         BY MR. QUINTERO:

12         Q    While you were employed there?

13         A    No.

14         Q    Has he had communications with you concerning what

15   Mr. VonStrasdas did with Resource "F" funds since you've left

16   his employment?

17         A    I have only spoken to him two or three times, the

18   most recently was last week when I was subpoenaed to be here,

19   again, I stated that that was about two minutes in length, I

20   have not spoken to him in six to eight months.

21         Q    Okay, but I'm asking you whether you had any

22   communications with Mr. Dyer concerning what Mr. VonStrasdas

23   did with the funds.

24         A    I had no communications with him at all so I --

25         Q    Well, you said you've talked to him two or three

145

1      times since you left.

2          A    Not about -- I mean, about the health of his family

3      and my father had been ill and purely social things.

4          Q    Okay.  You testified earlier that the executive

5      summary that was found in -- it's part of Exhibit 22 -- was

6      something that you discussed with Mr. Dyer in or about

7      November of 1999, is that correct?

8          A    I never discussed it with Mr. Dyer, I knew that Mr.

9      Dyer had discussed it, he was talking about a discussion he

10     had had with Mr. VonStrasdas about it and it was expressing

11     his displeasure.

12         Q    To you?

13         A    In general, about it.

14         Q    Okay, and was he talking to you when he expressed

15     this --

16         A    He was speaking to me, yes.

17         Q    Okay, and at that time did he say anything about

18     the legitimacy of the investment that was described in the

19     executive summary?

20         A    No, he thought that the information was, in no way,

21     truthful.  In other words, it was -- not that it was false

22     but it was, you know, it was not -- it was just out there, I

23     mean, he was flabbergasted by it, would be a better choice of

24     words.

25         Q    Was he expressing doubt that that was the way in

Diversified Reporting Services, Inc.
(202) 296-9626

146

1    which the money was invested?

2         A    No, I think he was -- it never was the discussion

3    as to the way the investment was invested.   Evidently there

4    was some agreement between Mr. Dyer and Mr. VonStrasdas'

5    companies or whatever they did to get these returns but he

6    was just mad at how they were described.

7         Q    Okay, and what was it about the description -- and

8    feel free to take -- to turn back to Exhibit 22 -- that

9    flabbergasted Mr. Dyer?

10        A    Well, I think it was salacious.   In other words, it

11   was overly -- it's not correct grammar, it's just overly --

12   you know, it references things not in the correct context, it

13   defines things not as they are.   A good example is, you know,

14   "Custodian", when there's a -- you know, when you have a bank

15   account in a place, I don't know that you could describe that

16   as a custodial relationship.   I think it was his aggressive

17   use of the English language but again, that is conjecture on

18   my part.

19        Q    Okay.   What about the actual description of how the

20   rate of return was made on the investment?

21        A    We never discussed the particulars in it, only that

22   he was surprised at the nature and the language in the piece.

23        Q    Did he speak to you at all about this being the

24   manner by which Mr. VonStrasdas was investing funds for

25   Resource "F"?

1       A    No, he did not.  Again, this came up much later

2    than -- it is included here in an offering memorandi, it was

3    never included in offering memorandi and myself only knew of

4    its existence about six months into my employment.  The fund

5    had been going on for approximately a year, year and a half

6    so in my opinion, the investment vehicle and its description

7    here were two separate things.

8              MR. QUINTERO:  I see.

9                        (SEC Exhibit No. 93 was marked

10                       for identification.)

11             MR. QUINTERO:  Mr. Lorusso, I hand you a copy of a

12   document that has been marked as Exhibit 93.

13             Mr. Murray it's the only copy I have for the two of

14   you so afraid you'll have to look on there.

15             Directing your attention specifically to page four

16   of Exhibit 93, these appear to be wire transfer statements.

17             MR. MURRAY:  One, two, three, four.

18             BY MR. QUINTERO:

19       Q    Specifically, to the second transaction that's

20   enumerated in the amount of $45,000, do you see that, Mr.

21   Lorusso?

22       A    Yes, I do.

23       Q    And taking a look at that, it's dated January 27th,

24   2000 and the origin on that is from a FleetBank account,

25   Michael Lorusso, 440 Commercial Street, Boston, going to Wall

1    Street Scuth Corp. and it goes "Barclays Bank", what is that

2    wire?

3        A    It appears to be a wire from a bank account that I

4    had, I don't have any information here about that, I can

5    research it and get back to you.

6        Q    Why did you wire it?

7        A    Again, what's the date of the wire?

8        Q    "January 27th, 2000" is what it states.

9        A    A year and a half ago.  I don't know, off the top

10   of my head and I'm not being evasive, the manner of which I

11   sent that so --

12       Q    Do you routinely forget what you did with $45,000?

13       A    No, I don't.

14       Q    What was the purpose of wiring it, then, to Wall

15   Street South?

16       A    Again, I don't recollect, I would have to review my

17   records.

18       Q    And what records do you have on this transaction?

19       A    I would have my bank statements and other things.

20   The information that I prepared into coming here and I

21   thought I prepared very well, was information specific to the

22   Resource "F".  Now, with regards to Resource "F", I prepared

23   and have provided you all the information.  In my opinion,

24   this is not a Resource "F" transaction and I am not prepared

25   at this time to speak to that.

1              MR. GILMAN:  Do you wire transfer funds out of your

2       account --

3              MR. MURRAY:  Excuse me.  I know that you're

4       authorized to ask questions --

5              MR. QUINTERO:  Mr. Gilman --

6              MR. MURRAY:  -- under this appointment.  I didn't

7       see his name.

8              MR. GILMAN:  Yes, I'm also -- I've been --

9              MR. MURRAY:  I didn't see his name on the

10      appointment sheet.

11             MR. QUINTERO:  If it's not --

12             MR. GILMAN:  It's been amended, I just received a

13      copy of it.

14             MR. QUINTERO:  And Mr. Gilman, as I represented at

15      the outset, is an officer of the Commission for the purpose

16      of the proceeding, which would entitle him to ask questions.

17             MR. MURRAY:  Well, let me think.

18             MR. GILMAN:  Well, we --

19             MR. MURRAY:  I know you gave me this for -- I mean,

20      I'm sure he can ask the same question for you.

21             THE WITNESS:  I think I've answered the question.

22      In other words, I'm not being evasive, I'm happy to speak to

23      that, I don't have that information today.

24             BY MR. QUINTERO:

25      Q     Who did you send it to?

1        A     I'm happy to speak to that, I don't have that

2    information today, I prepared --

3        Q     Do you know who you sent it to?  That's a "Yes" or

4    "No" question.

5        A     I can only repeat what I stated before.

6        Q     Which is?

7        A     I prepared for the information based on the

8    subpoena and the subsequent documentation, I have answered

9    very fairly, to you, all the questions.  That is not a

10   Resource "F" transaction.  I'm sure I have knowledge and

11   backup on that but I don't have it with me today, nor do I

12   recollect it off the top of my head.

13       Q     Is it your testimony that you do not know who you

14   sent the $45,000 to?

15             MR. MURRAY:  That's not his testimony.

16             MR. QUINTERO:  I'm asking you if it is your

17   testimony.

18             THE WITNESS:  That is not my testimony.

19             BY MR. QUINTERO:

20       Q     Do you know who you sent the $45,000 to?

21       A     I did not prepare --

22       Q     I understand you did not prepare, I've heard that

23   answer about four times now.  I'm asking you to respond to

24   the question I posed to you, which is, who did you send the

25   $45,000 to?

151

1          MR. MURRAY:  I'm going to direct you not to answer

2     that question.  Maybe we should call a judge.

3          MR. QUINTERO:  On what grounds.

4          MR. MURRAY:  It has nothing to do with Resource

5     "F", he's already testified to that.

6          BY MR. QUINTERO:

7     Q    Under whose control is the Wall Street South

8     account that this money was wired to?

9     A    I have no knowledge of whose control Resource "F"

10    South is -- Wall Street South is.  I'm sorry.

11    Q    Do you make it a practice of wiring funds to

12    accounts which you don't know who it belongs to?

13    A    That's a flip answer and no, I don't.

14    Q    So then are you then refusing to answer my

15    question, which is, who did you wire the $45,000 to?

16         MR. MURRAY:  I'm directing him not to answer that

17    question until he has an opportunity to go over it with me.

18         THE WITNESS:  I'm not refusing to answer the

19    question, I'm saying that I don't have the knowledge base to

20    answer that question today.  There's a distinct difference,

21    sir.

22         BY MR. QUINTERO:

23    Q    Did you receive any returns based on this $45,000

24    that was wired to this particular account?

25    A    I don't have that information in front of me, sir.

152

1        Q    I'm not asking you how much you received, I'm

2    asking whether you received any funds?

3        A    I don't know.

4             MR. GILMAN:  Can we take a break for just two

5    minutes and --

6             MR. QUINTERO:  Sure.

7             MR. MURRAY:  Sure.

8             MR. QUINTERO:  We'll go off the record at 3:50 p.m.

9             (Whereupon, at 3:50 p.m., a brief recess was

10   taken.)

11            (Whereupon, at 4:02 p.m., the examination was

12   resumed.)

13            MR. QUINTERO:  Back on the record at 4:02 p.m.

14            BY MR. QUINTERO:

15       Q    Before we begin, Mr. Lorusso, I just wanted to

16   confirm with you that during our break, there were no

17   conversations between you and the staff concerning this

18   investigation, is that correct?

19       A    That's correct.

20            MR. QUINTERO:  Mr. Murray, is that correct.

21            MR. MURRAY:  That's correct.

22            MR. QUINTERO:  I just want to put before both of

23   you the Supplemental Order designating an additional officer

24   which authorizes Mr. Gilman to be an officer of the

25   Commission for the purposes of the Resource "F", LLC

Diversified Reporting Services, Inc.
(202) 296-9626

153

1    investigation.

2         (Pause)

3         THE WITNESS:  Dated March 16th?

4         MR. QUINTERO:  After seeing the Supplemental Order,

5    Mr. Murray, do you have an further objection to Mr. Gilman

6    posing any questions to Mr. Lorusso?

7         MR. MURRAY:  Absolutely not.

8         MR. QUINTERO:  Very good.

9         MR. QUINTERO:  I believe, before we took our break,

10   Mr. Murray, that you had instructed Mr. Lorusso not to answer

11   a line of questions, is that correct?

12        MR. MURRAY:  As a response to his reply to you that

13   that particular transaction, that he is going to have to make

14   his own inquiry -- personal inquiry of but that he did not

15   believe that it related to Resource "F", I directed him not

16   to answer the question.

17        MR. QUINTERO:  And what is the basis of that

18   objection?

19        MR. MURRAY:  Well, it goes beyond the scope of this

20   investigation.

21        MR. QUINTERO:  Is it beyond the scope of the Formal

22   Order of Investigation?

23        MR. MURRAY:  That's correct.

24        MR. QUINTERO:  And -- okay, Mister --

25        MR. MURRAY:  If, upon his review of his records --

Diversified Reporting Services, Inc.
(202) 296-9626

154

1          MR. QUINTERO:  Certainly.

2          MR. MURRAY:  -- he determines that it does relate

3    to Resource "F", we will so notify the SEC and we'll make him

4    available for further inquiry.

5          BY MR. QUINTERO:

6    Q    Mr. Lorusso, I --

7    A    Yes, sir?

8    Q    Oh, were you going to say something?

9    A    No, I was just reaffirming Mr. Murray's assertation

10   (sic).

11         MR. QUINTERO:  Okay, very well.

12                        (SEC Exhibit No. 91 was marked

13                        for identification.)

14         MR. QUINTERO:  Let me hand you a document that has

15   been marked as Exhibit 91, it is a "Dear Client" letter, on

16   Resource "F" letterhead of the Palm Beach Office, dated

17   January 8, 2001 from Voldemar VonStrasdas.  I direct your

18   attention specifically to the signature line which has him as

19   Co-managing member, Resource "F", Wall Street South.

20         THE WITNESS:  Okay, I see that here, yes.

21         BY MR. QUINTERO:

22   Q    Have you seen this letter before?

23   A    No, I have not.

24   Q    Prior to seeing this letter, did you understand

25   there to be any connection between Mr. VonStrasdas and Wall

155

1    Street South?

2         A    No, I did not.

3                        (SEC Exhibit No. 82 was marked

4                        for identification.)

5         MR. QUINTERO:  I hand you a copy of a document that

6    has been marked as Exhibit 82.  I direct your attention to

7    the transaction dated December 4th, '98 and December 9th, '98

8    where it says, "Credit Advice".

9         THE WITNESS:  Yes, that appears to be a Barclays

10   Antietam Bank statement.

11        BY MR. QUINTERO:

12        Q    Yes and specifically -- I'm sorry, if I could just

13   take a look at that, where it states "Ellison in, three

14   fourteen, comma, nine, nine zero, $314,990", do you see that?

15        A    Yes, I do.

16        Q    And do you see, underneath that, December 9th, '98,

17   "Debit Advice, 300,000, Ellison to 'W'" and then underneath

18   that, it says "Wall Street S-O-U"?

19        A    Yes, I do.

20        Q    And was Mr. Ellison a client of Resource "F"?

21        A    That's correct.

22        Q    And what was the amount of his investment?

23        A    On the GMAG, Exhibit 85 --

24        Q    Yes.

25        A    -- it shows that he has a $300,000 investment.

156

1       Q     And that matches the $300,000 that was sent to Wall

2    Street South for a Mr. Ellison, according to Exhibit 82?

3       A     Correct.

4       Q     Is this the first time that you've seen that funds

5    for Mr. Ellison were sent to Wall Street South?

6       A     Yes.   If you notice, that is a Barclays Antietam

7    statement, it doesn't have the remittance address but that is

8    delivered to Mr. Dyer's PO Box in Manchester By The Sea,

9    Massachusetts.

10      Q     Therefore, after seeing Exhibits 82 and the other

11   Exhibit with Mr. VonStrasdas' signature, Exhibit 91, does

12   that change your belief that there is no connection between

13   Resource "F" and Wall Street South?

14      A     I don't disagree that there may be a connection, I

15   don't know who the entities are, I don't know if it's a sole

16   proprietorship, I don't know -- I've previously stated I

17   don't know who Mr. Resteiner is but I need to research the

18   matter.   I'm happy to provide you the documentation in a

19   timely manner, I just am not prepared to speak about it now.

20           MR. QUINTERO:   Mr. Murray, as you can see, there

21   is, indeed, a connection between Wall Street South and

22   Resource "F", therefore bringing it under the scope of the

23   Formal Order which I remind you is extremely broad, as

24   construed by case law.   After examining that, do you still

25   have an objection --

                   Diversified Reporting Services, Inc.
                           (202) 296-9626

1    THE WITNESS:  I don't --

2    MR. QUINTERO:  Again --

3    THE WITNESS:  I'm not -- well --

4    MR. QUINTERO:  Do you still have or are you still

5 directing Mr. Lorusso not to answer my questions concerning

6 Exhibit 93?

7    MR. MURRAY:  As I stated to you, you know, these

8 are areas which obviously have just come to his attention

9 that relate to Resource "F", he and I have not had an

10 opportunity to go over his documents, which would have

11 required, I think, if he has documents that relate to that

12 particular transaction and to provide you copies of those

13 documents --

14    MR. QUINTERO:  And I certainly will --

15    MR. MURRAY:  -- and --

16    MR. QUINTERO:  -- make that request.

17    MR. MURRAY:  Okay, and you don't have to, we will

18 provide them if they exist but I haven't had the opportunity

19 to discuss that transaction with him and I would like to have

20 the opportunity to advise him, as is provided by the

21 regulations of the SEC.

22    MR. QUINTERO:  Well, with respect to that, Mr.

23 Murray and Mr. Lorusso, I'm certainly not asking for the

24 documents today and all I'm asking for today is, your

25 substantive testimony concerning Exhibit 93, which is within

158

1    the scope of the Formal Order.

2         THE WITNESS:  I do not doubt that your question is

3    within the scope of the Formal Order.  What I'm stating and

4    I'm stating this completely honestly, is, I don't have the

5    information at hand, either mentally or in documentation to

6    answer that question so I do not want to make a conjecture

7    answer.

8         MR. QUINTERO:  And I'm certainly not asking for

9    that, Mr. Lorusso so why don't we go through some questions,

10   since you seem to agree that we are within the scope of the

11   Formal Order and if there is a question I pose to you that

12   you cannot answer at this time because you do not know or do

13   not remember, you can state that, obviously, answer it any

14   way you'd like on the record but I do require a substantive

15   answer to my questions.

16        MR. MURRAY:  Well, let's take a break.

17        MR. QUINTERO:  We can go off the record at 4:12

18   p.m.

19        (Whereupon, at 4:12 p.m., a brief recess was

20   taken.)

21        (Whereupon, at 4:37 p.m., the examination was

22   resumed.)

23        MR. QUINTERO:  Back on the record at 4:37 p.m.

24        BY MR. QUINTERO:

25    Q    Before we continue, Mr. Lorusso, I just want to

                  Diversified Reporting Services, Inc.
                          (202) 296-9626

159

1    confirm with you that there have been no discussions between

2    you and the staff concerning this investigation, is that

3    correct?

4         A    There has been no discussions, yes.

5              MR. QUINTERO:  Mr. Murray?

6              MR. MURRAY:  That's correct.

7              MR. QUINTERO:  Turning your attention back to

8    Exhibit 93, Mr. Lorusso and the fourth page of that Exhibit,

9    specifically the second transaction from the top, which is

10   dated 27 January, 2000, which is a wire transfer of $45,000

11   originating with you, Mr. Lorusso, to a Wall Street South

12   account, it appears to be at Barclays Bank.

13             THE WITNESS:  I see that transaction.

14             MR. QUINTERO:  Okay.

15             BY MR. QUINTERO:

16        Q    Did you, in fact, make that wire transaction?

17        A    Again, I will stipulate that I don't have the

18   benefit of my records, as I thought the scope was particular

19   to the Resource "F" transaction.  I did make that

20   transaction, it was my understanding and again, Mr. Dyer was

21   having financial troubles, the Resource "F" Fund was winding

22   down, that that was going into a new fund, it was for the

23   creation of a new fund but again, I don't have -- I beg your

24   indulgence of not having much more further information but

25   I'm happy to try to answer --

Diversified Reporting Services, Inc.
(202) 296-9626

160

```
1      Q    Sure.

2      A    -- questions.

3      Q    That's fine, and was this your own personal money?

4      A    Yes.

5      Q    Did this new fund have a name?

6      A    No.

7      Q    And who was involved with this new fund?

8      A    Again, without the benefit of my information, I
9  can't -- I don't want to speculate.

10     Q    Was Mr. Dyer involved with it?

11     A    Mr. Dyer was not involved in the fund, it was not
12 Resource "F", it was not Resource "F", Alpha, it had no
13 involvement with Mr. Dyer.

14     Q    Was Mr. VonStrasdas involved with the fund?

15     A    I'd have to review my records to look at that.  I
16 know it was involved with the Wall Street South Corp. and
17 there's another group but again, I don't want to speculate.

18     Q    Another group --

19     A    I'm happy to --

20     Q    Another group of individuals, you're saying?

21     A    Yes, and I'm happy to provide that information to
22 you.

23     Q    Sure.  How did you first hear about this
24 investment?

25     A    I think it was derived from discussions with
```

Diversified Reporting Services, Inc.
(202) 296-9626

161

1    VonStrasdas, again, particular to the winding down of the

2    Dyer fund but that would be conjecture.

3        Q    Discussions that you had with Mr. VonStrasdas?

4        A    I believe it was discussions that I had, yes.

5        Q    Did you speak to anyone else about this investment?

6        A    Other investment managers or others, meaning the

7    general public?

8        Q    Did you speak -- well, I meant in connection with

9    your decision to invest.

10       A    Yes, but I don't have that information in front of

11   me, who that was.

12       Q    Was it more than one individual?

13       A    I believe it was, yes.

14       Q    Was it any of the individuals that we've talked

15   about today?

16       A    No, it was not.

17           MR. MURRAY:  Other than --

18           BY MR. QUINTERO:

19       Q    Other than Mr. VonStrasdas?

20       A    Other than Mr. VonStrasdas.  There have been

21   discussions about the performance all along and whether some

22   of it was mismanagement by Dyer -- these were sort of

23   conjecture things.

24       Q    Sure.

25       A    There was discussion of whether funds should be

162

1    placed in my custody.  The people were very happy with the

2    level of service that they got from me with regards to

3    answers and accounting so I was trying to replicate the back

4    office function if that was required for the new fund, it's

5    my -- that never came to fruition and I have to also state

6    that my hesitation is more of embarrassment than it is of

7    trying to provide obstacles to you in your investigation of

8    Mr. Dyer.

9         Q    Okay.

10        A    Mr. VonStrasdas.

11        Q    Understood.  Did anyone describe the investment to

12   you?

13        A    The description was less -- it was more implied, it

14   was along the lines of -- I had witnessed the 18 month return

15   on the Resource "F" Fund and it was described as being

16   similar but closer to the original source.

17        Q    What does that mean, "closer to the original

18   source"?

19        A    It wouldn't have involved the split by Dyer,

20   VonStrasdas and the management fee so that the return

21   would -- even though the return was the same, the return

22   would be greater --

23        Q    Okay.

24        A    -- in a sense.

25        Q    I see, so directing your attention back to Exhibit,

163

1    is it 85?

2        A    85, yes.

3        Q    For example, the one that's dated December of 1999,

4    where it states at the top, above the "Client Distributions"

5    portion, where it has the "0.59", which seems to indicate a

6    return of 5.9% per month --

7        A    That's correct.

8        Q    -- and whereas the clients were receiving what

9    appears to be, in this month, 4.56%.

10        A    Correct.  Yeah, they --

11        Q    So you're saying the spread between the two --

12        A    The spread was less, not the overall -- the overall

13    gain by the fund --

14        Q    Yes.

15        A    -- would be similar --

16        Q    Yes.

17        A    -- so at the time, it was very plausible.

18        Q    Right, so you, as the client closer to the source

19    here, would get something closer to it, in this case, the

20    5.9% as opposed to the 4.6?

21        A    Correct, because it was a very -- from a

22    bookkeeping side, it didn't require much of the -- in other

23    words, once percent or one point five percent of 10 million

24    was a lot of money just to --

25        Q    Perform these functions?

164

1    A    -- perform these functions.

2    Q    -- that you've been performing for some months?

3    A    Right.

4    Q    Okay, and you said that the investment never came

5  to fruition?

6    A    I received one check.

7    Q    Yes?

8    A    I believe somewhere between two and five thousand

9  dollars but again, I'm going to have to provide that

10 information to you.

11   Q    That's fine, and how did you receive that check?

12 Was it by a wire?

13   A    I believe it was by wire.

14   Q    And where did that wire come from?

15   A    The same place I sent the funds.

16   Q    And did it go to the FleetBank account that seems

17 to be referenced here in Exhibit 93?

18   A    Again, I'd have to check, it more than likely did

19 but Fleet changed to Sovereign and I wouldn't want to give

20 you incorrect information.

21   Q    Sure.  Did you receive any documentation in

22 connection with this investment?

23   A    No.

24   Q    So nothing similar to a private placement

25 memorandum that we'd seen before?

Diversified Reporting Services, Inc.
(202) 296-9626

1       A       No.  I took it on good faith of the relationships

2   of some of the people that I'd been doing business with and

3   based on the past performance of the funds.

4       Q       And in addition to Mr. VonStrasdas, who were some

5   of those people?

6       A       Again, off the top of my head, I can't say.

7       Q       Were they based in the United States?

8       A       I wouldn't speculate.  I -- with regards to your --

9   the -- what did you call this?  Not a subpoena but a --

10      Q       Formal Order?

11      A       No, actually the original subpoena.

12      Q       The subpoena, yes.

13      A       I will list the people who are not involved, just

14  so there's clarity.

15      Q       Okay.

16      A       Eric Resteiner, Miles Harbur, Dave Conary, George

17  Bathhurst, Brian West and Hufnagle were not so the named --

18  these named individuals were not part of the thing.

19  VonStrasdas may have been but certainly not -- as I stated

20  earlier, I had just recently learned of Mr. Resteiner's

21  either involvement or noninvolvement, I still don't know what

22  the correct description of Mr. Resteiner is or was.

23      Q       Did you speak to someone about the fact that you

24  only received one check in return for this investment?

25      A       I actually did not.  Mr. Dyer, I knew, was going

166

1    after Mr. VonStrasdas.  There was terrible, you know, ill

2    feelings.  I did speak to an attorney friend in Florida,

3    discussed --

4          MR. MURRAY:  Don't tell them about what you talked

5    with your attorneys about.

6          THE WITNESS:  No, no, no, no, but I mean I

7    discussed the possibility of engaging them in Florida, given

8    the origin of the documents, of looking for a correct --

9          MR. GILMAN:  Jurisdiction?

10         THE WITNESS:  At the beginning, it was a

11   jurisdictional issue --

12         MR. QUINTERO:  I see.

13         THE WITNESS:  -- and also, with regards to the

14   funds, the fact it didn't pay every month, didn't necessarily

15   mean that -- to me, that I had lost my money.

16         MR. QUINTERO:  Sure.

17         THE WITNESS:  And then when Mr. Dyer had engaged in

18   this and I knew Mr. Bathhurst had engaged the SEC, I felt

19   that it would hopefully come to a positive light.

20         BY MR. QUINTERO:

21    Q    Did you speak to any of the parties that were

22   connected to this investment about the fact that you haven't

23   received payments?

24    A    I think I sent one or two faxes but again -- and

25   this may or may not seem strange to you -- even when I was

1    employed and would speak very rarely to Mr. VonStrasdas, it

2    was very few and far between, you know, with regards to the

3    pages that came or with regards to our requests for more

4    information, they would come on Von time, not on -- he didn't

5    like it if you called him and asked him a question,

6    basically.

7        Q    Who did you send these faxes to?

8        A    I would have sent them to the Florida address.

9        Q    For Mr. VonStrasdas?

10       A    Yes.

11       Q    Okay.

12       A    The Palm Beach Post Office in Florida.

13       Q    And when did you send these faxes?

14       A    It would have been over the summer.

15       Q    Summer of 2000?

16       A    Yes, sir.

17       Q    Did you receive any response?

18       A    No.

19       Q    Did you ask for your money back?

20       A    He sent letters, very generic letters as -- you

21   don't have a copy of them here but they're generic in the

22   sense that I've seen some that you have that he says, "Dear

23   Client", da-da-da-da, and he basically had sent forms if you

24   wanted to add additional money, things like that.

25       Q    Right.  When was the last time you received any

Diversified Reporting Services, Inc.
(202) 296-9626

168

1    correspondence from the parties connected to this investment?

2         A    Eight months ago.

3         Q    And what was that communication?

4         A    There was a -- very similar to what I had done

5    before, there was -- which you don't have a copy of -- a

6    client form, it just listed a person's name and the return

7    sent to them for the year --

8         Q    Okay.

9         A    -- and then typically, a letter of promise, "Oh,

10   we're -- it's going to be great", you know, "Don't call me,

11   everything's great", you know, "We're going to be profitable

12   next month".

13        Q    Did anyone sign these letters -- that letter?

14        A    No, they were -- again, they were generic.

15        Q    So it was not signed by Mr. VonStrasdas?

16        A    No, and I'll do my best to cull my copies of those

17   letters and provide them to you.

18        Q    Okay, and you do have copies of those?

19        A    I may.

20        Q    Okay.

21        A    Again, I didn't -- in my opinion, when I came here

22   today, I didn't consider them in the scope of the Resource

23   "F" so I did not --

24        Q    Okay.

25        A    -- do that.

Diversified Reporting Services, Inc.
(202) 296-9626

169

1       Q     You mentioned that in terms of the return, it was

2    going to be similar to what you've been working on with

3    Resource "F".

4       A     Yes.

5       Q     What did you understand the actual investment to

6    be?

7       A     Again, it was less of me understanding what the

8    investment was, I was just happy to take the risk on the

9    return.

10      Q     Did anybody explain what the investment was, in any

11   way, to you?

12      A     Esoterically but never mechanically.

13      Q     And when you say "esoterically", could you describe

14   that for me?

15      A     Oh, an investment in double "A" or better

16   commercial paper that's traded simultaneously in Europe, kind

17   of.

18      Q     Was it similar to what you saw in the executive

19   summary that we looked at earlier in -- I believe it's

20   Exhibit 22?

21      A     Yeah, but no way in that detail and not, you know,

22   defining entities and other things but just basically looking

23   for quick high net transactions that could be entered into

24   and exited quickly.

25      Q     And at the time that you made the transaction, did

1    you tell Mr. Dyer you were entering into it?

2        A    No, I did not, I was ending my employment with Mr.

3    Dyer at the time.

4        Q    And did you, at some later point, inform Mr. Dyer

5    that you had made this investment?

6        A    Mr. Dyer became aware of, I believe, my investment

7    but I've never spoken to Mr. Dyer on this issue.

8        Q    And how did he become aware of it?

9        A    I don't know.  I believe -- I have hearsay

10   knowledge that he said, through another person, another

11   person that he thought I had invested in his term, directly

12   with Von.

13       Q    And you mentioned, on several occasions, documents

14   that you have that you would go back and look at.

15       A    Yes, sir.

16       Q    What are those documents?

17       A    Oh, along the same lines as nothing more than the

18   monthly statement, which I may or may not have because the

19   information didn't change so I don't know that I've archived

20   them, so to speak and then also a client letter and again,

21   I'm happy to, given reasonable time, produce those for you.

22       Q    And how is it that those documents -- how will they

23   refresh your memory as to who else was involved besides Mr.

24   VonStrasdas?

25       A    There's other documents of personal notes I made

Diversified Reporting Services, Inc.
(202) 296-9626

171

1    when I was considering the investment.

2         Q    Okay, so I'll try to ask a global question then.

3    What documents do you have that's in any way connected to

4    your $45,000?

5         A    I have the client statements.

6         Q    Okay.

7         A    I have the client statements, I probably have the

8    handwritten wire transfer sheet, okay, you already have the

9    summary of that.  I have the front page or the blurb of the

10   statement and that set may not be inclusive.  In other words,

11   I haven't lived where he's been sending the stuff for nine

12   months so some of it may have been lost or destroyed or

13   sitting there --

14        Q    Okay.

15        A    -- and I probably have some information with

16   regards to my thought process and data collection about the

17   investment.

18        Q    Notes that you took?

19        A    Yes.

20        Q    They'd be handwritten notes?

21        A    Probably handwritten notes.

22        Q    Did you type them up?

23        A    No.

24        Q    Anything else?

25        A    No.  I mean, a very -- again, I was familiar with

Diversified Reporting Services, Inc.
(202) 296-9626

172

1      the transactions, wasn't -- you know, Mr. Bathhurst and some

2      of the other people who had been doing similar things with

3      Mr. Dyer, it was sort of a friendly group, it wasn't a -- you

4      didn't want to paper people to death.

5           Q      Sure.  Was Mr. Bathhurst involved --

6           A      No.

.7          Q      -- with this?  Was Mr. Wadsworth involved?

8           A      No.

9           Q      Is there anyone by the name of "Clifton" involved?

10          A      No.

11          Q      Did you have any meetings -- I'm sorry.  Were you

12     going to say something?

13          A      I just wanted to know who Clifton was so if I --

14                 MR. MURRAY:  Well, when he's answering, it's clear

15     to you that he's saying he's not aware of whether they were

16     involved, they could have participated in --

17                 MR. QUINTERO:  Oh, absolutely.

18                 THE WITNESS:  Right.

19                 MR. MURRAY:  -- Wall Street South.

20                 MR. QUINTERO:  This is obviously it's always based

21     on your knowledge.

22                 THE WITNESS:  Right.

23                 MR. QUINTERO:  I mean, that goes without saying.

24                 THE WITNESS:  No, I was only asking if you gave me

25     the full name and the relationship.  In the course of my

173

1    looking, I might be able to assist you in the --

2              MR. QUINTERO:  I just have the name, "Clifton",

3    that's why I was just asking about that.

4              THE WITNESS:  Okay.  No, I've never heard the name,

5    "Clifton".

6              MR. QUINTERO:  Okay.

7              BY MR. QUINTERO:

8         Q    Did you have any meetings with any of those people

9    involved in this investment, other than Mr. VonStrasdas?

10        A    No.

11        Q    Phone conversations?

12        A    Probably phone conversations and fax transmissions.

13        Q    Okay, and would those fax transmissions be part of

14   the documents that you still retain?

15        A    Yes, possibly.

16        Q    And you mentioned that some of these communications

17   may have gone to a prior address, is that an address here in

18   Massachusetts?

19        A    That would be the address at 440 Commercial Street,

20   the stated address.  I live in Washington, D.C. now.

21        Q    Yes, that's right.  Okay.  Did you fill out any

22   subscription agreement or investor questionnaire in

23   connection with this investment?

24        A    No.

25        Q    And when was the last time you received any

                Diversified Reporting Services, Inc.
                        (202) 296-9626

174

1    payments?

2        A    I want to say at least a year but I mean, a generic

3    year.

4            MR. QUINTERO:  Okay.  We'll just go off the record

5    at 4:52 p.m.

6            (Whereupon, at 4:52 p.m., a brief recess was

7    taken.)

8            (Whereupon, at 5:02 p.m., the examination was

9    resumed.)

10           MR. QUINTERO:  Back on the record at 5:02 p.m.

11           BY MR. QUINTERO:

12       Q    Again, Mr. Lorusso, before we continue, I just

13   wanted to confirm that during our break, there were no

14   communications between you and the staff concerning this

15   investigation, is that correct?

16       A    That's correct.

17           MR. QUINTERO:  Mr. Murray, is that correct?

18           MR. MURRAY:  That's correct.

19           MR. QUINTERO:  You testified earlier about the

20   executive summary found in Exhibit 22 and Mr. Dyer's reaction

21   to it.

22           THE WITNESS:  I had previously stated that Mr. Dyer

23   had a strong negative reaction to the executive summary in

24   Exhibit 22.

25           MR. QUINTERO:  Yes.

1           THE WITNESS:  Remembering from my recollection --

2           MR. MURRAY:  He hasn't asked you a question yet.

3           THE WITNESS:  No, no, no but it was not included in

4     the --

5           MR. MURRAY:  I --

6           THE WITNESS:  -- in your Exhibit 22, it is included

7     in the offering memorandum.

8           MR. QUINTERO:  Yes.

9           THE WITNESS:  In any of the offering memorandum in

10    the office of Resource "F", Bunker Hill, 440 Commercial, one

11    whatever place, these were not part of the offering

12    memorandum.

13          MR. QUINTERO:  Okay.

14          BY MR. QUINTERO:

15    Q     But that communication with Mr. Dyer occurred prior

16    to your decision to invest, is that correct?

17    A     I actually don't recollect but the executive

18    summary issue was one that Chuck had a strong reaction to

19    because of who -- from a standpoint of did not feel that this

20    was at all a good way to talk about from a marketing

21    standpoint, it really wasn't a discussion of a damning of the

22    ideals, it was just a --

23    Q     So it was form?  He was objecting to the form

24    rather then the substance of it so much?

25    A     I don't want to speak for Mr. Dyer --

                    Diversified Reporting Services, Inc.
                           (202) 296-9626

176

1    Q    Okay.

2    A    -- but --

3    Q    Now, you mentioned that -- going back to the

4    investment that you made in January 2000 -- that that was

5    described to you in what you termed "esoteric terms" having

6    to do with Double "A" commercial paper and the like --

7    A    Yes.

8    Q    -- and you understood that to be similar to the

9    manner in which Mr. VonStrasdas or others were making money

10   for Resource "F"?

11   A    That's correct.

12   Q    And when did you come to that conclusion?

13   A    That was what was stated to me, that it was similar

14   in fashion, to use that wording, to the way the investments

15   were carried out for Resource "F".

16   Q    And when did you learn that?

17   A    That was what I was told.

18   Q    When did you learn that?

19   A    Prior to investment.

20   Q    Approximately when?

21        MR. MURRAY:  In calendar when?

22        MR. QUINTERO:  Yes.

23        THE WITNESS:  January or February.

24        BY MR. QUINTERO:

25   Q    Well, you made the investment, looks like January

Diversified Reporting Services, Inc.
(202) 296-9626

177

1    27th, 2000 is when the wire went through, is that correct?

2         A    In January.

3         Q    Okay.

4         A    In January.

5         Q    So prior to January, then, is it still your

6    testimony that you did not know how the money was being

7    invested to get the rate of return that the investors enjoyed

8    in Resource "F"?

9         A    Well, I -- and I'm going back to my original

10   testimony, I still don't know how the money was made at

11   Resource "F" nor do I know the mechanics of how the money was

12   made in the alternate investment vehicle.

13        Q    Okay.  In terms of what anyone may have told you,

14   not necessarily whether it was, in fact, the truth in terms

15   of "If we somehow get to the bottom of this", what exactly

16   was going on but did you have any understanding, true or not,

17   as we sit here today, but did you have understanding at the

18   time as to how the rate of return for these investors in

19   Resource "F" was obtained?

20        A    Based on that question, no.  I basically looked at

21   the overall return that was garnished since the beginning of

22   the fund, 18 months and again, I'll have to refer back to my

23   records but overall it was a risk reward issue.

24        Q    Okay.  Let me ask it a different way then.

25        A    Okay.

178

1      Q      You described the manner in which these parties in

2    the alternate investment described how they would make money

3    on the investment, is that correct?

4      A      Correct.

5      Q      Did you hear a similar description of how Resource

6    "F" made its money?

7      A      No, I did not.

8      Q      And when was the first time that anyone

9    communicated to you in any fashion that that was the way in

10   which Resource "F" made its money?

11     A      I think it was implied, I don't think anyone stated

12   but if it was a date, it would have been that January date.

13     Q      So is it still your testimony that you had no clue

14   whatsoever or no representations have been made to you

15   whatsoever as to how money was being made in Resource "F"?

16     A      That's correct.  Again, the Resource "F" was formed

17   and funded, although not fully, prior to my arrival.  Under

18   my stewardship, I was required to keep track of the client

19   distribution portion, the funds came in from GMAG, which was

20   listed as the co-managing member of the fund, none of these

21   things I found to be worthy of scrutiny, as I was not an

22   investor at that time nor was I subsequently an investor in

23   Resource "F".

24     Q      Uh-huh.

25     A      Only when I did research and considered a risk

179

1    reward relationship to join the alternate investment, did I

2    learn a little more and again, it was very esoteric.

3        Q    Okay, and again, just talking about all the

4    documents you have, connected to the alternate investment

5    that you'd made, were those --

6            MR. MURRAY:  Potentially may have.

7            THE WITNESS:  Right.  No, well, go --

8            MR. GILMAN:  No, let him ask him ask the question.

9            MR. MURRAY:  That's what I said to him outside, I

10   said, "You seem to leave the impression that you have these

11   and you haven't" --

12           THE WITNESS:  No, I said I may.

13           MR. QUINTERO:  Well, I think you may have some of

14   them but my understanding was that you did have some.

15           THE WITNESS:  I may have some of them and the

16   things that I may have include a client statement, a client

17   letter, those type of documents.

18           BY MR. QUINTERO:

19       Q    Okay and now that we're able to take some time to

20   discuss the investment, do you have any current memory as to

21   who else was involved besides Mr. VonStrasdas?

22       A    No, I do not at this time.

23       Q    Any first names?

24       A    I know it's not the people listed in that section

25   but without refreshing my memory, looking at my notes, I

180

1    don't.

2        Q    Did you have any communications with anyone other

3    than Mr. VonStrasdas?

4        A    Again, I'd have to look at my notes.  I had

5    communications with Mr. Bathhurst, some other people who were

6    talking about alternate investments, Mr. Letts, some other

7    people but again, a lot of these didn't come to fruition so I

8    don't want to give you people's names where we discussed

9    things but didn't come to fruition and have you think that

10   they were part of another investment.

11       Q    Okay.  I believe you had used those words in

12   connection with this investment you did make, that it didn't

13   come to fruition, what do you mean by that?

14       A    Well, I use that term rather flipply.  In other

15   words, I invested in it, it certainly did not mirror the

16   return that Resource "F" had.

17       Q    Okay, 'cause it only lasted for one or two

18   payments?

19       A    I believe it was one and it was the first one, then

20   you know, it was just letters and again, I may have them.

21   When there was no information in them, I may have discarded

22   them.

23       Q    Were there any other investors in this alternate

24   investment?

25       A    It was my understanding there were many investors,

181

1    I don't know any of them by name.

2        Q    Were there representations made to you as to how

3    many investors there were?

4        A    No, it was talking about a total value of the fund.

5        Q    And what was the total value of the fund?

6        A    I want to say 350 million but again, that would be

7    pure conjecture, that's just something I recollect.

8        Q    And was that communicated to you orally?

9        A    I believe there's some notation in the

10   documentation I received, trying to reach a certain dollar

11   threshold level with the investors but also I don't know if

12   there were ten ten million dollar investors, or two hundred

13   and fifty thousand one dollar investors or --

14       Q    With respect to the 350 million dollar figure, was

15   that the goal of the fund or was that how much the fund had

16   raised up to date?

17       A    I would have to refresh my memory with the notes.

18       Q    Okay.  In your communications with Mr. Dyer about

19   Resource "F", did he, at any time, use the words "prime bank"

20   in connection with Resource "F"?

21       A    No.

22       Q    Did he ever use those words at all with you during

23   your tenure?

24       A    He did speak of that once or so but it was not in

25   conjunction with Resource "F".

182

```
 1        Q    What was it in conjunction with?

 2        A    It was just in a discussion with someone else, I

 3   don't know the context.

 4        Q    So it was a conversation that you overheard?

 5        A    I overheard, yes.

 6        Q    And what was he saying on his end about prime

 7   banks?

 8        A    I don't know, I just recollect the word.

 9        Q    Are you aware of an entity called "Osaka, Limited"?

10        A    No.

11        Q    Are you aware of an entity called "Telogy Network"?

12   Telogy, T-E-L-O-G-Y?

13        A    I know Teligent, I don't know Telogy.

14        Q    Are you aware of an entity called "Swiss Asset

15   Management"?

16        A    No.

17        Q    Are you aware of an entity called "Euro,

18   Caribbean"?

19        A    No.

20        Q    Are you aware of an entity called "Euro, Asia"?

21        A    No.

22        Q    Are you aware of an entity called "Seabreeze"?

23        A    No.

24        Q    Now, just directing your attention away from this

25   investment, just back to sometime in the summer of 1999 --
```

183

1      A    Okay.

2      Q    -- did you receive $20,000 from Mr. Dyer on or

3   about August 20th, 1999?

4      A    It was used to pay off a gentleman named "Jack

5   Pough.  Mr. Dyer did not have the funds, I paid Mr. Jack

6   Pough $20,000 which I have a letter and -- or a cancelled

7   check from and Mr. Dyer paid me back the $20,000.

8      Q    Who is Mr. Pough?

9      A    He was somebody who he owed money to, particular to

10  a real estate investment and again, as that was my area of

11  expertise', he allowed me to work and to work out -- he

12  basically stated numerous times that he was tired of the

13  rhetoric that Mr. Dyer was giving him and would not deal with

14  Mr. Dyer so he wouldn't even take on of Mr. Dyer's checks,

15  for example because people -- himself has had Mr. Dyer's

16  check and they were deemed worthless, in his opinion.

17     Q    So then you gave Mr. Pough $20,000 in repayment for

18  Mr. Dyer, then Mr. Dyer reimbursed you, is that how it

19  worked?

20     A    That's correct.  There was no fee or other

21  enhancement to the transaction.  That's Mr. Jack Pough of

22  Dallas, Texas, if you --

23     Q    Okay.  Just moving back to the Alpha fund and you

24  mentioned that it was turned over to Haynes and Boone in

25  Dallas, the law firm?

Diversified Reporting Services, Inc.
(202) 296-9626

184

1      A     The person who created or document with the term

2  "Alpha fund" on it was Haynes and Boone.

3      Q     Okay, and why did Mr. Dyer go to a law firm all the

4  way in Dallas?

5      A     He had a relationship with them, he had a number of

6  friends, a former friend is Mr. Pough but also some other

7  friends in the Dallas area, they had suggested that he use

8  this firm.  He often -- I used the term before, "FOC",

9  "Friends of Chuck", he basically spent half of his day

10 talking to his Harvard Business School classmates and so he

11 would get ideas and advice on issues from his Harvard

12 Business School classmates so if they said to use this firm,

13 he would use that firm.

14         COURT REPORTER:  One moment for a tape change.

15         (Pause)

16         COURT REPORTER:  Please continue.

17         BY MR. QUINTERO:

18     Q     Okay, Mr. Lorusso, have you ever been named as a

19 defendant in a civil lawsuit relating to the federal or state

20 securities laws?

21     A     No.

22     Q     Have you ever been named as a defendant or a

23 respondent in an action brought by the SEC, any other federal

24 government agency, any state securities or corporate agency,

25 any stock exchange or the National Association of Securities

1    Dealers?

2        A     No.

3        Q     Prior to today, have you ever testified in an

4    investigation by the SEC, any other federal government

5    agency, any state securities or corporate agency, any stock

6    exchange or the National Association of Securities Dealers?

7        A     No.

8        Q     Have you ever testified in any civil or criminal

9    proceeding relating to federal or state securities laws?

10       A     No.

11       Q     Have you ever held any professional licenses?

12       A     No.

13       Q     Including real estate licenses?

14       A     No.

15       Q     Have you ever been indicted, convicted or pled

16   guilty to a crime other than a traffic offense?

17       A     No.

18       Q     With the exception of the communication with Mr.

19   Dyer and any communications with counsel, have you had any

20   communications with anyone concerning this investigation?

21       A     Since being contacted by the SEC, I have had no

22   communications with anyone except for Mr. Dyer and counsel.

23       Q     You've had communications concerning this

24   investigation other than with Mr. Dyer and counsel, though,

25   prior to being contacted by the SEC?

186

1       A    Not -- in other words, not -- I've had

2  communications with people, do you mean a different time

3  frame?

4       Q    Well, let me ask you this.  When did you learn of

5  the existence of the SEC investigation?

6       A    When I received a notice on my e-mail to contact an

7  attorney.

8            MR. QUINTERO:  Okay.

9            MR. MURRAY:  When did the investigation begin?

10           THE WITNESS:  Yeah, I don't -- I have no knowledge

11  as to when the investigation began, that's my --

12           MR. QUINTERO:  I understand.  No, I'm just saying

13  maybe if you had learned that from communication you had with

14  somebody.

15           THE WITNESS:  No.

16           MR. QUINTERO:  Okay.

17           All right, Mr. Lorusso, I have no further questions

18  for you at this time.  We may, however, call you again to

19  testify in this investigation, however what I would like to

20  do is obtain the documents that you spoke of in connection

21  with your $45,000 investment in that alternate investment.

22           BY MR. QUINTERO:

23       Q    Is that something that you would be willing to

24  provide?

25       A    Two weeks' time?

                    Diversified Reporting Services, Inc.
                            (202) 296-9626

1        Q        Where would the documents be located?

2        A        Since I moved, I don't know where they

3    would -- that's my problem.  In other words, they may be in a

4    box somewhere, unmarked box.  If you provide a reasonable

5    time frame and I can look for them, I can, you know -- first

6    of all, I know I probably have something, I don't know what

7    it is but you know, a week or two, I'm happy to provide.

8             MR. QUINTERO:  Okay, if we could do one week just

9    because of the expedited nature of our investigation.

10            THE WITNESS:  How about the -- not a week from

11   Friday but a week from the next Monday?

12            MR. MURRAY:  Well --

13            THE WITNESS:  Give me two weekends -- this gives me

14   two weekends to look.

15            MR. QUINTERO:  Sure, why don't we do this?  Why

16   don't we make contact -- I'll make contact with Mr. Murray

17   towards the latter part of next week and obviously if you get

18   it before then, that would be fine but what I'll do is, I'll

19   follow this up in writing with a request pursuant to

20   subpoena --

21            THE WITNESS:  Sure.

22            MR. QUINTERO:  -- 'cause that's the way we do

23   it --

24            THE WITNESS:  Right.

25            MR. QUINTERO:  -- on this but I'll set a date --

188

1    THE WITNESS:  I'll provide best efforts to --

2    MR. QUINTERO:  Sure.

3    THE WITNESS:  -- do that but two weekends provides

4    me more time to rummage through boxes.

5    MR. QUINTERO:  Okay, and what we may do also is

6    that to the extent that the documents you provide may provide

7    further questions, we may go ahead and call you back in on

8    that or make some sort of arrangements to get you on the

9    record.

10    THE WITNESS:  Yeah, my preference, due to my

11    distance, I'm happy to appear at the SEC office which is ten

12    feet from my office, which is an offer I made before or

13    telephonically or some other way.

14    MR. QUINTERO:  Okay, well, we can talk about it if

15    we --

16    THE WITNESS:  Right.

17    MR. QUINTERO:  -- get to that stage, how we do it

18    but in any event, I just wanted to let you know that that's a

19    possibility and if we do all this, I'll make the contact

20    through Mr. Murray.

21    THE WITNESS:  Yes, all contact should made through

22    my attorney.

23    MR. QUINTERO:  Obviously.

24    BY MR. QUINTERO:

25    Q    Mr. Lorusso, do you wish to clarify anything or add

189

1    anything to the statements you've made here today?

2    A    My only concern about the documentation is that it

3    is not in a format that we used or provided to clients so I

4    need to make sure that you understand that.

5    Secondly, reviewing the -- where's that one page?

6    I'm looking for the little one page one.  Oh, with regard to

7    our earlier questions about Exhibit 1676, that's the

8    accountant's compilation letter" --

9    Q    Oh, Exhibit 34.

10    A    Excuse me, yeah.  I noticed at the top, which I did

11    not notice before, that it says, "Draft" on the top.

12    Q    Yes.

13    A    That this was not a copy that was mailed.  Again, I

14    don't recollect it being like this, it may have been mailed

15    to Resource "F" or this may be for another one of Mr. Dyer's

16    entities --

17    Q    Okay.

18    A    -- but I just want to note that previously I had

19    not noticed the "draft" on the top.  This was evidently

20    attained from Grant, Thornton directly, as opposed to a true

21    copy of something received by Mr. Dyer's firm.

22    Q    Okay, and did Mr. Dyer have an entity called

23    "Antietam", other than the one associated with the bank

24    account in the Bahamas?

25    A    I know very little about Antietam but I know that

Diversified Reporting Services, Inc.
(202) 296-9626

190

1    it has a bank account in the Bahamas, I don't know any of its

2    assets.

3              MR. QUINTERO:  Okay, and Mr. Murray, do you wish to

4    ask any clarifying questions?

5              MR. MURRAY:  The only thing I want to reiterate is

6    that he did state that he may have received these documents,

7    whether he still has them or not --

8              MR. QUINTERO:  Well, I believe he testified he did

9    receive them, it's a question of --

10              MR. MURRAY:  That's right.

11              MR. QUINTERO:  -- whether he still --

12              MR. MURRAY:  Whether he still has them and I know

13    that he is basically in four different locations at this

14    point, his personal papers so it would be difficult for

15    him to --

16              THE WITNESS:  As a matter of record, I live with my

17    brother and don't have my own home so I don't have a place to

18    store personal documents so there might be a myriad of places

19    but I'm happy to provide best efforts.

20              MR. MURRAY:  His family sold the building and

21    they've been moving stuff out while he's been away and --

22              THE WITNESS:  Who knows where anything is?

23              MR. QUINTERO:  Off the record at 5:23 p.m., March

24    23rd, 2001.

25    (Whereupon, at 5:23 p.m., the examination was concluded.)

Diversified Reporting Services, Inc.
(202) 296-9626

192

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS    )
                                )    SS.
COUNTY OF MIDDLESEX             )

I, Ronald E. Blackwell, a Court Reporter and Notary

Public within and for the Commonwealth of Massachusetts, do

hereby certify that there came before my representative, ELAINE

HORAN-RATCLIFFE, on March 23, 2001, the person hereinbefore

named, who was duly sworn to tell the truth, the whole truth, and

nothing but the truth, concerning and touching the matter in

controversy in this cause; that MICHAEL LORUSSO was thereupon

examined upon oath and his examination reduced to typewriting by

me and that this Deposition transcript is a true and accurate

record of the testimony given by the Witness, to the best of my

knowledge and belief.

I further certify that I am not related to any of the

parties hereto nor their counsel and that I am in no way

interested in the outcome of said cause.

Dated at Ashby, Massachusetts, this 26th day of March,

2001.

RONALD E. BLACKWELL
NOTARY PUBLIC

My Commission Expires:  December 24, 2004.

Diversified Reporting Services, Inc.
(202) 296-9626

PROOFREADER'S CERTIFICATE

/91

In the Matter of:     Resource F, LLC

Witness:     Michael Lorusso

File Number:     B-1678

Date:     March 23, 2001

Location:     Boston, MA

This is to certify that I, _Larry Baliles_ (the undersigned), do hereby swear and affirm that the attached proceedings before the U.S. Securities and Exchange Commission were held according to the record and that this is the original, complete, true and accurate transcript that has been compared to the reporting or recording accomplished at the hearing.


_Larry Baliles_                    _March 28, 2001_
(Proofreader's Name)                    (Date)

DIVERSIFIED REPORTING SERVICES, INC.
(202) 296-9626